1    MICHAEL N. FEUER (SBN 111529)
     CITY ATTORNEY
2    CITY OF LOS ANGELES
     200 N. Main Street, Room 800
3    Los Angeles, CA 90012
     Telephone: (213) 978-8100
4    Email: Mike.feuer@lacity.org

5    STEVE W. BERMAN (*pro hac vice* pending)
     HAGENS BERMAN SOBOL SHAPIRO LLP
6    1918 8th Avenue, Suite 3300
     Seattle, WA 98101
7    Telephone: (206) 623-7292
     Email: steve@hbsslaw.com
8
     ELAINE T. BYSZEWSKI (SBN 222304)
9    LEE M. GORDON (SBN 174168)
     HAGENS BERMAN SOBOL SHAPIRO LLP
10   301 North Lake Avenue, Suite 203
     Pasadena, CA 91101
11   Telephone: (213) 330-7150
     Email: elaine@hbsslaw.com
12   Email: lee@hbsslaw.com

13   [Additional Counsel Listed on Signature Page]

14   *Attorneys for Plaintiff the City of Los Angeles*

15              **UNITED STATES DISTRICT COURT**

16              **CENTRAL DISTRICT OF CALIFORNIA**

17

18   CITY OF LOS ANGELES, a municipal          No. **CV13-9046**NRP (AGRx)
     corporation,
19                                             COMPLAINT FOR VIOLATION
                              Plaintiff,       OF THE FEDERAL FAIR
20                                             HOUSING ACT
          v.
21                                             DEMAND FOR JURY TRIAL
     BANK OF AMERICA CORPORATION;
22   BANK OF AMERICA, N.A.;
     COUNTRYWIDE FINANCIAL
23   CORPORATION; COUNTRYWIDE
     HOME LOANS; and COUNTRYWIDE
24   BANK, FSB,

25                            Defendants.

26

27

28

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13 652420 V3

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ................................................................ 1

    A.    BoA Has Engaged in a Continuing Pattern of Discriminatory Mortgage Lending Practices in Los Angeles Resulting in Foreclosures ............................................................................... 1

II.    PARTIES ...................................................................................... 10

III.    REFERRALS FROM BANK REGULATORY AGENCIES ........................ 13

IV.    JURISDICTION AND VENUE ........................................................... 14

V.    FACTUAL BACKGROUND ............................................................... 14

VI.    BOA/COUNTRYWIDE ENGAGED IN DISCRIMINATORY  LENDING PRACTICES .................................................................................. 18

    A.    Specific Allegations Regarding BoA's Countrywide Subsidiary ............ 18

        1.    Mortgage loan channels and loan types ..................................... 18

        2.    Retail Lending Pricing ............................................................ 19

        3.    Wholesale Lending Mortgage Broker Fees ................................. 21

        4.    Wholesale Lending Product Placement ...................................... 25

    B.    BoA/Countrywide's Conduct Had a Disparate Impact on Minority Borrowers in Violation of the Fair Housing Act ..................... 26

        1.    Discriminatory lending results in a disproportionate number of foreclosures in minority areas ..................................... 26

        2.    Minority neighborhoods are disproportionate recipients of predatory loans ................................................................ 28

    C.    BoA/Countrywide Intentionally Discriminated Against Minority Borrowers in Violation of the Fair Housing Act Throughout the Time Period 2004-2011 as Demonstrated by Former Bank Employees .................................................................. 33

        1.    BoA/Countrywide targets minorities for predatory loan terms ................................................................................. 35

        2.    BoA/Countrywide gives its employees discretion to steer people into predatory loans (and pays its employees more for doing so) ....................................................................... 41

        3.    BoA/Countrywide underwrites adjustable rate loans that borrowers cannot afford ......................................................... 42

4.  BoA/Countrywide gives its employees discretion to include balloon payments. ...................................... 43

5.  BoA induced foreclosures by failing to offer refinancing or loan modifications to minority customers on fair terms, and otherwise limiting equal access to fair credit.............. 44

6.  BoA/Countrywide engages in other abusive lending practices. .......................................................... 46

D.  Minorities in Fact Receive Predatory Loan Terms from BoA/Countrywide ....................................................... 47

E.  Minorities in Los Angeles Receive Such Predatory Loan Terms from BoA/Countrywide Regardless of Creditworthiness ....................... 49

F.  BoA/Countrywide's Targeting of Minorities who in fact Receive Predatory Loan Terms Regardless of Creditworthiness Causes Foreclosures ......................................... 52

a.  Data shows that BoA/Countrywide's foreclosures are disproportionately located in minority neighborhoods in Los Angeles. .............................................. 52

b.  Data shows that BoA/Countrywide's loans to minorities result in especially quick foreclosures. ............. 55

c.  Data shows that the discriminatory loan terms cause the foreclosures. .......................................... 56

VII.  INJURY TO LOS ANGELES CAUSED BY BOA/COUNTRYWIDE'S DISCRIMINATORY LOAN PRACTICES. ................................. 58

A.  Los Angeles Has Been Injured by a Reduction in Property Tax Revenues from Foreclosures Caused by Discriminatory Loans Issued by BoA .......................................................... 59

1.  The decreased value of the properties foreclosed by BoA result in reduced property tax revenues. ...................... 59

2.  The decreased value of properties in the neighborhoods surrounding foreclosed properties results in reduced property tax revenues. ............................................. 60

B.  Los Angeles Is Injured Because It Still Must Provide Costly Municipal Services for Properties in Minority Neighborhoods that Have Become Vacant as a Direct Result of Discriminatory Loans Originated or Purchased by BoA .............................. 62

VIII.  SAMPLE FORECLOSURE PROPERTIES IN THE CITY OF LOS ANGELES ........................................................... 63

IX.  STATUTE OF LIMITATIONS AND CONTINUING VIOLATIONS DOCTRINE ......................................................... 64

- ii -

X.     CLAIMS FOR RELIEF ..................................................................... 64

FIRST CLAIM FOR RELIEF  (VIOLATION OF THE FEDERAL FAIR
        HOUSING ACT, 42 U.S.C. §§ 3601, *ET SEQ.*) ................................ 64

SECOND CLAIM FOR RELIEF  (COMMON LAW CLAIM FOR
        RESTITUTION BASED ON CALIFORNIA LAW) ........................... 67

DEMAND FOR JURY TRIAL ................................................................... 67

PRAYER FOR RELIEF ............................................................................. 67

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13  652420 V3

# I.   NATURE OF THE ACTION

1.      It is axiomatic that banks should not make discriminatory loans.  Banks must extend credit to minorities on equal terms as they do to other similarly situated borrowers.  Banks should not target minority neighborhoods for loans that discriminate nor make loans to minorities on terms that are worse than those offered to whites with similar credit characteristics.  When banks engage in such discriminatory conduct, the misconduct has profound financial consequences for the cities in which mortgaged properties exist, and banks should be responsible for those financial consequences.  Banks should reimburse such cities for lost tax revenues due to discriminatory lending.  And banks should pay the costs of repairing and maintaining properties that go into foreclosure due to discriminatory lending.  This lawsuit arises because BoA breached these legally- mandated obligations, and foreseeably injured the City of Los Angeles.

## A.   BoA Has Engaged in a Continuing Pattern of Discriminatory Mortgage Lending Practices in Los Angeles Resulting in Foreclosures

2.      This suit is brought pursuant to the Fair Housing Act of 1968 ("FHA"), as amended, 42 U.S.C. §§ 3601, *et seq.*, by the City of Los Angeles ("Los Angeles" or "City") to seek redress for injuries caused by Bank of America's[1] ("BoA/Countrywide," "BoA" or "the Bank") pattern or practice of illegal and discriminatory mortgage lending.  Specifically, Los Angeles seeks injunctive relief and damages for the injuries caused by foreclosures on BoA's loans in minority neighborhoods and to minority borrowers that are the result of the Bank's unlawful and discriminatory lending practices.  The unlawful conduct alleged herein consists of both intentional discrimination and disparate impact discrimination.

---

[1] Defendants collectively are referred to as "BoA," including:  Bank of America Corporation, Bank of America, N.A., Countrywide Financial Corporation, Countrywide Home Loans, and Countrywide Bank, FSB.  Plaintiff alleges that Defendants are also liable for residential home loans and lending operations acquired from, and/or sold by or through, Countrywide Bank, N.A., First Franklin Corporation, Grand Harbor Mortgage, John Laing Homes, Nexstar Financial Corporation, and Treasury Bank National Association.

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13  652420 V3

3.      BoA has engaged in a continuous pattern and practice of mortgage discrimination in Los Angeles since at least 2004 by imposing different terms or conditions on a discriminatory and legally prohibited basis.  In order to maximize profits at the expense of the City of Los Angeles and minority borrowers, BoA adapted its unlawful discrimination to changing market conditions. This unlawful pattern and practice conduct is continuing through the present and has not terminated. Therefore, the operative statute of limitations governing actions brought pursuant to the Federal Fair Housing Act has not commenced to run.

4.      The pattern and practice of lending discrimination engaged in by BoA consists of traditional redlining,[2] and reverse redlining,[3] both of which have been deemed to violate the FHA by federal courts throughout the country.  BoA engaged in redlining, and continues to engage in said conduct, by refusing to extend mortgage credit to minority borrowers in Los Angeles on equal terms as offered to non-minority borrowers.  BoA engaged in reverse redlining, and continues to engage in said conduct, by extending mortgage credit on predatory terms to minority borrowers in minority neighborhoods in Los Angeles on the basis of the race or ethnicity of its residents.  Federal Reserve Chairman Ben Bernanke recently acknowledged these twin evils of mortgage discrimination, and explained that both types of mortgage discrimination "continue to have particular significance to mortgage markets."[4]

5.      Major banks such as BoA have a long history of engaging in redlining throughout Los Angeles.  That practice began to change in the late 1990s, when BoA adapted to changing market conditions, and began to flood historically underserved

---

[2] Redlining is the practice of denying credit to particular neighborhoods based on race.

[3] Reverse redlining is the practice of flooding a minority community with exploitative loan products.

[4] Remarks by Federal Reserve Chairman Ben Bernanke at the Operation HOPE Global Financial Dignity Summit, Atlanta, Georgia at pg. 10 (November 15, 2012) *available at* www.federalreserve.gov/newsevents/speech/bernanke20121115a.htm.

- 2 -

minority communities with mortgage loans that consisted of a variety of high cost and abusive mortgage loan products with predatory terms when compared to the mortgage loans issued to white borrowers (reverse redlining).

6.      BoA's discriminatory lending practices have the purpose and effect of placing vulnerable, underserved borrowers in loans they cannot afford.  Reverse redlining maximizes BoA's profit without regard to the borrower's best interest, the borrower's ability to repay, or the financial health of underserved minority neighborhoods.  Moreover, BoA has averted any significant risk to itself by selling the vast majority of mortgage loans it originates or purchases on the secondary market (collectively "BoA Loans").

7.      Between 1996-2006, one category of discriminatory loan products – subprime loans – grew throughout the country from $97 billion to $640 billion.  These loans were frequently targeted to minorities.  Upon information and belief, the lack of accessible credit resulting from BoA's previous pattern and practice of redlining in the minority communities in Los Angeles created conditions whereby the Bank could easily target and exploit underserved minority communities which, due to traditional redlining, had been denied credit.

8.      Therefore, following several years of issuing abusive, subprime mortgage loans throughout the minority communities of Los Angeles, commencing in or around 2007, BoA once again adapted to changing market conditions, while continuing its pattern and practice of issuing a variety of discriminatory loan products.  Simultaneously, BoA also decided to curtail the issuance of mortgage credit to minority borrowers in Los Angeles.[5]  In other words, BoA not only refused to extend credit to minority borrowers when compared to white borrowers, but when the Bank did extend credit, it did so on predatory terms.  This combination of reverse

_____

[5] California Reinvestment Coalition, *From Foreclosure to Re-Redlining* (2010), at 4 (*available at* http://www.calreinvest.org/system/resources/.../Foreclosure_to_Re_Redliningcalreinvest.org/system/resources/.../Foreclosure_to_Re_Redlining.pdf).

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13  652420 V3

redlining and redlining represents a continuing and unbroken pattern and practice of mortgage lending discrimination in Los Angeles that still exists today.

9.      BoA's pattern and practice of *reverse redlining* has caused an excessive and disproportionately high number of foreclosures on the BoA Loans it has made in the minority neighborhoods of Los Angeles.  Foreclosures on loans originated by BoA are concentrated in these neighborhoods, even though the bulk of BoA's lending in Los Angeles is in white neighborhoods.  *A loan in a predominantly minority neighborhood is 4.184 times more likely to result in foreclosure than is a loan in a predominantly white neighborhood.*

10.      BoA's pattern and practice of *traditional redlining* has also caused an excessive and disproportionately high number of foreclosures in the minority neighborhoods of Los Angeles.  These foreclosures often occur when a minority borrower who previously received a predatory loan sought to refinance the loan, only to discover that BoA refused to extend credit at all, or on terms equal to those offered when refinancing loans issued to white borrowers.  The inevitable result of the combination of issuing a predatory loan, and then refusing to refinance the loan, was foreclosure.

11.      BoA would have had comparable foreclosure rates in minority and white communities if it had properly and uniformly applied responsible underwriting practices in both areas.  BoA possesses sophisticated underwriting technology and data that allows it to predict with precision the likelihood of delinquency, default, or foreclosure.  The fact that BoA's foreclosures are so disproportionately concentrated in minority neighborhoods is not the product of random events.  To the contrary, it reflects and is fully consistent with BoA's practice of targeting minority neighborhoods and customers for discriminatory practices and predatory pricing and products.  It also reflects and is consistent with BoA's practice of failing to underwrite minority borrowers' applications properly, and of putting these borrowers

- 4 -

into loans which:  (1) have more onerous terms than loans given to similarly situated white borrowers; and (2) the borrowers cannot afford, leading to foreclosures.

12.    The Bank's discriminatory lending practices, including targeting of minorities and the unbridled discretion and incentive arrangements that result in the disproportionate issuance of discriminatory loans to minorities, are evidenced by confidential witness statements provided by former employees of BoA (discussed further herein).  For example:

a)    Looking at BoA loans from 2010-12, an audit firm found many lending irregularities: "We were auditing their stuff to see if there was any fraud or misrepresentations of customers . . . We did find a lot of things."  The audit showed that a high rate of African-American and Hispanic borrowers "were taken advantage of" by BoA.

b)    Countrywide "gathered people who were the best" and "given the opportunity to do more loans," which turned out to be a license to "basically do anything with anybody's loans that you want and the supervisor would never say anything." Management "orchestrated the whole thing." The loans would be approved by using "creative finance;" if team members did not play along, "you could possibly [be] fired, let go, not given additional leads, things like that."

c)    "We were doing this huge push, where we were targeting lower-income areas", in the City of Los Angeles. "It was understood that this was the prime target, would be that particular demographic, and that particular demographic was unfortunately minorities who were struggling in their loans and who couldn't pay their mortgages."  Loan officers were under "an extreme amount of pressure" to make loan quotas, and there "was a lot going on that was not properly monitored."

d)    "They are going to take prime people and put people in subprime because they make more money".

e)    The Bank's management "would come back and say, 'you know this person is a minority.  You can go a little higher (on debt ratio).'"

f)    Regarding the lack of refinancing and loan modifications offered to minority borrowers: "Management would tell us, if the borrower doesn't qualify because they're not in foreclosure, because

- 5 -

they aren't delinquent in the system, tell them to call us back when they can't pay their mortgage anymore."

13.     The reports of these witnesses are confirmed when Los Angeles data on BoA loans is examined.  Such an examination reveals a widespread practice of discrimination.  For example, a regression analysis that controls for credit history and other factors demonstrates that an African-American BoA borrower was 1.522 times more likely to receive a predatory loan than was a white borrower, and a Latino borrower was 1.325 times more likely to receive such a loan.  The regression analysis confirms that African-Americans with FICO scores over 660 are 1.396 times more likely to receive a predatory BoA loan than is a white borrower, and a Latino borrower is 1.167 times more likely to receive such a loan.

14.     According to a Justice Department complaint, BoA's Countrywide subsidiary:  (i) had charged upwards of 200,000 minority homeowners higher interest rates and fees than white borrowers who were similarly qualified, with similar credit ratings; (ii) had failed to offer minority homeowners conventional mortgages for which they qualified and which they would have been offered, were they white; and (iii) systematically pushed minority borrowers into exploitative mortgages with higher rates and fees.  Many of the victims were in California.  To settle the complaint, Bank of America agreed to pay $335 million in restitution and penalties to the 200,000 identified minority victims – without compensation, restitution, or penalties to the City of Los Angeles.

15.     In or about June 2011, BoA settled charges with the Federal Trade Commission alleging that Countrywide had charged excessive fees to homeowners for property maintenance when they went into default, and added illegitimate charges to what the homeowners owed. To settle the FTC complaint, Bank of America paid $107 million to the FTC for distribution to homeowner victims (again without compensation to the City of Los Angeles).

- 6 -

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13  652420 V3

16.     The past several years have been highly profitable for BoA.  The following charts illustrate these results.

Net Income (millions)



Earnings per share



17.     The Bank's discriminatory practices and resulting foreclosures in the City's minority neighborhoods have inflicted significant, direct, and continuing financial harm to the City.

- 7 -

18.     One report[6] had estimated the impact that the City of Los Angeles has suffered is as follows:

- Overall, Los Angeles homeowners are estimated to have lost $78.8 billion in home values as a direct result of the 200,000 foreclosures for 2008-2012 alone.

- Property tax revenue losses are estimated to be $481 million in the wake of the foreclosure crisis.

- The typical foreclosure costs local governments more than $19,000 for increased costs of safety inspections, police, and fire calls, trash removal, and property maintenance.  In Los Angeles, these costs are estimated to be $1.2 billion.

- Los Angeles has 79,029 homeowners underwater, totaling $7.3 billion in loan value.  If banks wrote down those mortgages, it could pump $780 million into the local economy, and create 11,353 jobs.

19.     In this action the City seeks damages based on reduced property tax revenues based on:  (a) the decreased value of the vacant properties themselves; and (b) the decreased value of properties surrounding the vacant properties.  In addition, the City seeks damages based on the cost of municipal services that will be required to remedy the blight and unsafe and dangerous conditions which exist at vacant properties that were foreclosed as a result of BoA's illegal lending practices.

20.     Because of the multitude of analytic tools available to BoA to determine the likelihood that a particular mortgage loan would result in default by the borrower, as well as the existence of various studies, reports, and other pertinent literature specifically addressing the connection between mortgage loans and foreclosures, it was foreseeable that BoA knew, or should have known, that a predatory or high risk loan issued to an African-American or Hispanic in certain

---

[6] Alliance of Californians for Community Empowerment and the California Reinvestment Coalition, *The Wall Street Wrecking Ball:  What Foreclosures are Costing Los Angeles Neighborhoods* (September 2011).

- 8 -

neighborhoods in Los Angeles would result in default and subsequent foreclosure. Moreover, because BoA maintains numerous branch offices throughout Los Angeles, and has knowledge of the specific address for each loan it issued, it was foreseeable that BoA knew, or should have known, of the condition of foreclosed properties corresponding to loans that it issued in Los Angeles, regardless of whether it serviced the loan or subsequently sold the servicing rights to a third party.

21.     According to Federal Reserve Chairman Bernanke, "foreclosures can inflict economic damage beyond the personal suffering and dislocation that accompany them.  Foreclosed properties that sit vacant for months (or years) often deteriorate from neglect, adversely affecting not only the value of the individual property but the values of nearby homes as well.  Concentrations of foreclosures have been shown to do serious damage to neighborhoods and communities, reducing tax bases and leading to increased vandalism and crime.  Thus, the overall effect of the foreclosure wave, especially when concentrated in lower-income and minority areas, is broader than its effects on individual homeowners."[7]

22.     The discriminatory lending practices at issue here have resulted in what many leading commentators describe as the "greatest loss of wealth for people of color in modern US history."  It is well-established that poverty and unemployment rates for minorities exceed those of whites, and therefore, home equity represents a disproportionately high percentage of overall wealth for minorities.[8]  Indeed, between 2005-2009, the median wealth of Latino households decreased by 66 percent, and the median wealth of African-American households decreased by 53 percent, while the median wealth of white households decreased just 16 percent.[9]  As

---

[7] Bernanke, *supra* n.4 at p. 2.

[8] Robert Schwemm and Jeffrey Taren, *Discretionary Pricing, Mortgage Discrimination, and the Fair Housing Act*, 45 HARVARD CIVIL RIGHTS-CIVIL LIBERTIES LAW REV., 375, 382 (2010).

[9] Alliance of Californians for Community Empowerment, *California in Crisis: How Wells Fargo's Foreclosure Pipeline is Damaging Local Communities*, (2013) pg. 6 *available at* www.calorganize.org.

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13  652420 V3

Federal Reserve Chairman Bernanke recently explained, as a result of the housing crisis, "most or all of the hard-won gains in homeownership made by low-income and minority communities in the past 15 years or so have been reversed."[10]  The resulting impact of these practices represents "nothing short of the preeminent civil rights issue of our time, erasing, as it has, a generation of hard fought wealth accumulation among African Americans."[11]

## II.   PARTIES

23.     Plaintiff City of Los Angeles is a municipal corporation, organized pursuant to Article XI of the California Constitution.  The City is authorized by the City Council to institute suit to recover damages suffered by the City as described herein.

24.     Bank of America, N.A. is organized as a national banking association under the laws of the United States.  Upon information and belief, its corporate headquarters are located in Charlotte, North Carolina.  It maintains multiple offices in the State of California, including in the City of Los Angeles, for the purposes of soliciting applications for, and making, residential mortgage loans and engaging in other business activities.

25.     During the period of time relevant to the events at issue in this Complaint through July 1, 2008, Defendant Countrywide Financial Corporation ("CFC") was a Delaware-incorporated financial holding company or savings and loan holding company with its principal business office in Calabasas, California.  CFC created, authorized, and/or ratified the lending-related policies and practices at issue in this Complaint, which its divisions and subsidiaries implemented.

---

[10] Bernanke, *supra* n.2 at pg. 2.

[11] Charles Nier III and Maureen St. Cyr, *A Racial Financial Crisis: Rethinking the Theory of Reverse Redlining to Combat Predatory Lending Under the Fair Housing Act*, 83 TEMPLE LAW REV. 941, 942 (2011).

- 10 -

26.     On July 1, 2008, Defendant Bank of America Corporation ("BAC"), a Delaware-incorporated financial holding company, acquired ownership of CFC, including all of its subsidiary business entities.  Since that acquisition, CFC has remained a Delaware-incorporated company with its principal business office in Calabasas, California, as a direct, wholly-owned subsidiary of BAC.

27.     Defendant Countrywide Home Loans, Inc. ("CHL") is a New York-incorporated wholly-owned subsidiary of CFC, with its principal business office in Calabasas, California.  Prior to 2008, CHL funded the majority of CFC's nationwide residential mortgage loan origination activity.  For the loans it funded under the Countrywide name, CHL was the named lender on the promissory notes for those loans.  CHL became a wholly-owned indirect subsidiary of BAC on or about July 1, 2008, as a result of BAC's acquisition of CFC.

28.     Defendant Countrywide Bank, FSB ("CWB") was originally chartered as a national bank subject to supervision by the Office of the Comptroller of the Currency, and was a subsidiary of financial holding company CFC.  CWB was headquartered in Alexandria, Virginia, until February, 2009.  As a financial holding company, CFC, together with its subsidiary CHL, was supervised by the Board of Governors of the Federal Reserve System.  On or about March 12, 2007, CWB changed its charter to that of a federal savings association, and CFC became a savings and loan holding company.  Those changes caused CWB, CFC, and CHL to become subject to supervision by the Office of Thrift Supervision.

29.     During 2006, CFC began the process of transitioning the funding of its residential loan originations from CHL to CWB.  For those loans funded through CWB under the Countrywide name, CWB was the named lender on the promissory notes for those loans.  As of January 1, 2008, CWB funded substantially all nationwide residential loan origination activity using the Countrywide name.  For those loans funded by either CHL or CWB, CFC used the same loan origination

- 11 -

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13  652420 V3

policies and procedures that it had created, authorized, or ratified, and the same employees and mortgage brokers.  Throughout this Complaint, CFC, CWB, and CHL are referred to collectively as "Countrywide."

30.     Even after BAC's purchase of CFC on July 1, 2008, CWB continued its banking and mortgage lending operations as a direct subsidiary of CFC, using the same loan origination policies and procedures, until approximately November 7, 2008.  At that time, BAC engaged in a series of corporate transactions that ended CWB's status as a subsidiary of CFC and made CWB a direct subsidiary of BAC.

31.     On April 23, 2009, the Office of the Comptroller of the Currency approved CWB's request to convert its charter back to that of a national bank and the request by Bank of America, N.A. to then immediately acquire CWB by merger. These transactions were executed on April 27, 2009, as a result of which CWB ceased to exist.  Bank of America, N.A. was the surviving institution resulting from this merger.  Thus, Bank of America, N.A. is the successor in interest to CWB.

32.     The Defendants in this action are, or were at all relevant times, subject to Federal laws governing fair lending, including the FHA and the regulations promulgated thereunder.  The FHA prohibits financial institutions from discriminating on the basis of, inter alia, race, color, or national origin in their residential real estate-related lending transactions.

33.     The Defendants in this action are or were businesses that engage in residential real estate-related transactions in the City of Los Angeles within the meaning of the FHA, 42 U.S.C. § 3605.

34.     Based on information reported pursuant to the Home Mortgage Disclosure Act, in addition to loans that Defendants originated directly, Defendants are responsible for residential home loans acquired from, and/or sold by or through, Merrill Lynch Bank & Trust FSB, Merrill Lynch Credit Corp., and First Franklin Financial Corp.

- 12 -

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13  652420 V3

35.     Upon information and belief, Plaintiff alleges that each of the Defendants was and is an agent of the other Defendants.  Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting in the course and scope of its actual or apparent authority pursuant to such agencies, and/or the alleged acts or omissions of each Defendant as agent were subsequently ratified and adopted by each agent as principal.  Each Defendant, in acting or omitting to act as alleged in this Complaint, was acting through its agents, and is liable on the basis of the acts and omissions of its agents.

## III.     REFERRALS FROM BANK REGULATORY AGENCIES

36.     In 2006, Federal Reserve System Examiners initiated a fair lending review of CHL's mortgage pricing practices.  As a result of that review, the Federal Reserve Board ("FRB") determined that it had "reason to believe that Countrywide Home Loans engaged in a pattern or practice of discrimination based on race and ethnicity in violation of Section 701(a) of the Equal Credit Opportunity Act and the Fair Housing Act."

37.     Following its determination described in Paragraph 36, and pursuant to 15 U.S.C. § 1691e(g), the FRB referred the matter to the Department of Justice on March 5, 2007.  Countrywide agreed that various statutes of limitations for any cause of action that could be brought against Countrywide pursuant to the FRB referral would be tolled from March 22, 2007 through December 22, 2011.

38.     In early 2008, the Office of Thrift Supervision ("OTS") conducted an examination of the operations of Countrywide, including its compliance with applicable fair lending laws and regulations.  As a result of that examination, the OTS determined that it had "a 'reason to believe' that Countrywide has displayed a 'pattern or practice' of discriminating against minority loan applicants in the pricing of home loans and against married couples concerning the terms and condition of home loans."

- 13 -

39.     Following its determination described in Paragraph 38, and pursuant to 15 U.S.C. § 1691e(g), the OTS referred the matter to the Department of Justice on June 27, 2008. Countrywide agreed that various statutes of limitations for any cause of action that could be brought against Countrywide pursuant to the OTS referral would be tolled from July 1, 2009 through December 22, 2011.

40.     Based on the FRB and OTS referrals, the Department of Justice engaged in a lengthy investigation of Countrywide's lending policies, practices, and procedures, including reviewing millions of Countrywide loans originated between 2004 and 2008.  The investigation led to the Justice Department's complaint against Countrywide for discriminatory lending practices affecting upwards of 200,000 minority homeowners (saddling them with higher interest rates and fees than white borrowers who were similarly qualified, with similar credit ratings).

## IV.   JURISDICTION AND VENUE

41.     This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 3613 and 28 U.S.C. §§ 1331, 1343, because the claims alleged herein arise under the laws of the United States.

42.     Venue is proper in this district under 28 U.S.C. § 1391(b) because bank of America, N.A., BAC, and Countrywide all conduct business in this district, and a substantial part of the events and omissions giving rise to the claims occurred in this district.

## V.   FACTUAL BACKGROUND

43.     Prior to the emergence of subprime lending, most mortgage lenders made only "prime" loans.  Prime lending offered uniformly priced loans to borrowers with good credit, but individuals with lower credit were not eligible for prime loans.

44.     Subprime lending developed and began growing rapidly in the mid-1990s as a result of technological innovations in risk-based pricing and in response

- 14 -

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13  652420 V3

to the demand for credit by borrowers who were denied prime credit by traditional lenders.  Advances in automated underwriting allowed lenders to predict with improved accuracy the likelihood that a borrower with lower credit would successfully repay a loan.  These innovations gave lenders the ability to adjust the price of loans to match the different risks presented by borrowers whose credit records did not meet prime standards.  Lenders found that they could now accurately price loans to reflect the risks presented by a particular borrower.  When done responsibly, this made credit available much more broadly than had been the case with prime lending.

45.    Responsible subprime lending has opened the door to homeownership to many people, especially low- to moderate-income and minority consumers, who otherwise would have been denied mortgages.  At the same time, however, subprime lending has created opportunities for unscrupulous lenders to target minorities and engage in discriminatory, irresponsible lending practices that result in loans that borrowers cannot afford.  This, in turn, leads directly to defaults and foreclosures.

46.    Enticed by the prospect of profits resulting from exorbitant origination fees, points, and related pricing schemes, some irresponsible subprime lenders took advantage of a rapidly rising real estate market to convince borrowers to enter into discriminatory loans that had unfair terms that they could not afford.  Often this was accomplished with the help of deceptive practices and promises to refinance at a later date.  These abusive subprime lenders did not worry about the consequences of default or foreclosure to their business because, once made, a significant number of the loans were sold on the secondary market.

47.    As the subprime market grew, the opportunities for abusive practices grew with it.  As a consequence, the federal government has found that abusive and predatory practices "are concentrated in the subprime mortgage market."[12]  These

_____

[12] United States Department of Housing & Urban Development and United States Department of the Treasury, Curbing Predatory Home Mortgage Lending (2000) at 1

- 15 -

practices, which in recent years have become the target of prosecutors, legislators, and regulators, include the following:

a.    Placing borrowers in subprime loans even though they qualify for prime or conventional loans on better terms.

b.    Failing to prudently underwrite hybrid adjustable rate mortgages (ARMs), such as 2/28s and 3/27s.[13]   After the borrower pays a low "teaser rate" for the first two or three years, the interest rate on these loans resets to a much higher rate that can continue to rise based on market conditions.  Subprime lenders often underwrite these loans based only on considerations of whether the borrower can make payments during the initial teaser rate period, without regard to the sharply higher payments that will be required for the remainder of a loan's 30-year term. Irresponsible lenders aggressively market the low monthly payment that the borrower will pay during the teaser rate period, misleading borrowers into believing that they can afford that same low monthly payment for the entire 30-year term of the loan, or that they can refinance their loan before the teaser rate period expires.

c.    Failing to underwrite refinance loans prudently, where borrowers substitute unaffordable mortgage loans for existing mortgages that they are well-suited for, and that allow them to build equity.  Such refinanced loans strip much, or even all, of that equity, by charging substantial new fees, often hiding the fact that the high settlement costs of the new loan are also being financed.  Lenders that aggressively market the borrower's opportunity to pay off existing credit card and other debts by refinancing all of their debt into one mortgage loan mislead borrowers

---

(*available at* http://www.huduser.org/Publications/pdf/treasrpt.pdf) ("HUD/Treasury Report").

[13]  In a 2/28 ARM, the "2" represents the number of years the mortgage will be fixed over the term of the loan, while the "28" represents the number of years the interest rate paid on the mortgage will be variable.  Similarly, in a 3/27 ARM, the interest rate is fixed for three years, and variable for the remaining 27-year amortization.

- 16 -

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13  652420 V3

into believing that there is a benefit to debt consolidation, while obscuring the predictable fact that the borrower will not be able to repay the new loan.  The refinanced loans are themselves often refinanced repeatedly, with ever-increasing fees and higher interest rates, and with ever-decreasing equity, as borrowers seek to stave off foreclosure.

d.      Allowing mortgage brokers to charge "yield spread premiums" for qualifying a borrower for an interest rate that is higher than the rate the borrower qualifies for, and can actually afford.

e.      Failing to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, and work history.  These criteria ensure that a borrower is obtaining a loan that he or she has the resources and assets to repay; ignoring these criteria results in many loans that bear no relation to borrowers' ability to repay them.  This allows the lender to make a quick profit from the origination, but sets the borrower up for default and foreclosure.

f.      Requiring substantial prepayment penalties that prevent borrowers whose credit has improved from refinancing their subprime loan to a prime loan.  Prepayment penalties not only preclude borrowers from refinancing to a more affordable loan, but reduce the borrowers' equity when a subprime lender convinces them to refinance needlessly one subprime loan with another.

g.      Charging excessive points and fees that are not associated with any increased benefits for the borrower.

48.    The problem of predatory practices in subprime mortgage lending is particularly acute in minority communities because of "reverse redlining."  As used by Congress and the courts, the term "reverse redlining" refers to the practice of targeting residents in certain geographic areas for credit on unfair terms due to the racial or ethnic composition of the area.  This is in contrast to "redlining," which is

- 17 -

the practice of denying *prime* credit to specific geographic areas because of the racial or ethnic composition of the area.  Both practices have repeatedly been held to violate the federal Fair Housing Act.

49.     Following the onset of the subprime mortgage crisis, and after years of issuing abusive home loans in minority neighborhoods, the big bank lenders began to limit the issuance of mortgage credit to minority borrowers (*i.e.*, refusing to refinance predatory loans).  At the same time, when the big banks did extend credit, they continued to do so on predatory terms.

## VI.     BOA/COUNTRYWIDE ENGAGED IN DISCRIMINATORY LENDING PRACTICES

**A.     Specific Allegations Regarding BoA's Countrywide Subsidiary**

**1.     Mortgage loan channels and loan types.**

50.     Between January 2004 and December 2008, Countrywide originated residential loans nationwide through both a retail channel and a wholesale channel.

51.     Between 2004 and 2008, Countrywide's retail and wholesale divisions operated in virtually all geographical markets in the United States, including several hundred metropolitan areas ("MSAs"), including specifically the Los Angeles MSA.

52.     Between in at least January 2004 and August 2007, Countrywide originated virtually every type of loan product that was available in the residential lending market, several hundred products in all. Among others, these products included:  (a) traditional prime loans (least risky); (b) subprime loans (most risky), typically designed for borrowers with credit scores or other credit characteristics deemed too weak to qualify for prime loans; and (c) "Alt-A" loans (risk level between prime and subprime loans), with application requirements or payment terms less restrictive than traditional prime loan terms or requirements, such as interest-only or negative amortization terms, reduced documentation requirements, or balloon payments. Subsequent to origination, Countrywide sold or securitized for sale the

- 18 -

bulk of the loans it originated in the secondary market, either to government-sponsored entities Fannie Mae and Freddie Mac, or to private investors.

### 2. Retail Lending Pricing.

53.     Between 2004 and 2008, Countrywide charged more than 100,000 Hispanic and African-American borrowers higher fees and costs than non-Hispanic White retail borrowers, not based on their creditworthiness or other objective criteria related to borrower risk, but because of their race or national origin.  It was Countrywide's business practice to allow its employees who originated loans through its retail channel to vary a loan's interest rate and other fees from the price initially set, based on a borrower's objective credit-related factors.  As a result of Countrywide's discriminatory retail pricing practices, a Hispanic or African-American borrower paid, on average, hundreds of dollars more for a Countrywide loan.

54.     Countrywide's retail channel consisted of two primary divisions.  The larger, the Consumer Markets Division ("CMD"), originated Countrywide's non-subprime residential loan products.  Countrywide employed retail loan officers and other employees at each CMD branch and call center to solicit applications for, and originate residential loans to, individual loan applicants.

55.     Beginning prior to January 2004 and continuing through at least December 2008, Countrywide utilized a two-tier decision-making process to set the interest rates and other terms and conditions of the retail loans it originated.  The first step involved setting the credit risk-based terms on a daily basis for Countrywide's various home mortgage loan products, including interest rates, loan origination fees, and discount points.  In this step, Countrywide accounted for numerous objective credit-related characteristics of applicants by setting a variety of prices for each of the different loan products that reflected its assessment of individual applicant creditworthiness, as well as the current market rate of interest and the price it could obtain from the sale of such a loan to investors.  These prices, referred to as par or

- 19 -

base prices, were communicated through rate sheets, which were available electronically to its retail mortgage loan officers and other retail lending employees. Individual loan applicants did not have access to these rate sheets.

56.    As the second step in determining the final price it would charge an applicant for a loan, Countrywide allowed its retail mortgage loan officers, and other employees who participated in the loan origination process, to increase the loan price charged to borrowers over the rate sheet prices set by Countrywide, up to certain caps; this pricing increase was labeled an "overage."  Countrywide also allowed these same employees to decrease the loan price charged to borrowers below the stated rate sheet prices; this pricing decrease was labeled a "shortage."  Countrywide further allowed those employees to alter the standard fees it charged in connection with processing a loan application, and the standard allocation of closing costs between Countrywide and the borrower.  Employees made these pricing adjustments in a subjective manner, unrelated to factors associated with an individual applicant's credit risk.  Countrywide provided no written guidance to its retail loan officers or other employees about the criteria they should consider in adjusting risk-based prices during the time period at issue.  It did not establish an operational system for the documentation and supervisory review of their adjustments prior to loan origination.

57.    During the time period at issue, Countrywide loan officer compensation was affected by the loan officers' decisions with respect to pricing overages and shortages, as well as other factors, such as volume of loans originated.  Loan officers could obtain increased compensation for overages, and could have their total compensation potentially decreased for shortages.  Countrywide's compensation policy thus provided an incentive for its loan officers in making pricing adjustments to maximize overages and, when offering shortages, to minimize their amount.

58.    Countrywide regularly calculated a Net Pricing Exception ("NPE") for each retail loan it funded, subsequent to origination.  The NPE approximates the

- 20 -

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13  652420 V3

amount, positive or negative, by which the total cost of a loan to a borrower differs from the total cost of that loan had it closed at the rate sheet price, with the borrower paying standard fees, and with a standard allocation of closing costs between the borrower and Countrywide.  A positive NPE was an overage, and a negative NPE was a shortage.

59.    For each residential loan that Countrywide retail mortgage loan officers originated, information about each borrower's race and national origin and the amount of overage or shortage paid was available to, and was known by, Countrywide.

### 3.    Wholesale Lending Mortgage Broker Fees.

60.    Between 2004 and 2008, Countrywide charged more than 100,000 Hispanic and African-American wholesale borrowers higher fees and costs than non-Hispanic White wholesale borrowers, not based on their creditworthiness or other objective criteria related to borrower risk, but because of their race or national origin. It was Countrywide's business practice to allow its mortgage brokers who generated loan applications through its wholesale channel to vary a loan's interest rate and other fees from the price set based on a borrower's objective credit-related factors. As a result of Countrywide's discriminatory practices, a Hispanic or African-American borrower paid, on average, hundreds of dollars more for a Countrywide loan.

61.    Prior to January 2004, and continuing at least until December 2008, Countrywide originated and funded residential loans of all types, including both subprime and non-subprime loans, through its Wholesale Lending Division ("WLD").  Applications for these loans were brought to Countrywide during those years by mortgage brokers throughout the United States who had entered into contracts with Countrywide for the purpose of bringing loan applications to it for origination and funding.

- 21 -

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13 652420 V3

62.     Countrywide's relationship with the mortgage brokers who brought loans to it was governed throughout the time period at issue by its standard Wholesale Broker Agreement ("WBA").  The WBA, while revised from time to time, consistently contained extensive provisions:  (a) mandating that a broker act in compliance with all Countrywide policies; (b) requiring submission to Countrywide of the full details of all compensation a broker received for each Countrywide loan; (c) specifying that the decision whether to fund a loan application was Countrywide's alone; and (d) permitting Countrywide to obtain any information with respect to a broker's business operations.

63.     Countrywide was directly and extensively involved in setting the complete, final terms and conditions of wholesale loan applications generated by mortgage brokers that Countrywide approved and originated.  Countrywide employed wholesale account executives who worked with mortgage brokers in submitting loan applications to Countrywide, and it employed underwriters to determine whether and on what terms to approve and fund wholesale loan applications.  At the time of originating each loan, Countrywide was fully informed of those terms and conditions, including the fees it passed along to brokers, and it incorporated those terms and conditions into the wholesale loans it originated.

64.     Prior to January 2004 and until December 2008, Countrywide set terms and conditions, including interest rates, on a daily basis for its various home mortgage loan products available through its wholesale loan channel.  Countrywide accounted for numerous applicant credit risk characteristics by setting a range of prices for each of the different loan products it offered that reflected applicant creditworthiness.  It communicated these loan product prices to its brokers through rate sheets updated daily.  Individual loan applicants did not have access to these rate sheets.

- 22 -

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13  652420 V3

65.     Under its WBA, Countrywide authorized brokers to inform prospective borrowers of the terms and conditions under which a Countrywide residential loan product was available.  Countrywide did not require the mortgage brokers to inform a prospective borrower of all available loan products for which he or she qualified, of the lowest interest rates and fees for a specific loan product, or of specific loan products best designed to serve the interests expressed by the applicant.

66.     Between 2004 and 2008, Countrywide operated between 39 and 52 WLD branch offices and several regional centers, and employed wholesale account executives to work with mortgage brokers in originating loans, which included assisting the brokers in setting the terms and conditions of loan applications and approvals.

67.     Mortgage brokers who supplied Countrywide with loan applications that Countrywide funded were compensated in two ways.  One was through a yield spread premium ("YSP"), an amount paid by Countrywide to the brokers based on the extent to which the interest rate charged on a loan exceeded the base, or par, rate for that loan to a borrower with particular credit risk characteristics fixed by Countrywide and listed on its rate sheets.  The YSP is derived from the present dollar value of the difference between the credit risk-determined par interest rate a wholesale lender such as Countrywide would have accepted on a particular loan, and the interest rate a mortgage broker actually obtained for Countrywide.  Countrywide benefitted financially from the loans it made at interest rates above the par rates set by its rate sheets.  For those loans that it sold or securitized, higher interest rates meant sales at prices higher than it otherwise would have obtained; for loans it retained, higher interest rates meant more interest income over time for it.  The second way brokers were compensated was through direct fees.  Countrywide directed its closing agents to pay these direct fees to brokers out of borrowers' funds

- 23 -

at the loan closing.  Taken together, these two forms of compensation are referred to in this Complaint as "total broker fees."

68.    During the time period at issue, Countrywide was fully informed of all broker fees to be charged with respect to each individual residential loan application presented to it.  Countrywide included fees from the broker's application package in the calculations it made to prepare various closing documents, including the HUD-I Form, an itemized statement of receipts and expenditures in connection with a residential loan closing, and the Truth in Lending Act Disclosure Statement. Countrywide also included these fees in its instructions on how to distribute funds at closing.  Total broker fees raised the annual percentage rate ("APR") charged on a loan, and could increase the note interest rate and the total amount borrowed.

69.    Between at least January 2004 and December 2008, Countrywide's policies and practices established a two-step process for the pricing of wholesale loans that it originated, similar to that used in its retail division.  The first step was to establish a base or par rate for a particular type of loan for an applicant with specified credit risk characteristics.

70.    Countrywide's second step of pricing wholesale loans permitted mortgage brokers to set the amount of total broker fees charged to individual borrowers, unrelated to an applicant's credit risk characteristics.

71.    Total broker fees for an average subprime loan were notably higher than total broker fees on a similarly-sized non-subprime loan.  Other than certain broker fee caps, Countrywide did not establish any objective criteria, or provide guidelines, instructions, or procedures to be followed by brokers:  (a) in setting the amount of direct fees they should charge; or (b) in determining to charge an interest rate for a loan above that set by its rate sheet, which in turn determined the amount of YSP Countrywide would pay the broker.  Mortgage brokers exercised this fee pricing discretion Countrywide gave them, untethered to any objective credit characteristics,

- 24 -

on every loan they brought to Countrywide for origination and funding. Countrywide affirmed or ratified these discretionary fee pricing decisions for all the brokered loans it originated and funded.  Each year during this time period when Countrywide had in place higher fee caps for subprime than prime loans, Countrywide's mortgage brokers charged higher average total fees for subprime loan applications than for non-subprime loan applications, measured on a nationwide basis.

72.    Countrywide's compensation policy and practice created a financial incentive for mortgage brokers to submit subprime loans to Countrywide for origination rather than other types of residential loan products.

73.    For each residential loan application obtained by mortgage brokers and subsequently funded by Countrywide, information about each borrower's race and national origin and the amount and types of broker fees paid was available to, and was known by, Countrywide.

**4.    Wholesale Lending Product Placement.**

74.    Between 2004 and 2007, Countrywide placed more than 10,000 Hispanic and African-American wholesale borrowers into subprime loans even though non-Hispanic White wholesale borrowers who had similar credit qualifications were placed into prime loans.  As a result of being placed into an illegal discriminatory loan, a Hispanic or African-American borrower paid, on average, thousands of dollars more for a Countrywide loan.  It was Countrywide's business practice to allow its mortgage brokers and employees to place a wholesale loan applicant in a subprime loan even when the applicant qualified for a prime loan according to Countrywide's underwriting practices.

75.    Countrywide also gave mortgage brokers discretion to request exceptions to underwriting guidelines, and Countrywide's employees had discretion to grant these exceptions.  These policies and practices resulted in the placement of

- 25 -

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13  652420 V3

Hispanic and African-American borrowers into discriminatory loans (based on criteria other than strict adherence to its published underwriting guidelines), when similarly-situated non-Hispanic White borrowers were placed into prime loans.  This occurred both on a nationwide basis, and in dozens of geographic markets across the country (including Los Angeles), where Countrywide originated a large volume of wholesale loans.  Between at least January 2004 and August 2007, Countrywide attempted to implement a system that would "flag" subprime loan applicants eligible to be "uplifted" to a non-subprime loan product.  This system flagged thousands of Hispanic and African-American loans.  However, this pre-origination "uplift" system only required that notification of potential uplift eligibility be given to brokers, and neither required the brokers to inform applicants of this fact, nor obligated the brokers to take any other specific action with respect to identified applicants.  Moreover, this "uplift" system did not accurately correspond to Countrywide's actual underwriting practices for non-subprime loan products, which treated published underwriting guidelines as merely advisory, and widely granted exceptions.  As a result, the system both failed to identify a large proportion of applicants who received a subprime loan whose qualifications were similar to those of applicants who received non-subprime loan products, and resulted in few "flagged" applicants receiving a non-subprime loan.

**B.    BoA/Countrywide's Conduct Had a Disparate Impact on Minority Borrowers in Violation of the Fair Housing Act**

**1.    Discriminatory lending results in a disproportionate number of foreclosures in minority areas.**

76.    Foreclosures are on the rise in many of the nation's most vulnerable neighborhoods, particularly those with substantial concentrations of minority households.  The increase appears to stem from the presence of:  (1) subprime lending in these communities; and (2) continuing discriminatory lending practices

1    (*e.g.*, steering minorities into loan products with more onerous terms – which happen

2    to be more profitable for BoA/Countrywide).

3        77.    A seminal report on foreclosure activity by Mark Duda and William

4    Apgar documents the negative impact that rising foreclosures have on low-income

5    and low-wealth minority communities, using Chicago as a case study.  Mr. Apgar is

6    a Senior Scholar at the Joint Center for Housing Studies of Harvard University, and a

7    Lecturer on Public Policy at Harvard's John F. Kennedy School of Government.  He

8    previously served as the Assistant Secretary for Housing/Federal Housing

9    Commissioner at the U.S. Department of Housing and Urban Development, and also

10    Chaired the Federal Housing Finance Board.  Mr. Apgar holds a Ph.D. in Economics

11    from Harvard University.  Mr. Duda is a Research Fellow at the Joint Center for

12    Housing Studies.  The Apgar-Duda report has continually been cited by subsequent

13    governmental, public sector, and private sector reports due to its clarity and

14    thoroughness with respect to the negative impact foreclosures have on lower-income

15    and minority neighborhoods.[14]

16        78.    This significant report highlights the foreseeability of foreclosures

17    arising from predatory lending practices and their attendant harm, demonstrating that

18    such foreclosures impose significant and predictable costs on borrowers, municipal

19    governments, and neighboring homeowners.

20        79.    Another report, by the Center for Responsible Lending, uses a national

21    dataset to show that the foreclosure rate for low- and moderate-income African-

22    Americans is approximately 1.8 times higher than it is for low- and moderate-income

23    non-Hispanic whites.  The gap is smaller for Latinos, especially among low-income

24    households, but even among low-income Latinos the foreclosure rate is 1.2 times

25    that of low-income whites.  Racial and ethnic disparities in foreclosure rates cannot

---

26    [14] *See* W. Apgar, M. Duda & R. Gorey, *The Municipal Costs of Foreclosures:  A*

27    *Chicago Case Study* (2005) (*available at*
http://www.nw.org/network/neighborworksProgs/foreclosuresolutions/documents/200

28    5Apgar-DudaStudy- FullVersion.pdf).

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13 652420 V3

be explained by income, since disparities persist even among higher-income groups. For example: approximately 10 percent of higher-income African-American borrowers, and 15 percent of higher-income Latino borrowers, have lost their homes to foreclosure, compared with 4.6 percent of higher income non-Hispanic white borrowers. Overall, low- and moderate-income African-Americans, and middle- and higher-income Latinos, have experienced the highest foreclosure rates.[15]

80.    Nearly 20 percent of loans in high-minority neighborhoods have been foreclosed upon or are seriously delinquent, with significant implications for the long-term economic viability of these communities.[16]

### 2.    Minority neighborhoods are disproportionate recipients of predatory loans.

81.    There is a substantial body of empirical evidence demonstrating the prevalence of reverse redlining in the subprime mortgage market. These studies show that, even after controlling for creditworthiness and other legitimate underwriting factors, subprime loans and the predatory practices often associated with subprime lending are disproportionately targeted at minority neighborhoods.[17]

---

[15] Center for Responsible Lending, *Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures* (2011) (*available at* www.responsiblelending.org/-mortgage-lending/research-analysis/*Lost-Ground-2011*.pdf).

[16] *Id.*

[17] *See* Abt Associates, *Using Credit Scores to Analyze High-Cost Lending in Central City Neighborhoods* (2008); Center for Responsible Lending, *Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures* (2011) (*available at* www.responsiblelending.org/mortgage-lending/research-analysis/*Lost-Ground--2011*.pdf); Center for Responsible Lending, *Unfair Lending: The Effect of Race and Ethnicity on the Price of Subprime Mortgages* (2006) (*available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/rr011-Unfair_Lending-0506.pdf); Finance and Economics Discussion Series Divisions of Research & Statistics and Monetary Affairs Federal Reserve Board, Washington, D.C, *Subprime Mortgages: What, Where, and to Whom?* (2008) (*available at* http://www.nber.org/papers/w14083.pdf?new_window=1 ); C. Reid and E. Laderman, Federal Reserve Bank of San Francisco, *The Untold Costs of Subprime Lending: Examining the Links among Higher-Priced Lending, Foreclosures and Race in California*, Presented at Brandeis University (2009) (*available at* http://iasp.brandeis.edu/pdfs/Author/reid-carolin/The%20Untold%20Costs%20of%20Subprime%20Lending%203.pdf).

- 28 -

82.     In general, as recently observed by the Federal Reserve in December 2012, both African-American and Hispanic borrowers were far more likely (in fact, nearly twice more likely) to obtain higher-priced loans than were white borrowers. These relationships hold both for home-purchase and refinance lending, and for non-conventional loans.  These differences are reduced, but not eliminated, after controlling for lender and borrower characteristics.  "Over the years, analyses of HMDA data have consistently found substantial differences in the incidence of higher-priced lending and in application denial rates across racial and ethnic lines, differences that cannot be fully explained by factors included in the HMDA data."[18]

83.     African-Americans and Hispanics were much more likely to receive subprime loans and loans with features that are associated with higher foreclosures, specifically prepayment penalties and hybrid or option ARMs.  These disparities were evident even comparing borrowers within the same credit score ranges.  In fact, the disparities were especially pronounced for borrowers with higher credit scores. For example, among borrowers with a FICO score of over 660 (indicating good credit), African-Americans and Latinos received a high interest rate loan more than three times as often as white borrowers.[19]

84.     In addition to receiving a higher proportion of higher-rate loans, African-Americans and Latinos also were much more likely to receive loans with other risky features, such as hybrid and option ARMs and prepayment penalties. Disparities in the incidence of these features are evident across all segments of the credit spectrum.[20]

---

[18] Federal Reserve Bulletin, *The Mortgage Market in 2011: Highlights from the Data Reported under the Home Mortgage Disclosure Act* (Dec. 2012) (*available at* http://www.federalreserve.gov/pubs/bulletin/2012/PDF/2011_HMDA.pdf).

[19] Center for Responsible Lending, *Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures* (2011) (*available at* www.responsiblelending.org/-mortgage-lending/research-analysis/*Lost-Ground-2011*.pdf).

[20] *Id.*

- 29 -

85.     A 2010 Report from the California Reinvestment Coalition finds: "[The] hardest-hit communities are racially concentrated, low to moderate income areas of African-Americans and Latinos that were saturated with high-cost, subprime lending since 2000.  Neighborhoods once redlined – where lenders refused to lend in neighborhoods of color without regard to the actual financial qualifications of residents – were flooded in the past decade with high-cost subprime loans and abusive option ARM loans.  These loans were often unaffordable and unsustainable for working class families, and inevitably led to large scale foreclosures.  In the past two years, borrowers and communities struggling to preserve their primary asset – their home – have found that banks are not willing to work with them to restructure their mortgages or to offer new loans."[21]  Key findings from the 2010 Report include:

(a)     In 2008, minority neighborhoods contained roughly 63% of the housing in Los Angeles, but suffered over 90% of the City's foreclosures.

(b)     While predatory and fraudulent lending helped precipitate the foreclosure crisis, a wave of a resetting option ARM loans threatens to keep California immobilized by foreclosure beyond 2010.

(c)     California cities are more likely than the national average to be saturated with low documentation loans (*e.g.*, stated income loans).  In Los Angeles, 74% of all loans in the sample were made with limited documentation, as compared to only 56% for all loans in the sample.

(d)     Minority neighborhoods saw a dramatic decrease in lower cost prime loans in 2008.  The drop off from 2006 to 2008 was stunning.  In Los Angeles, less than 1/3[rd] as many prime loans were made available by big bank lenders in minority neighborhoods in 2008, as compared to 2006.

(e)     In 2008, nearly one out of two African-Americans and Latinos seeking a home loan or refinance were

_____

[21] California Reinvestment Coalition, *From Foreclosure to Re-Redlining,* at 1 (2010) (*available at* http://www.calreinvest.org/system/resources/.../Foreclosure_to_Re_Redlining.pdf).

- 30 -

denied, as compared to only about one in four whites.

(f)    Even though high-cost lending began to decrease significantly by 2008, when it occurred, it was still more likely to occur in minority neighborhoods as compared to white neighborhoods. The big bank lenders still were more than twice more likely to sell subprime loans in minority neighborhoods in Los Angeles, as compared to white neighborhoods.

(g)    In many cases, minority borrowers were overburdened not only by subprime lending but by other onerous loan terms, such as prepayment penalties, yield spread premiums, option ARMs, and HELOCs, all of which have been conducive to foreclosures.

(h)    In a March 2009 survey, two-thirds of housing counselors reported that they believed borrowers of color were receiving worse foreclosure prevention outcomes than white borrowers.

(i)    In the wake of the subprime meltdown, as underwriting tightened for all loans, higher cost FHA mortgage loans were the "only game in town" left for many new homebuyers.

86.    Since 2008, as the data discussed below makes clear, there has been a shift in the types of loans issued – and not issued – by the Bank. For example, the Bank shifted from offering new subprime loans toward issuing more Home Equity Lines of Credit ("HELOCs") and higher cost FHA/VA loans.[22] FHA and VA government loans are characterized as higher risk loans because: (1) they are typically more expensive for a borrower than conventional loans and include fees and costs not associated with conventional loans; and (2) several of the government loan programs permit negative amortization.[23] At the same time, in the last several years, the Bank tightened lending requirements in a manner that drastically limited

---

[22] While FHA/VA loans are not inherently predatory, these loans have higher risk features such as higher fees and higher interest rates. When banks target minorities for FHA/VA loans and issue more of them to minorities, they are acting in a discriminatory manner.

[23] California Reinvestment Coalition, *et al.*, *Paying More for the American Dream VI, Racial Disparities in FHA/VA Lending,* (July 2012); www.fha.com/fha_loan_types; www.benefits.va.gov/homeloans.

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13  652420 V3

the ability of minority borrowers to refinance or otherwise modify the subprime loans previously issued by the Bank.

87.   A 2011 Report from the California Reinvestment Coalition found that between 2008 and 2009, in Los Angeles, the number of conventional refinance loans made in predominantly white neighborhoods more than doubled (increasing by about 200%), while conventional refinance loans declined in the City's minority neighborhoods where such refinancing was most desperately needed.[24]

88.   At the same time that conventional credit has contracted, FHA lending has expanded dramatically.  During the subprime boom, FHA lending fell as subprime lenders targeted minority communities.  Now, with little or no subprime lending, and conventional credit restricted, FHA lending has shot up.  Overall, the share of loans with government backing went from 5% in 2005 to 26.6% in 2010.[25]

89.   For African-Americans, the share of mortgages used to purchase a home and backed by a government program increased to almost 80% in 2010; for Latinos the share increased to 73%.  But for whites, the share increased to only 49%.  At present, most minority borrowers cannot gain access to the conventional mortgage market and instead, are relegated to more expensive FHA loans.[26]

90.   A 2012 Report from the California Reinvestment Coalition "shows that black and Latino borrowers and borrowers in communities of color received government-backed loans – insured by the Federal Housing Administration (FHA) or guaranteed by the Department of Veterans Affairs (VA) – significantly more often than did white borrowers.  The findings indicate persistent mortgage redlining and

---

[24] California Reinvestment Coalition, *et al.*, *Paying More for the American Dream V:  The Persistence and Evolution of the Dual Market* (2011) (*available at* http://www.community-wealth.org/sites/clone.community-wealth.org/files/downloads/report-crc-et-al.pdf).

[25] Center for Responsible Lending, *The State of Lending in America & its Impact on U.S. Households,* at 44 (2012) (*available at* http://www.responsiblelending.org/state-of-lending/State-of-Lending-report-1.pdf).

[26] *Id*. at 45.

- 32 -

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13  652420 V3

raise serious concerns about illegal and discriminatory loan steering…. [T]he report shows a pattern of two-tiered lending, in which borrowers and communities of color received disproportionately fewer conventional mortgages and disproportionately more government-backed loans than did white borrowers and communities…. [T]he disproportionate prevalence of FHA loans in communities of color raises fair lending flags." In particular, the 2012 Report observes that: "In Los Angeles, homebuyers in neighborhoods of color received government-backed loans five times more often than did those in predominantly white neighborhoods…. [H]omeowners in communities of color received FHA or VA refinance loans 6.5 times more often than did homeowners in predominantly white neighborhoods."[27]

**C.     BoA/Countrywide Intentionally Discriminated Against Minority Borrowers in Violation of the Fair Housing Act Throughout the Time Period 2004-2011 as Demonstrated by Former Bank Employees**

91.     Confidential Witnesses ("CWs") are former BoA/Countrywide employees responsible for making and/or underwriting loans on behalf of the Bank in the greater Los Angeles region. CWs describe how the Bank has targeted minorities and residents of minority neighborhoods in and around Los Angeles for predatory lending practices.

92.     CW1 worked on a project in 2012-2013 for the U.S. Office of the Comptroller of the Currency ("OCC"), which was conducted by a business advisory and staffing firm, in order to audit BoA loans for fraud and evidence of financial harm to borrowers. She worked on location at BoA's office in Pasadena. The OCC was looking at loans from 2010, 2011, and a portion of 2012. She said that the OCC found, through the audits, many lending irregularities and evidence of harm to borrowers. "We did find a lot of things."

---

[27] California Reinvestment Coalition, *Paying More for the American Dream VI: Racial Disparities in FHA/VA Lending* (2012) (*available at* http://calreinvest.org/system/resources/W1siZiIsIjIwMTIvMDcvMTgvMTZfMzVfM jNfMV9wYXlpbmdtb3JlVklfbXVsdGlzdGF0ZV9qdWx5MjAxMl9GSU5BTC5wZ GYiXV0/payingmoreVI_multistate_july2012-%20FINAL.pdf).

- 33 -

93.    CW2 joined Bank of America in 2010 as a loan officer. Typical customers whom CW2 dealt with during her time at the bank were minority borrowers who were struggling under mortgages they could not afford.  They "really had difficulties" paying, and were seeking loan modifications or anything" the Bank could do to help them.

94.    CW3 was a loan officer for Countrywide in 2005. CW3 observed management encouraging loan officers to close loans for people who were not qualified, including many minorities in the LA area. CW3 also observed fellow loan officers pushing predatory loans on customers, a practice which hit minorities particularly hard.

95.    CW4 was a loan officer for Countrywide and Bank of America through the end of 2008. CW4 witnessed BoA pressuring salespeople to reach out to depressed minority neighborhoods in the City of Los Angeles and pushing loan refinancing and other loan products on minority applicants. She recalls targeting minority groups with subprime loans, and according to CW4, BoA did not do enough policing of its lending practices.

96.    CW5 worked as a senior underwriter at BoA from 2010 to 2011. According to CW5, by 2010, BoA had changed the rules on low-income borrowers, most of whom no longer qualified to refinance out of bad loans they previously obtainedfrom BoA.  In CW5's experience, a dramatically smaller ratio of minorities was being approved for loans processed by BoA in 2010-2011, as compared to earlier years. Approvals of loan applications that crossed his desk were mostly for white borrowers.

97.    CW6 worked for BoA as a first mortgage loan specialist/collector in 2009-11, and later as a contract mortgage claim file examiner III/independent foreclosure reviewer in 2012-2013. She worked with delinquent customers nationwide with BoA mortgages. Among the various options she discussed with

- 34 -

customers were loan modifications, special forbearance, allowing the home to go into foreclosure, and a "cash for keys" option, in which buyers could collect payments for walking away from a home in good condition.

98.     CW7 worked as an underwriter for Countrywide from 2002 to 2007. CW7 observed that Countrywide's payment and commission system incentivized loan officers to steer borrowers into predatory loans, and that salespeople included false information in loan applications made to unqualified applicants.

99.     CW8 worked at Countrywide from 2000 to 2011 as an underwriter in several different Los Angles branches, and as a member of the Company's Quality Control Department from 2008 to 2009. He underwrote "A paper" loans, also known as prime loans, and "A-minus" loans that were sold with teaser rates, balloon payments, and/or payment option plans, as well as HELOCs.

100.    CW9 worked as an underwriter for Countrywide.  CW9 underwrote loans that included adjustable rates, balloon payments, no document, and stated income loans.  In his experience, mortgage brokers for Countrywide pushed underwriters to approve predatory loans for minority applicants, and management encouraged underwriters to ignore proper underwriting criteria.

**1.      BoA/Countrywide targets minorities for predatory loan terms.**

101.    CW3 will testify that:

- Countrywide had what it called an "elite team" of loan salespeople working at the Van Nuys office who were encouraged by management to do or say anything to close as many loans as possible.

- Countrywide's salespeople, management and underwriters on this "elite team" approved loans for people who were not qualified, including many minorities in the LA area.

- 35 -

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13 652420 V3

- Countrywide salespeople, management and underwriters on this "elite team" were aware of false information submitted on loan applications, but ignored it, encouraged it and/ or sometimes inserted it themselves so that the loans would be approved.

- Countrywide's loan salespeople on this "elite team" aggressively enticed and in some cases coerced current Countrywide customers to refinance into bigger loans with often higher rates, even when the financials of the new loan were not beneficial to the borrower.  This was known and encouraged by Countrywide management.

- Countrywide's salespeople on this "elite team" added points to loans, pushed customers to borrow more than they needed and set higher rates than necessary whenever possible.

- Countrywide loan salespeople targeted people who lacked education and an understanding of mortgages and loans, a practice that hit minorities particularly hard.

102.   CW4 will testify that:

- Bank of America had "this huge push" in 2008 for loan officers to reach out to "very depressed neighborhoods" in the City of Los Angeles where people were struggling to pay their mortgages.  The witness recalled setting up kiosks on weekends with

- 36 -

her manager at black churches around Los Angeles
to reach out to people who were having trouble with
loans, and offer various services, such as refinancing
and modifications.

- She and some of her black coworkers were upset that
they were being asked to market to minority
communities, in part because the odds that they
could offer real help to distressed minority
homeowners were low, because many would not
qualify. "We were angry," she said.

- She said she felt under "an extreme amount of
pressure" during her employment to make her loan
quotas, which leaves her bitter to this day.  She also
felt BoA did not do "enough policing" of its loans,
and there "was a lot going on that was not properly
monitored."

103.    BoA/Countrywide also targeted minority churches and their
congregations for subprime loans.  During her time at Bank of America in 2007 and
2008, CW4 recalled giving up a lot of her Saturdays to go with her manager to set up
kiosks at certain churches.  "They were all in very depressed neighborhoods," CW4
stated.  "We were doing this huge push, where we were targeting lower-income
areas, and we actually were having seminars and expos, where we'd actually go to
various churches."  She recalled that the names of some of the churches were West
Angeles, Faithful Central, and City of Refuge.  She said all were in Los Angeles and
were "predominantly African-American."

104.    CW4 recalls that BoA would find people "who were in trouble and
having problems with their mortgage, have them come in, and I remember

- 37 -

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13  652420 V3

refinancing at least a couple of people." BoA even pushed minority employees to target churches on the basis of race.  For example, BoA asked her and some of her black coworkers to market to minority communities, which she said she could recall "because I had a black coworker who used to say, 'I don't like that they're always trying to push us as black people into neighborhoods to deal with low-income blacks.'"

105.   CW4 explained:  "We were targeting people with subprime loans who were struggling and the likelihood of us being able to sell them property of if they were in a property and had to refinance, the likelihood was very low" that such refinancing would occur.  It was understood what was going on, "she said of the marketing program to African-American and Hispanic areas.  "I had a couple coworkers.  It was understood what was going on.  We were angry."

106.   CW4 said:  "It was understood that this was the prime target, would be that particular demographic, and that particular demographic was unfortunately minorities who were struggling in their loans and who couldn't pay their mortgages." "That's when we started to go into the most depressed areas, the inner city of LA."

107.   CW4 also said that she "hated" adjustable-rate loans because she "knew what it meant" but said that they were definitely offered to some customers of BoA/Countrywide.  "It was discretionary."  "While I may not have agreed with some of the loan officers' choices, it was up to their discretion, whatever it is that their client agreed to do."

108.   The loans that CW1 reviewed for the OCC project mostly involved low-income borrowers across the U.S., including many in the City of Los Angeles.  "We were looking for specific things, fees charged to see if any harm was done to the borrower" financially, she said.  She explained that among the loans she audited were those with teaser rates that ballooned after an initial period, stated income loans, and no doc loans with incomes exaggerated by BoA loan officers.  She saw a

- 38 -

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13 652420 V3

lot of African-Americans and other minorities from the City of Los Angeles and around the country who were harmed by BoA's loan practices and processes, many of whom had already lost their homes to foreclosure.

109.    CW6 said that minority borrowers appeared to be lacking even an "elementary-level" understanding of the mortgages into which they had been placed. "When the loan would go into default, we had to explain to them what that meant and what the next steps were," she said.  "It was kind of like explaining them to someone that didn't have a mortgage.  But they did have a mortgage."

110.    CW8 said that he and other underwriters were under intense pressure to process loan application files, and if they did not meet their quotas they could be written up or eventually fired. Due to the pressure to approve loans at Countrywide from 2000 to 2011, questionable applications were rushed through the approval process. In addition to the quota pressure, underwriters sometimes faced pressure from loan officers and management not to reject loans, even if they failed to meet the loans' criteria.

111.    CW8 also said that underwriters were advised to discard documents that would kill the loan, such as evidence that stated income had been manipulated. When he rejected a loan application, he would see the same file return as a new application with different documentation.  He said management sometimes approved loans that did not meet underwriting criteria.

112.    When CW8 was transferred to the quality control department, he began to audit loan applications that had ended up in foreclosure.  He said that at least 50 percent of those loans should not have been approved, because they violated the Company's underwriting rules.  He found multiple incidents of applications with fraudulent, incomplete, and questionable information and documentation.

113.    CW9 worked as a senior underwriter in Countrywide's wholesale lending department in Southern California between 2002 and 2007.  He underwrote

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13  652420 V3

1    loans that included adjustable rates, balloon payments, no document, and stated

2    income loans.  All of the no documentation, stated income loans had higher interest

3    rates than documented, prime loans.

4         114.   In CW9's experience, Countrywide tailored some of its mortgage

5    products to entice minorities into teaser rate loans that they were not qualified for

6    after the payments increased.  These loans included negative amortization loans,

7    which offered extremely low starting interest rates (like 1.25%) and balloon

8    payments.  After 6 months to a year, the rates would skyrocket 4 or 5 times over

9    (*e.g.*, 5%-6% or more).  Plus, the difference between the monthly payment at the

10   teaser rate and the payment at the increased rate was tacked on to the loan principal

11   amount.  Countrywide qualified borrowers based on the initial teaser rate to get them

12   approved for the loan.  The lender did not qualify the borrower based on the higher

13   rate and payment.  "So when the rate goes up, the (borrower) can't afford the loan

14   anymore," he said.  Countrywide salespeople pushed these loan products on

15   minorities, enticing them with the idea of very small payments that would get them

16   into a nice house that was in reality more than they could afford.

17        115.   According to CW9, mortgage brokers showered underwriters with gifts.

18   Loan officers also pushed underwriters to approve questionable loans for minority

19   applicants by arguing the borrowers' "culture" played a role in why they should be

20   approved for the subprime loan.  For example, if a Hispanic borrower applied for a

21   stated income loan and the underwriter questioned the high level of income claimed,

22   the loan officer would assert that in Hispanic culture many members of the family

23   would be living in the home and would be assisting with the mortgage payments.

24        116.   Some underwriters felt pressure to approve questionable loans.

25   Furthermore, even though CW9 personally rejected a number of loan applications,

26   someone in upper management approved some of the same loans anyway, especially

27   with loans submitted by top producing brokers and salesmen.

28

- 40 -

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13 652420 V3

## 2. BoA/Countrywide gives its employees discretion to steer people into predatory loans (and pays its employees more for doing so).

117. The confidential witness statements demonstrate that BoA/Countrywide steered borrowers into loans with more onerous terms than necessary. Notably, CW3 explained that Countrywide encouraged salespeople to do or say anything to close as many loans as possible, targeting minority neighborhoods in the process. Countrywide coerced or enticed customers to refinance into bigger loans with worse terms. Countrywide's salespeople had the discretion to add points to loans, push customers to borrow more than they needed, and set higher rates than necessary whenever possible. Likewise, CW4's statements underscore that BoA made a huge push to market to struggling minority neighborhoods, and gave loan officers discretion to make whatever loans the customers might accept.

118. BoA has used a commission-only compensation system for loan officers, tied to loan basis points, with monthly loan goals and higher commissions for higher totals, according to CW2. The compensation structure imposed substantial pressure to close loans and maximize loan points. Adding to that pressure, she said, loan officers routinely were indebted to BoA because they were paid a 'draw' (*e.g.*, about a few thousand dollars every month), to be repaid from mortgage sales commissions. If a loan officer failed to pay off the draw in the course of the month, the debt would roll-over to the next month, adding to the sales pressure. "There were loan officers that were always in the negative, always," CW2 said.

119. Similarly, CW7 said that Countrywide's payment and commission system incentivized loan officers to steer borrowers into subprime loans. CW7 said Countrywide paid its salespeople more for closing subprime loans than for prime loans, which motivated loan officers to put as many people in subprime as they could. "They are going to take prime people and put people in subprime because they make more money," he said.

- 41 -

120.   Similarly, BoA/Countrywide pressured and incentivized underwriters to approve dubious loans.  CW8 and CW9 observed that, through bonuses, quotas, and threats of disciplinary action, Countrywide's management encouraged underwriters to approve loans even when such loans failed to meet underwriting criteria (and sometimes management itself approved loans that the underwriters rejected).  Loan officers also gave gifts and paid underwriters kick-backs to underwriters to approve their loans quickly.

121.   CW8 also explained that the Bank's salespeople more easily took advantage of minorities.  He believes the salespeople could easily convince new Hispanic borrowers, in particular, that Countrywide could help them afford to buy a home.  And, when the borrower was a minority, CW8 said, managers told underwriters to approve the loan even if it fell short of underwriting criteria such as debt-to-income ratios. He recalls management "would come back and say, 'you know this person is a minority.  You can go a little higher (on debt ratio).'"

122.   Simply put, BoA/Countrywide incentivized salespeople to steer minority borrowers into more onerous loans than warranted by the circumstances, and BoA/Countrywide gave salespeople broad discretion to do so.  Indeed, this was part of a culture that focused only on making the most money possible, and not on putting borrowers in loans that were appropriate for them.

### 3.   BoA/Countrywide underwrites adjustable rate loans that borrowers cannot afford.

123.   BoA/Countrywide originated "3/27" adjustable rate mortgages, negative-amortization loans with low teaser rates, and low "pick-your-payment" monthly notes, marketed to borrowers from predominantly minority neighborhoods in Los Angeles.  Unless properly underwritten, such loans are destined to fail.

124.   BoA/Countrywide does not properly underwrite these loans when made to minorities and in minority neighborhoods.  BoA/Countrywide does not adequately consider the borrowers' ability to repay these loans, especially after the teaser rate

- 42 -

expires and the interest rate increases.  The fact that these loans would result in delinquency, default, and foreclosure for many borrowers was, or should have been, clearly foreseeable to BoA/Countrywide at the time the loans were made.

125.   The confidential witness statements of CW4, CW5, CW1, CW8, and CW9 support the fact that BoA/Countrywide has underwritten these loans as if the teaser rate will apply for the full life of the loan, instead of considering the borrowers' ability to repay the loan after the teaser rate expires.

126.   The use of negative amortization loans, pick-a-payment notes, 3/27 ARMs, and other adjustable loans in the manner described above is consistent with the practice of reverse redlining, has subjected minority borrowers to unfair and deceptive loan terms, and has contributed significantly to the high rate of foreclosure found in the minority neighborhoods of Los Angeles.

### 4.   BoA/Countrywide gives its employees discretion to include balloon payments.

127.   The confidential witness statements (such as those from CW5) further demonstrate that BoA/Countrywide loan officers had discretion to include onerous balloon payments in the terms and conditions of loans to minority borrowers prior to 2008, despite the fact that BoA/Countrywide would not qualify the same borrowers for subsequent refinancing.

128.   As CW1 and CW8 observed, BoA loan officers did not adequately explain the provisions of onerous balloon payment loans to applicants, and wrongly informed the applicants that they could refinance before the higher payments would become due.

129.   For example, CW8 describes one Hispanic customer who did not seem to understand the implications of a $700,000 loan he received that started at monthly payments of $2,000 then ballooned to $5,000 a month in one year.  "The loan officer told him, don't worry about (the balloon payment), you can refinance in a year. They always said that."  A year later, the borrower came back to try to refinance

- 43 -

because he could not afford the $5,000 monthly mortgage payment.  But at that point, the principal amount was too high, and the man did not qualify to refinance. He lost his home, said CW8.

**5.      BoA induced foreclosures by failing to offer refinancing or loan modifications to minority customers on fair terms, and otherwise limiting equal access to fair credit.**

130.    The confidential witness statements show that BoA induced foreclosures by failing to offer refinancing or loan modifications to minority customers on fair terms – which constitutes a particularly egregious form of redlining, given that minority borrowers sought refinancing or loan modifications with respect to bad loans that the Bank previously made to them.

131.    CW1 expressed that BoA customers were given loans with predatory terms, but were wrongly advised by their loan officers at closing that they could refinance at a later date.  CW1 said that a high rate of African-American and Hispanic people "were taken advantage of" by BoA.  She said that many BoA borrowers did not understand their loans, why the payments had become so unaffordable, and why they could not refinance to a lower rate and lower payments. In particular, she said that BoA customers who had loans with teaser rates and stated income loans were told by loan officers when they closed the loans that they would be able to refinance later, such as when monthly payments adjusted higher.  Many of these customers felt they were "scammed" by BoA, lied to and ripped off, because they were later told by the bank that they did not qualify to refinance.  Many of these same people subsequently lost their homes to foreclosure.

132.    CW1 also said BoA "dropped the ball" with many loan customers in the middle of the process of working out a late payment plan and/or a loan modification. Many of these customers were foreclosed on unexpectedly, and without warning, during what they believed was a modification process by BoA that never resulted in new loans.  "You could see in the loan notes the borrower contacted the bank, they

- 44 -

were trying to work with the bank, and for some reason the bank would foreclose on them when they were in the middle of the modification process." The bank "didn't even send them out a piece of paper to warn them they were going to do it," she said.

133. CW2 was frequently told to tell struggling customers that they should call the Bank to discuss modifications. But the customers who came into her office often reported that they had already done so repeatedly and were transferred from person to person, getting nowhere. These experiences prompted many customers to try coming into the Bank in person. "They were just complaining and crying that, 'We tried, and there's no help, they were just passing us from desk to desk,' "she said, recalling what borrowers would tell her.

134. CW2 observed borrowers who were struggling to pay mortgages, and should have qualified for refinancing, would face inexplicably long processing delays that often led them to fall further behind in payments, compounding their problems. Processes that should have taken 30 days would instead drag on for 120 days or longer, even for customers who appeared to qualify on paper. CW2 noted that BoA's high-pressure commission structure further discouraged BoA loan officers from refinancing existing customers.

135. CW4 explained that BoA targeted minority neighborhoods with onerous loans, for which the likelihood was very low that the Bank would offer refinancing.

136. CW5 confirmed that, by 2010, BoA had changed the rules on low-income borrowers and no longer qualified them to refinance out of bad loans they previously had obtained from BoA. Consequently, since then, the ratio of minorities who were being approved for loans at BoA decreased dramatically. In CW5's experience, a dramatically smaller ratio of minorities was being approved for loans processed by BoA in 2010-2011, in comparison to earlier years.

137. Prior to 2008, CW5 explained, BoA qualified people for negative-amortization loans with low teaser rates or low "pick-your-payment" monthly notes.

- 45 -

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13 652420 V3

But once the adjustment kicked in, and raised the monthly amount due, the borrower was no longer qualified, and could not afford the mortgage.  When borrowers could no longer afford a loan with payments that adjusted higher, they often would miss payments.  But when they tried to refinance, BoA would reject the borrowers because they had missed payments.  Even if these borrowers had not missed payments, CW5 said that it is still likely that, under the newer guidelines, BoA would not offer refinancing to many of these low-income borrowers.  He said that this practice hits minority people hard.

138.   In the last few years, CW5 said, there were not a lot of loans to approve for Hispanic or African-American borrowers.  Under the newer guidelines, most of the loans crossing his desk were for white borrowers.  According to CW5, many minority borrowers who were able to qualify for loans prior to 2008, including the subprime, negative amortization, and other types of balloon payment loans, have found themselves in the last several years unable to qualify for any kind of loans, even ones they had obtained previously.

139.   According to CW6, BoA encouraged her to tell struggling customers who did not qualify for a loan modification (under the Bank's stricter guidelines), that they should stop making payments so that they would go into foreclosure.  "Management would tell us, if the borrower doesn't qualify because they're not in foreclosure, because they aren't delinquent in the system, tell them to call us back when they can't pay their mortgage anymore."

**6.     BoA/Countrywide engages in other abusive lending practices.**

140.   Confidential witnesses like CW7 and CW8 also learned how some Countrywide loan officers had, among other things:  (1) falsified documents to make expensive mortgages seem affordable; (2) told customers their specific income level "didn't matter;" and (3) sold customers on one type of loan, only to sign them to

- 46 -

another, more onerous loan, in a sort of bait-and-switch.  The incidents of fraud were rampant, and foreclosures were a predictable result of these practices.

141.   Notably, CW7 and CW8 observed a tactic that salespeople used to increase their commissions and earn more money for Countrywide – namely, including a HELOC on the loans regardless of whether the homeowner asked for it or even wanted it.  At the loan signing, the HELOC would simply be included.  If the borrower asked about it, the salespeople would say it won't cost them anything, and it's only there if they need it.  CW7 said this was standard practice at Countrywide. CW8 added that Countrywide included HELOCs with all of its first mortgage loans, regardless of whether the borrower applied for it.

142.   CW7 also said that with "stated income" loan products, the salespeople used a number of tricks to make sure the applicants ended up in subprime.  Examples included adding a spouse with bad credit to a loan application by a spouse with good credit, or leaving off the salary of a spouse needed to show sufficient income for other loan products.  Alternatively, loan officers would exaggerate the borrowers' income.  Due to the amount of inaccurate and fraudulent information regularly included in such loans, CW7 said they were referred to as "liar loans" at Countrywide.

**D.    Minorities in Fact Receive Predatory Loan Terms from BoA/Countrywide**

143.   As discussed herein, BoA/Countrywide's *predatory* loans include: high-cost loans (*i.e.*, loans with an interest rate that was at least three percentage points above a federally-established benchmark), subprime loans, interest-only loans, balloon payment loans, loans with prepayment penalties, negative amortization loans, no documentation loans, and/or ARM loans with teaser rates (*i.e.*, lifetime maximum rate > initial rate + 6%).

144.   Data reported by the Bank, and available through public databases, shows that in 2004-2011, 14.7% of loans made by BoA/Countrywide to African-

- 47 -

American and Latino customers in Los Angeles were high-cost, but only 4.2% of loans made to white customers in Los Angeles were high-cost.  This data demonstrates a pattern of statistically significant differences in the product placement for high cost loans between minority and white borrowers.[28]

145.   The following map of BoA/Countrywide predatory loans originated in Los Angeles between 2004-2011 illustrates the geographic distribution of predatory loans in African-American and Latino neighborhoods versus white neighborhoods, in Los Angeles.  This map demonstrates that BoA/Countrywide's predatory loans are disproportionately located in minority neighborhoods.

---

[28] As alleged throughout the complaint, all references to the date range 2004-2011 are intended to include the time period up to and including December 31, 2011.

- 48 -

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13  652420 V3



146.   The fact that predatory loans involving all of BoA/Countrywide's loan products are more heavily concentrated in minority neighborhoods in Los Angeles is consistent with the practice of reverse redlining and, upon information and belief, has contributed significantly to the disproportionately high rates of foreclosure in minority communities in Los Angeles.

**E.    Minorities in Los Angeles Receive Such Predatory Loan Terms from BoA/Countrywide Regardless of Creditworthiness**

147.   According to *Discretionary Pricing, Mortgage Discrimination, and the Fair Housing Act*, 45 HARVARD CIVIL RIGHTS-CIVIL LIBERTIES LAW REV. 375, 398 (2010), several studies dating back to 2000 have established that minority borrowers were charged higher interest rates/fees than similar creditworthy white borrowers.

148.   Likewise, according to *A Racial Financial Crisis*, 83 TEMPLE LAW REV. 941, 947, 949 (2011), one study concluded that "[e]ven after controlling for

- 49 -

underwriting variables, African-American borrowers were '6.1% to 34.3% more likely than whites to receive a higher rate subprime mortgage' during the subprime boom."  And another study found that significant loan pricing disparity exists among low risk borrowers – African-American borrowers were 65% more likely to receive a subprime home purchase loan than similar creditworthy white borrowers, and 124% more likely to receive a subprime refinance loan.[29]  [citations omitted]

149.   Similarly, the Center for Responsible Lending's November 2011 report, *Lost Ground, 2011:  Disparities in Mortgage Lending and Foreclosures,* at 21-22, stated that "racial and ethnic differences in foreclosure rates persist even after accounting for differences in borrower incomes."  Further, the Center stated it is "particularly troublesome" that minorities received riskier loans "even within [similar] credit ranges."  For example, among borrowers having FICO scores above 660, the incidence of higher rate loans among various groups was as follows:  whites – 6.2%; African-American – 21.4% (3.5 times white rate); and Latino – 19.3% (3.1 times white rate).

150.   Moreover, data reported by the Bank, and available through both public and private databases, shows that minorities in Los Angeles received predatory loan terms from BoA/Countrywide more frequently than white borrowers, regardless of creditworthiness.

151.   A regression analysis of this data, controlling for borrower race and objective risk characteristics such as credit history, loan-to-value ratio, and the ratio of loan amount to income demonstrates that, from 2004-2011, an African-American borrower was 1.522 times more likely to receive a predatory loan as was a white borrower possessing similar underwriting and borrower characteristics.  The regression analysis further demonstrates that the odds that a Latino borrower would

---

[29] Center for Responsible Lending, *Unfair Lending: The Effect of Race and Ethnicity on the Price of Subprime Mortgages* (2006) (internal citation omitted) (*available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/rr011-Unfair_Lending-0506.pdf)

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13  652420 V3

receive a predatory loan were 1.325 times greater than that of a white borrower possessing similar underwriting and borrower characteristics.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers and between Latino and white borrowers.

152.   The regression analysis also shows that these disparities persist when comparing only borrowers with FICO scores above 660.  An African-American borrower with a FICO score above 660 was 1.396 times more likely to receive a predatory loan as was a white borrower with similar underwriting and borrower characteristics.  A Latino borrower with a FICO score above 660 was 1.167 times more likely to receive a predatory loan as was a white borrower with similar underwriting and borrower characteristics.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

153.   A similar regression analysis taking into account the racial makeup of the borrower's neighborhood rather than the individual borrower's race shows that borrowers in heavily minority neighborhoods in Los Angeles were more likely to receive predatory loans than borrowers in heavily white neighborhoods.  For example, a borrower in a heavily minority census tract (census tract consisting of at least 80% African-American or Latino households) was 1.676 times more likely to receive a predatory loan as was a borrower with similar characteristics in a heavily white neighborhood (census tract with at least 80% white households).  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

154.   This data also establishes that BoA/Countrywide disproportionately issued government loans with higher risk features (FHA/VA) to African-American and Latino borrowers in Los Angeles from 2009-2011.  A regression analysis, controlling for borrower race and objective risk characteristics such as ratio of loan

- 51 -

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13  652420 V3

amount to income, demonstrates that an African-American borrower was 5.600 times more likely to receive a higher risk government loan than was a white borrower possessing similar borrower and underwriting characteristics.  The regression analysis further demonstrates that a Latino borrower was 3.952 times more likely to receive a higher risk government loan than was a white borrower possessing similar borrower and underwriting characteristics.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

155.   Thus, the disparities are not the result of, or otherwise explained by, legitimate non-racial underwriting criteria.

**F.    BoA/Countrywide's Targeting of Minorities who in fact Receive Predatory Loan Terms Regardless of Creditworthiness Causes Foreclosures**

   **a.    Data shows that BoA/Countrywide's foreclosures are disproportionately located in minority neighborhoods in Los Angeles.**

156.   BoA/Countrywide has intentionally targeted predatory practices at African-American and Latino neighborhoods and residents.  The predatory practices include charging excessively high interest rates and fees that are not justified by borrowers' creditworthiness; providing teaser rate loans with bogus refinance opportunities; requiring large prepayment penalties while deliberately misleading borrowers about the penalties; refusing to refinance or modify predatory loans; and more.

157.   Far from being a responsible provider of much-needed credit in minority communities, BoA/Countrywide is a leading cause of stagnation and decline in African-American and Latino neighborhoods where its foreclosures are concentrated.  Specifically, since at least 2000, its foreclosures have been concentrated in neighborhoods with African-American or Latino populations exceeding 80%.

- 52 -

158.   Although only 16.6% of BoA/Countrywide's loan originations in Los Angeles from 2004 to 2011 were in census tracts that are at least 80% African-American or Latino, 25.6% of loan originations that had entered foreclosure by February 2013 were in those census tracts.  Similarly, while only 32.4% of BoA/Countrywide's loan originations in Los Angeles from 2004 to 2011 occurred in census tracts that are at least 50% African-American or Latino, 46.1% of BoA/Countrywide's loan originations that had entered foreclosure by February 2013 were in those census tracts.  Moreover, while 41.3% of BoA/Countrywide's loan originations in Los Angeles from 2004 to 2011 occurred in census tracts that were less than 20% African-American or Latino, only 25.5% of BoA/Countrywide's loan originations that had entered foreclosure by February 2013 were in those census tracts.  This data demonstrates a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

159.   The following map represents the concentration of BoA/Countrywide's loan originations from 2004 through 2011 that had entered foreclosure by February 2013 in African-American and Latino neighborhoods.  In addition to the disproportionate distribution of BoA/Countrywide foreclosures in African-American and Latino neighborhoods, disparate rates of foreclosure based on race further demonstrate BoA/Countrywide's failure to follow responsible underwriting practices in minority neighborhoods.  While 22.1% of BoA/Countrywide's loans in predominantly (greater than 80%) African-American or Latino neighborhoods result in foreclosure, the same is true for only 6.3% of its loans in predominantly (greater than 80%) white neighborhoods.  In other words, a BoA/Countrywide loan in a predominantly African-American or Latino neighborhood is 4.184 times more likely to result in foreclosure as is a BoA/Countrywide loan in a predominantly white neighborhood.  These odds ratios demonstrate a pattern of statistically significant

- 53 -

differences between African-American and white borrowers, and between Latino and white borrowers.



160.   As the above map demonstrates, there is a concentration of BoA foreclosures in African-American and Latino neighborhoods.   Specifically, a BoA loan in a predominantly African-American or Latino neighborhood is 4.184 times more likely to result in foreclosure as is a BoA loan in a predominantly white neighborhood.

161.   Thus, BoA/Countrywide's discretionary lending policies and pattern or practice of targeting of minorities, who in fact receive predatory loan terms regardless of creditworthiness, have caused and continue to cause foreclosures in Los Angeles.

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13  652420 V3

**b.     Data shows that BoA/Countrywide's loans to minorities result in especially quick foreclosures.**

162.   A comparison of the time from origination to foreclosure of BoA/Countrywide's loans originated in Los Angeles from 2004 to 2011 shows a marked disparity with respect to the speed with which loans to African-Americans and Latinos and whites move into foreclosure.  The average time to foreclosure for African-American borrowers is 3.024 years, and for Latino borrowers is 2.889 years. By comparison, the average time to foreclosure for white borrowers is 3.318 years. These statistically significant disparities demonstrate that BoA/Countrywide aggressively moved minority borrowers into foreclosure when compared with how the Bank handled foreclosures for white borrowers.

163.   This disparity in time to foreclosure is further evidence that BoA/Countrywide is engaged in lending practices consistent with reverse redlining. The disparity in time to foreclosure demonstrates that BoA/Countrywide is engaged in irresponsible underwriting in African-American and Latino communities that does not serve the best interests of borrowers.  If BoA/Countrywide were applying the same underwriting practices in African-American and Latino neighborhoods and white neighborhoods in Los Angeles, there would not be a significant difference in time to foreclosure.  Were BoA/Countrywide underwriting borrowers in both communities with equal care and attention to proper underwriting practices, borrowers in African-American and Latino communities would not find themselves in financial straits significantly sooner during the lives of their loans than do borrowers in white communities.  The faster time to foreclosure in African-American and Latino neighborhoods is consistent with underwriting practices in minority communities that are less concerned with determining a borrower's ability to pay and qualifications for the loan than they are in maximizing short-term profit.

164.   The HUD/Treasury Report confirms that time to foreclosure is an important indicator of predatory practices:  "[t]he speed with which the subprime

- 55 -

loans in these communities have gone to foreclosure suggests that some lenders may be making mortgage loans to borrowers who did not have the ability to repay those loans at the time of origination."[30]

### c.   Data shows that the discriminatory loan terms cause the foreclosures.

165.   BoA/Countrywide's discriminatory lending practices cause foreclosures and vacancies in minority communities in Los Angeles.

166.   Steering borrowers into loans that are less advantageous than loans for which they qualify, including steering borrowers who qualify for prime loans into subprime loans, can cause foreclosures because the borrowers are required to make higher loan payments.  The difference between what a borrower who is steered in this manner must pay, and the lower payments for which the borrower qualified, can cause the borrower to be unable to make payments on the mortgage.  In such instances, the borrower would have continued to make payments on the mortgage and remained in possession of the premises, had BoA/Countrywide made the loan without improperly steering the borrower into a subprime, or less advantageous, loan.  Steering borrowers in this manner, therefore, causes foreclosures and vacancies.

167.   Giving a loan to an applicant who does not qualify for the loan, especially a refinance or home equity loan, can also cause foreclosures and vacancies.  Some homeowners live in properties that he or she owns subject to no mortgage.  Other homeowners live in properties with modest mortgages that he or she can comfortably afford to pay.  Where a lender, such as BoA/Countrywide, solicits such a homeowner to take out a home equity loan on their property, or alternatively, to refinance an existing loan into a larger loan without proper underwriting to assure that the borrower can make the monthly payments for the new, larger loan, the result is likely to be that the borrower will be unable to make

---

[30] HUD/Treasury Report at 25.

- 56 -

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13  652420 V3

payments on the mortgage.  This is particularly true where the borrower is refinanced from a fixed-rate loan into an adjustable rate loan that the lender knows the borrower cannot afford, should interest rates rise.  In some instances the lender may refinance the borrower into a new loan that the lender knows the borrower cannot sustain, given the borrower's present debt obligations and financial resources.  In such circumstances, the likely result of such practices is to cause homeowners who are otherwise occupying properties without a mortgage, or comfortably making payments on a modest existing mortgage, to be unable to make payments on a new, unaffordable loan.  This, in turn, causes foreclosures and vacancies.  If these unaffordable refinance and home equity loans had not been made, the subject properties would not have become vacant.

168.   A regression analysis of loans issued BoA/Countrywide in Los Angeles from 2004-2011, controlling for objective risk characteristics such as credit history, loan-to-value ratio, and the ratio of loan amount to income, demonstrates that a predatory loan is 2.382 times more likely to result in foreclosure than a non-predatory loan.

169.   The regression analysis further demonstrates that a predatory loan in a heavily minority neighborhood (census tract consisting of at least 80% African-American and Latino households) is 2.742 times more likely to result in foreclosure than is a non-predatory loan with similar risk characteristics in a heavily white neighborhood (census tract with at least 80% white households).  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

170.   The regression analysis also demonstrates that a predatory loan made to an African-American borrower was 3.026 times more likely to result in foreclosure than was a non-predatory loan made to a white borrower with similar borrower and underwriting characteristics.  A predatory loan made to a Latino borrower was 3.406

- 57 -

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13  652420 V3

times more likely to result in foreclosure than was a non-predatory loan made to a white borrower with similar risk characteristics.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

171.   A regression analysis of government loans (FHA/VA) issued by BoA/Countrywide in Los Angeles from 2009-2011, controlling for borrower race and objective risk characteristics such as ratio of loan amount to income, demonstrates that a government loan is 3.347 times more likely to result in foreclosure as is a non-government loan.  These odds ratios demonstrate a pattern of statistically significant differences between African-American and white borrowers, and between Latino and white borrowers.

## VII.   INJURY TO LOS ANGELES CAUSED BY BOA/COUNTRYWIDE'S DISCRIMINATORY LOAN PRACTICES

172.   Los Angeles has suffered financial injuries as a direct result of BoA's pattern or practice of reverse redlining, and the resulting disproportionately high rate of foreclosure on BoA loans to African-Americans and Latinos in minority neighborhoods in Los Angeles.  Los Angeles seeks redress for these injuries.  The City does not seek redress in this action for injuries resulting from foreclosures on mortgages originated by lenders other than BoA.

173.   BoA continues to engage in the discriminatory pattern or practice described herein, with similar and continuing deleterious consequences to the City.

174.   The City seeks damages for its reduced property tax revenues, due to: (a) the decreased value of the vacant properties themselves; and (b) the decreased value of properties surrounding the vacant properties.  In addition, the City seeks damages based on municipal services that it still must provide to remedy blight and unsafe and dangerous conditions which exist at vacant properties that were foreclosed as a result of BoA's illegal lending practices.

- 58 -

**A.   Los Angeles Has Been Injured by a Reduction in Property Tax Revenues from Foreclosures Caused by Discriminatory Loans Issued by BoA**

175.   As stated in a September 2011 Report by the Alliance of Californians for Community Empowerment and the California Reinvestment Coalition, entitled *The Wall Street Wrecking Ball:  What Foreclosures are Costing Los Angeles Neighborhoods* ("Cost to Los Angeles Report"), "[w]hen a home falls into foreclosure, it affects the property value of the foreclosed home as well as the values of other homes in the neighborhood."  These decreased property values in turn reduce property tax revenues to the City.[31]

176.   "As property values drop an estimated $78.8 billion, Los Angeles communities could lose as much as $481 million in property tax revenue" from the decreased value of the foreclosed homes themselves and those in the surrounding neighborhoods.[32]

**1.   The decreased value of the properties foreclosed by BoA result in reduced property tax revenues.**

177.   The *Cost to Los Angeles* Report states that "[i]t is estimated that homes in foreclosure experience a 22% decline in value."[33]

178.   For example, "[t]hat means the impact of the 200,000 foreclosures estimated for the period 2008 through 2012 will be more than $26 billion in lost home value in communities across Los Angeles."[34]  A portion of this lost home value is attributable to homes foreclosed as a result of BoA's discriminatory loan practices.

179.   The decreased property values of foreclosed homes in turn reduce property tax revenues to the City and constitute damages suffered by Los Angeles.

---

[31] *Cost to Los Angeles* Report at 3.

[32] *Id.*

[33] *Id.*

[34] *Id.*

- 59 -

**2.     The decreased value of properties in the neighborhoods surrounding foreclosed properties results in reduced property tax revenues.**

180.    BoA foreclosure properties and the problems associated with them likewise cause especially significant declines in surrounding property values because the neighborhoods become less desirable.  This in turn reduces the property tax revenues collected by Los Angeles.

181.    Property tax losses suffered by Los Angeles as a result of vacancies resulting from BoA's foreclosures are fully capable of empirical quantification.

182.    Routinely maintained property tax and other data allow for the precise calculation of the property tax revenues lost by the City as a direct result of particular BoA foreclosures.  Using a well-established statistical regression technique that focuses on effects on neighboring properties, the City can isolate the lost property value attributable to BoA foreclosures and vacancies from losses attributable to other causes, such as neighborhood conditions.  This technique, known as Hedonic regression, when applied to housing markets, isolates the factors that contribute to the value of a property by studying thousands of housing transactions.  Those factors include the size of a home, the number of bedrooms and bathrooms, whether the neighborhood is safe, whether neighboring properties are well-maintained, and more. Hedonic analysis determines the contribution of each of these house and neighborhood characteristics to the value of a home.

183.    The number of foreclosures in a neighborhood is one of the neighborhood traits that Hedonic analysis can examine.  Hedonic analysis allows for the calculation of the impact on a property's value of the first foreclosure in close proximity (*e.g.*, ⅛ or ¼ of a mile), the average impact of subsequent foreclosures, and the impact of the last foreclosure.

184.    Foreclosures attributable to BoA in minority neighborhoods in Los Angeles can be analyzed through Hedonic regression to calculate the resulting loss in

- 60 -

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13  652420 V3

the property values of nearby homes.  This loss can be distinguished from any loss attributable to non-BoA foreclosures or other causes.  The loss in property value in minority neighborhoods in Los Angeles attributable to BoA's unlawful acts and consequent foreclosures can be used to calculate the City's corresponding loss in property tax revenues.

185.   Various studies establish that Hedonic regression can be used for this purpose.  A study published by the Fannie Mae Foundation, using Chicago as an example, determined that each foreclosure is responsible for an average decline of approximately 1.1% in the value of each single-family home within an eighth of a mile.[35]

186.   Other studies have focused on the impact of abandoned homes on surrounding property values.  A study in Philadelphia, for example, found that each home within 150 feet of an abandoned home declined in value by an average of $7,627; homes within 150 to 299 feet declined in value by $6,810; and homes within 300 to 449 feet declined in value by $3,542.[36]

187.   These studies highlight the foreseeability of tax related harm to the City as the result of foreclosures arising from discriminatory loans.

188.   And most recently, the *Cost to Los Angeles* Report stated, "[i]t is conservatively estimated that each foreclosed property will cause the value of neighboring homes within an eighth of a mile to drop 0.9%."  Thus, "[i]n Los Angeles, impacted homeowners could experience property devaluation of $53 billion."  This decreased property value of neighboring homes in turn reduces property tax revenues to the City.

---

[35] *See* Dan Immergluck & Geoff Smith, *The External Costs of Foreclosure: The Impact of Single-Family Mortgage Foreclosures on Property Values*, 17 HOUSING POLICY DEBATE 57 (2006) at 69.

[36] *See* Anne B. Shlay & Gordon Whitman, *Research for Democracy: Linking Community Organizing and Research to Leverage Blight Policy*, at 21 (2004).

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13 652420 V3

189.   Application of such Hedonic regression methodology to data regularly maintained by Los Angeles can be used to quantify precisely the property tax injury to the City caused by BoA's discriminatory lending practices and resulting foreclosures in minority neighborhoods.

**B.    Los Angeles Is Injured Because It Still Must Provide Costly Municipal Services for Properties in Minority Neighborhoods that Have Become Vacant as a Direct Result of Discriminatory Loans Originated or Purchased by BoA**

190.   Vacant BoA foreclosure properties cause direct costs to the City because the City is required to provide increased municipal services at these properties.  These services would not have been necessary if the properties were occupied.

191.   For example, the City's Police Department must send personnel and police vehicles to vacant BoA foreclosure properties to respond to public health and safety threats that arise at these properties because the properties are vacant.  Because violent crime has been found to increase 2.33% for every 1% increase in foreclosures, among other services, LAPD must respond to calls reporting suspicious activity at vacant properties, and perform ongoing investigations involving criminal activity, including gang activity, at vacant properties.

192.   Likewise, the Code Enforcement Bureau of the Los Angeles Building and Safety Department ("Building and Safety Department") must devote personnel time and out-of-pocket funds to inspect vacant properties and issue orders for violations of the municipal code to be fixed.  When the municipal code violations are not fixed, the Building and Safety Department is required to perform certain services, including, but not limited to, removing excess vegetation at vacant properties, hauling away trash and debris at vacant properties, boarding vacant property from casual entry, putting up fencing to secure vacant properties, putting up fencing to prevent access to swimming pools by young children at vacant properties, coordinating with the Los Angeles County Health Department to chemically treat the

- 62 -

pools at vacant properties to prevent mosquitoes from breeding, painting and removing graffiti at vacant properties, condemning and demolishing vacant structures deemed an imminent hazard to public safety, and having vacant properties frequented by gangs declared a public nuisance and demolished on that basis.

193.   As stated by the *Cost to Los Angeles* Report, "[l]ocal government agencies have to spend money and staff time on blighted foreclosed properties, providing maintenance, inspections, trash removal, increased public safety calls, and other code enforcement services …. Responding to these needs is a gargantuan task that involves multiple agencies and multiple levels of local government."[37]

194.   Moreover, as discussed above, the Apgar-Duda report underscores the foreseeability of municipal costs as the result of foreclosures arising from discriminatory loans.

## VIII.  SAMPLE FORECLOSURE PROPERTIES IN THE CITY OF LOS ANGELES

195.   Plaintiff has already identified two thousand three hundred ninety-eight (2,398) discriminatory loans issued by BoA in Los Angeles between 2004-2011 that resulted in foreclosure.[38]  The City has already incurred, or will incur in the future, damages corresponding to each of these properties.  A sample of property addresses corresponding to these foreclosures is set forth below:

1128 E. 103rd St., 90002

10710 S. San Pedro St., 90061

7940 Goll Ave., 91605

---

[37] *Id*. at 3.

[38]   Plaintiff anticipates that it will be able to identify significantly more foreclosures resulting from the issuance of discriminatory loans during this time period with the benefit of discovery.  This conclusion derives from the fact that, because of certain reporting limitations, the publicly-available mortgage loan databases utilized by Plaintiff are not as comprehensive as the mortgage loan databases maintained by, and in the possession of, an issuing bank.

- 63 -

355 W. 84th Pl., 90003

610 W. 109th St., 90044

7426 S. Hobart Blvd., 90047

9573 Lev Ave., 91331

8031 Tunney Ave., 91335

2010 S. 2nd Ave., 91402

5443 Geer St., 90016

## IX.   STATUTE OF LIMITATIONS AND CONTINUING VIOLATIONS DOCTRINE

196.   As alleged herein, Defendant BoA/Countrywide has engaged in a continuous pattern and practice of mortgage discrimination in Los Angeles since at least 2004 by imposing different terms or conditions on a discriminatory and legally prohibited basis.  In order to maximize profits at the expense of the City of Los Angeles and minority borrowers, BoA/Countrywide adapted its unlawful discrimination to changing market conditions.  This unlawful pattern and practice conduct is continuing through the present and has not terminated.  Therefore, the operative statute of limitations governing actions brought pursuant to the Federal Fair Housing Act has not commenced to run.

## X.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Violation of the Federal Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*)**

197.   Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13  652420 V3

198.   BoA/Countrywide's acts, policies, and practices as described constitute intentional discrimination on the basis of race.  BoA/Countrywide has intentionally targeted residents of predominantly African-American and Latino neighborhoods in Los Angeles for different treatment than residents of predominantly white neighborhoods in Los Angeles with respect to mortgage lending.  BoA/Countrywide has intentionally targeted residents of these neighborhoods for high-cost loans without regard to their credit qualifications and without regard to whether they qualify for more advantageous loans, including prime loans.  BoA/Countrywide has intentionally targeted residents of these neighborhoods for increased interest rates, points, and fees, and for other disadvantageous loan terms including, but not limited to, adjustable rates, prepayment penalties, and balloon payments.  BoA/Countrywide has intentionally targeted residents of these neighborhoods for unfair and deceptive lending practices in connection with marketing and underwriting mortgage loans.

199.   BoA/Countrywide's acts, policies, and practices have had an adverse and disproportionate impact on African-Americans and Latinos and residents of predominantly African-American and Latino neighborhoods in Los Angeles as compared to similarly situated whites and residents of predominantly white neighborhoods in Los Angeles.  This adverse and disproportionate impact is the direct result of BoA/Countrywide's policies of providing discretion to loan officers and others responsible for mortgage lending; failing to monitor this discretion to ensure that borrowers were being placed in loan products on a nondiscriminatory basis when BoA/Countrywide had notice of widespread product placement disparities based on race and national origin; giving loan officers and others responsible for mortgage lending large financial incentives to issue loans to African-Americans and Latinos that are costlier than better loans for which they qualify; otherwise encouraging and directing loan officers and others responsible for mortgage lending to steer borrowers into high-cost loans or loans with adjustable

- 65 -

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13  652420 V3

rates, prepayment penalties, or balloon payments without regard for whether they qualify for better loans, including but not limited to prime loans; and setting interest rate caps.  These policies have caused African-Americans and Latinos and residents of predominantly African-American and Latino neighborhoods in Los Angeles to receive mortgage loans from BoA/Countrywide that have materially less favorable terms than mortgage loans given by BoA/Countrywide to similarly situated whites and residents of predominantly white neighborhoods in Los Angeles, and that are materially more likely to result in foreclosure.

200.   BoA/Countrywide's residential lending-related acts, policies, and practices constitute reverse redlining and violate the Fair Housing Act as:

(a)   Discrimination on the basis of race and national origin in making available, or in the terms and conditions of, residential real estate-related transactions, in violation of 42 U.S.C. § 3605(a); and

(b)   Discrimination on the basis of race and national origin in the terms, conditions, or privileges of sale of a dwelling, in violation of 42 U.S.C. § 3604(b).

201.   BoA/Countrywide's policies or practices are not justified by business necessity or legitimate business interests.

202.   BoA/Countrywide's policies and practices are continuing.

203.   The City is an aggrieved person as defined by 42 U.S.C. § 3602(i) and has suffered damages as a result of BoA/Countrywide's conduct.

204.   The City's damages include lost tax revenues and the need to provide increased municipal services.  The loss of tax revenues at specific foreclosure sites and at closely neighboring properties in predominantly minority neighborhoods of the City was a foreseeable consequence that was fairly traceable to BoA's discriminatory lending.  Likewise, the need to provide increased municipal services at blighted foreclosure sites in predominantly minority neighborhoods of the City

- 66 -

was a foreseeable consequence that was fairly traceable to BoA's discriminatory lending.

205.   BoA/Countrywide's policies and practices, as described herein, had the purpose and effect of discriminating on the basis of race or national origin.  These policies and practices were intentional, willful, or implemented with reckless disregard for the rights of African-American and Latino borrowers.

## SECOND CLAIM FOR RELIEF

### (Common Law Claim For Restitution Based On California Law)

206.   Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

207.   As a direct and proximate result of Defendants' predatory lending practices, Defendants have been enriched at Plaintiff's expense.  Defendants have failed to remit those wrongfully obtained benefits or reimburse the City for their costs improperly caused by Defendants, and retention of the benefits by Defendants would be unjust without payment.

208.   In addition, to its detriment the City has paid for the Defendants' externalities, or Defendants' costs of harm caused by its mortgage lending discrimination, in circumstances where Defendants are and have been aware of this obvious benefit and retention of such benefit would be unjust.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), the City demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the City respectfully prays that the Court grant it the following relief:

A.    Enter a declaratory judgment that the foregoing acts, policies, and practices of BoA/Countrywide violate 42 U.S.C. §§ 3604 and 3605;

- 67 -

B.      Enter a permanent injunction enjoining BoA/Countrywide and its directors, officers, agents, and employees from continuing the discriminatory conduct described herein, and directing BoA/Countrywide and its directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of the discriminatory conduct described herein, and to prevent additional instances of such conduct or similar conduct from occurring in the future, pursuant to 42 U.S.C. § 3613(c)(1);

C.      Award compensatory damages to the City in an amount to be determined by the jury that would fully compensate the City of Los Angeles for its injuries caused by the conduct of BoA/Countrywide alleged herein, pursuant to 42 U.S.C. § 3613(c)(1);

D.      Award punitive damages to the City in an amount to be determined by the jury that would punish BoA/Countrywide for the willful, wanton, and reckless conduct alleged herein, and that would effectively deter similar conduct in the future, pursuant to 42 U.S.C. § 3613(c)(1);

E.      Award the City its reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 3613(c)(2);

F.      Require payment of pre-judgment interest on monetary damages; and

G.      Order such other relief as this Court deems just and equitable.

DATED:  December 6, 2013

By _Michael N. Feuer (jpc)_
     Michael N. Feuer (SBN 111529)
     City Attorney
     CITY OF LOS ANGELES
     200 N. Main Street, Room 800
     Los Angeles, CA 90012
     Phone: (213) 978-8100
     Mike.feuer@lacity.org

- 68 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
steve@hbsslaw.com

Elaine T. Byszewski (SBN 222304)
Lee M. Gordon (SBN 174168)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 203
Pasadena, CA  91101
Telephone:  (213) 330-7150
elaine@hbsslaw.com
lee@hbsslaw.com

Joel Liberson (SBN 164857)
Howard Liberson (SBN 183269)
TRIAL & APPELLATE RESOURCES, P.C.
400 Continental Blvd., 6th Floor
El Segundo, CA  90245
Telephone:  (310) 426-2361
joel@taresources.com
howard@taresources.com

Robert Peck
CENTER FOR CONSTITUTIONAL
LITIGATION
777 6th Street NW, Suite 520
Washington, DC  20001
Telephone:  (202) 944-2803
Robert.peck@cclfirm.com

Clifton Albright (SBN 100020)
ALBRIGHT YEE & SCHMIT
888 West 6th Street, Suite 1400
Los Angeles, CA  90017
Telephone: (213) 833-1700
clifton.albright@ayslaw.com

*Attorneys for Plaintiff the City of Los Angeles*

- 69 -

COMPLAINT FOR VIOLATION OF
THE FEDERAL FAIR HOUSING ACT
010346-13  652420 V3

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____ Mariana R. Pfaelzer _____ and the assigned Magistrate Judge is _____ Alicia G. Rosenberg _____ .

The case number on all documents filed with the Court should read as follows:

### 2:13CV9046 MRP AGRx

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

The United States District Judge assigned to this case will review all filed discovery motions and thereafter, on a case-by-case or motion-by-motion basis, may refer discovery related motions to the Magistrate Judge for hearing and determination.

Clerk, U. S. District Court

December 6, 2013
_____
Date

By  J.Prado
_____
Deputy Clerk

---

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

| | | |
|---|---|---|
| [x] Western Division<br>312 N. Spring Street, G-8<br>Los Angeles, CA 90012 | [ ] Southern Division<br>411 West Fourth St., Ste 1053<br>Santa Ana, CA 92701 | [ ] Eastern Division<br>3470 Twelfth Street, Room 134<br>Riverside, CA 92501 |

**Failure to file at the proper location will result in your documents being returned to you.**

---

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

CITY OF LOS ANGELES, a municipal corporation, )
                                               )
                                               )
                                               )
—————————————————————————                      )    **CV13-9046**UPP (AGRx)
_Plaintiff(s)_                                  )
          v.                                    )    Civil Action No.
                                               )
BANK OF AMERICA CORPORATION; BANK OF            )
AMERICA, N.A.; COUNTRYWIDE FINANCIAL           )
CORPORATION; COUNTRYWIDE HOME LOANS;           )
     and COUNTRYWIDE BANK, FSB                  )
—————————————————————————                      )
_Defendant(s)_                                  )

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Elaine T. Byszewski
                                       Lee M. Gordon
                                       HAGENS BERMAN SOBOL SHAPIRO LLP
                                       301 N. Lake Ave., Suite 203
                                       Pasadena, CA 91101

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

                                               CLERK OF COURT

          DEC - 6 2013

Date: _____                JULIE PRADO
                                       _____
                                       _Signature of Clerk or Deputy Clerk_

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

CITY OF LOS ANGELES, a municipal corporation

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS; and COUNTRYWIDE BANK, FSB

**(b) County of Residence of First Listed Plaintiff**  LOS ANGELES, CA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**County of Residence of First Listed Defendant**
*(IN U.S. PLAINTIFF CASES ONLY)*

**(c) Attorneys** *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.
Michael Feuer (SBN 111529)
City Attorney, CITY OF LOS ANGELES
200 N. Main Street, Room 800
Los Angeles CA 90012, (213) 978-8100

**Attorneys** *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No  (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No  ☐ **MONEY DEMANDED IN COMPLAINT:** $

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Federal Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq. Seeking redress for injuries caused by pattern or practice of illegal and discriminatory mortgage lending.

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influ-enced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Com-modities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☒ 443 Housing/Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:**  Case Number:  CV13-9046

CV-71 (11/13)  CIVIL COVER SHEET  Page 1 of 3

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| **Question A: Was this case removed from state court?** | **STATE CASE WAS PENDING IN THE COUNTY OF:** | **INITIAL DIVISION IN CACD IS:** |
|---|---|---|
| ☐ Yes  ☒ No<br><br>If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| **Question B: Is the United States, or one of its agencies or employees, a party to this action?** | If the United States, or one of its agencies or employees, is a party, is it: | | **INITIAL DIVISION IN CACD IS:** |
|---|---|---|---|
| ☐ Yes  ☒ No<br><br>If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | **A PLAINTIFF?**<br><br>Then check the box below for the county in which the majority of DEFENDANTS reside. | **A DEFENDANT?**<br><br>Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| | ☐ Los Angeles | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| **Question C: Location of plaintiffs, defendants, and claims?** (Make only one selection per row) | **A.** Los Angeles County | **B.** Ventura, Santa Barbara, or San Luis Obispo Counties | **C.** Orange County | **D.** Riverside or San Bernardino Counties | **E.** Outside the Central District of California | **F.** Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of defendants reside: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of claims arose: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |

| **C.1. Is either of the following true? If so, check the one that applies:** | **C.2. Is either of the following true? If so, check the one that applies:** |
|---|---|
| ☐ 2 or more answers in Column C | ☐ 2 or more answers in Column D |
| ☐ only 1 answer in Column C and no answers in Column D | ☐ only 1 answer in Column D and no answers in Column C |
| Your case will initially be assigned to the<br>SOUTHERN DIVISION.<br>Enter "Southern" in response to Question D,  below.<br><br>If none applies, answer question C2 to the right. ➡ | Your case will initially be assigned to the<br>EASTERN DIVISION.<br>Enter "Eastern" in response to Question D,  below.<br><br>If none applies, go to the box below. ⬇ |

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| **Question D: Initial Division?** | **INITIAL DIVISION IN CACD** |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | WESTERN |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES**: Has this action been previously filed **in this court** and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES**: Have any cases been previously filed **in this court** that are related to the present case?   ☒ NO   ☐ YES

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):**   _Michael Feuer (jpc)_   DATE: _12/6/13_

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |