1  STEVEN A. ELLIS (SBN 171742)
   *sellis@goodwinprocter.com*
2  LAURA A. STOLL (SBN 255023)
   *lstoll@goodwinprocter.com*
3  **GOODWIN PROCTER LLP**
   601 S. Figueroa Street, 41st Floor
4  Los Angeles, CA 90017
   Tel.: 213.426.2500
5  Fax.: 213.623.1673

6  Attorneys for Defendants:
   BANK OF AMERICA CORPORATION;
7  BANK OF AMERICA, N.A., for itself and
   as successor by merger to Countrywide
8  Bank, FSB; COUNTRYWIDE
   FINANCIAL CORPORATION; and
9  COUNTRYWIDE HOME LOANS, INC.

10 [ADDITIONAL COUNSEL IN SIGNATURE BLOCK]

11            **UNITED STATES DISTRICT COURT**

12            **CENTRAL DISTRICT OF CALIFORNIA**

13               **WESTERN DIVISION**

14 CITY OF LOS ANGELES, a municipal      Case No. 2:13-cv-09046-PA-AGR
   corporation,
15                                        **MEMORANDUM OF POINTS AND**
              Plaintiff,                  **AUTHORITIES IN SUPPORT OF**
16                                        **THE MOTION OF DEFENDANTS**
         v.                               **BANK OF AMERICA CORP. AND**
17                                        **BANK OF AMERICA, N.A. (FOR**
   BANK OF AMERICA                        **ITSELF AND AS SUCCESSOR BY**
18 CORPORATION; BANK OF                   **MERGER TO COUNTRYWIDE**
   AMERICA, N.A.; COUNTRYWIDE             **BANK, FSB) FOR SUMMARY**
   FINANCIAL CORPORATION;                 **JUDGMENT ON STATUTE OF**
19 COUNTRYWIDE HOME LOANS; and            **LIMITATIONS**
   COUNTRYWIDE BANK, FSB,
20                                        Date:        May 11, 2015
              Defendants.                 Time:        1:30pm
21                                        Courtroom:   15
                                          Judge:       Hon. Percy Anderson
22
                                          Complaint filed:  December 6, 2013
23

24

25

26

27

28

*Goodwin Procter LLP*
*601 S Figueroa Street, 41st Floor*
*Los Angeles, California 90017*

ACTIVE/81588673.1

# TABLE OF CONTENTS

**Page**

BACKGROUND ..................................................................................................... 3

ARGUMENT ......................................................................................................... 6

I.   There Were No "Predatory" Mortgage Loans Made In The Limitations Period. .............................................................................................................. 6

II.  The City Has No Other Evidence of Discrimination Within the Limitations Period. ........................................................................................ 8

   A.   The City Has No Evidence of Disparate Treatment. ................................... 8

      1.   There Is No Evidence of a Discriminatory Motive. .............................. 9

      2.   The Loan Data Evidences No Practice of Discrimination. .................. 11

   B.   The City Has No Evidence of Disparate Impact. ....................................... 12

      1.   The City Fails to Identify Specific Facially-Neutral Practices. ........... 12

      2.   The Loan Data Show No Evidence of an Adverse, Disparate Impact. .................................................................................................. 14

III. The City Cannot Show Timely Injury. ............................................................ 18

IV. The City's "Continuing Violation" and "Pattern and Practice" Theories Do Not Negate the Time Bar. ............................................................................ 18

   A.   There Is No Continuing Violation Because the Conduct Challenged After 2011 Is Different from the Conduct Alleged Before That. .............. 18

   B.   The City Cannot Bring a "Pattern or Practice" Claim Based on Loans Outside the Limitations Period—Or Otherwise. ........................................ 21

V.  The City's Actual Notice of its Claims More Than Two Years Before Filing Suit Bars its Claims. ............................................................................. 22

VI. The City's Unjust Enrichment Claim is Also Barred. ..................................... 24

CONCLUSION ..................................................................................................... 25

**Goodwin Procter LLP**
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

ACTIVE/81588673.1

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Alpha III, Inc. v. City of San Diego*,
    187 F. App'x 709 (9th Cir. 2006)............................................................................20

*Berry v. Bd. of Supervisors*,
    715 F.2d 971 (5th Cir. 1983) ..................................................................................19

*Budnick v. Town of Carefree*,
    518 F.3d 1109 (9th Cir. 2008) ................................................................................14

*Chin v. Port Auth. of N.Y. & N.J.*,
    685 F.3d 135 (2d Cir. 2012) ...................................................................................22

*City of Los Angeles v. Citigroup Inc.*,
    24 F. Supp. 3d 940, 952 (C.D. Cal. 2014)..............................................................21

*Conn. Light & Power Co. v. Sec'y of U.S. Dep't of Labor*,
    85 F.3d 89 (2d Cir. 1996) .......................................................................................19

*Cooper v. Fed. Reserve Bank of Richmond*,
    467 U.S. 867 (1984)................................................................................................22

*Coral Constr. Co. v. King Cnty.*,
    941 F.2d 910 (9th Cir. 1991) ..................................................................................11

*Cowell v. Palmer Twp.*,
    263 F.3d 286 (3d Cir. 2001) ...........................................................................19, 23

*Darensburg v. Metro. Transp. Comm'n*,
    636 F.3d 511 (9th Cir. 2011) ..................................................................................14

*Davidson v. AOL, Inc.*,
    337 F.3d 1179 (10th Cir. 2003) ..............................................................................21

*Davis v. Coca-Cola Bottling Co. Consol.*,
    516 F.3d 955 (11th Cir. 2008) ................................................................................22

*Diaz v. AT&T*,
    752 F.2d 1356 (9th Cir. 1985) ................................................................................11

**Goodwin Procter LLP**
**601 S Figueroa Street, 41st Floor**
**Los Angeles, California 90017**

ii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Goodwin Procter LLP**
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

*Domingo v. New England Fish Co.*,
 727 F.2d 1429 (9th Cir. 1984) ............................................................................... 12

*Douglas v. Cal. Dep't of Youth Auth.*,
 271 F.3d 812 (9th Cir. 2001) ................................................................................. 23

*EEOC v. Freeman*,
 No. 09-2573, 2010 WL 1728847 (D. Md. Apr. 27, 2010) ...................................... 21

*Escandon v. L.A. Cnty.*,
 584 F. App'x 517 (9th Cir. 2014) ........................................................................... 14

*Fielder v. UAL Corp.*,
 218 F.3d 973 (9th Cir. 2000) ................................................................................. 19

*Gamble v. City of Escondido*,
 104 F.3d 300 (9th Cir. 1997) ................................................................................... 9

*Garcia v. Brockway*,
 526 F.3d 456 (9th Cir. 2008) ................................................................................. 17

*Gilty v. Vill. of Oak Park*,
 919 F.2d 1247 (7th Cir. 1990) ............................................................................... 22

*Havens Realty Corp. v. Coleman*,
 455 U.S. 363 (1982) ........................................................................................ 19, 22

*Heagney v. Univ. of Wash.*,
 642 F.2d 1157 (9th Cir. 1981) ............................................................................... 12

*Hipp v. Liberty Nat. Life Ins. Co.*,
 252 F.3d 1208 (11th Cir. 2001) ............................................................................. 23

*Home Quest Mortg. LLC v. Am. Family Mut. Ins. Co.*,
 340 F. Supp. 2d 1177 (D. Kan. 2004) ..................................................................... 7

*Honeywell, Inc. v. S.F. Hous. Auth.*,
 164 F. Supp. 2d 1130 (N.D. Cal. 2001) ................................................................. 25

*Hunt v. Tektronix, Inc.*,
 952 F. Supp. 998 (W.D.N.Y. 1997) ........................................................................ 13

*Inland Mediation Bd. v. City of Pomona*,
 158 F. Supp. 2d 1120 (C.D. Cal. 2001) ................................................................... 8

iii

*Int'l Brotherhood of Teamsters v. United States*,
  431 U.S. 324 (1977) .......................................................................................... 8, 9, 11

*Keohane v. United States*,
  669 F.3d 325 (D.C. Cir. 2012) ................................................................................ 23

*Khan v. Jenkins*,
  No. 85-2252, 1987 WL 36862 (4th Cir. Mar. 19, 1987) ......................................... 19

*Knox v. Davis*,
  260 F.3d 1009 (9th Cir. 2001) ........................................................................... 22, 23

*Lawrence v. Norton*,
  No. 04-0203, 2006 WL 850878 (E.D. Wash. Mar. 28, 2006) ................................. 14

*Llamas v. Butte Cmty. Coll. Dist.*,
  238 F.3d 1123 (9th Cir. 2001) ................................................................................ 16

*Lowery v. Circuit City Stores, Inc.*,
  158 F.3d 742 (4th Cir. 1998) .................................................................................. 22

*Lyons v. England*,
  307 F.3d 1092 (9th Cir. 2002) ........................................................................... 21, 22

*McDonald v. Coldwell Banker*,
  543 F.3d 498 (9th Cir. 2008) .................................................................................. 10

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973) ................................................................................................. 8

*Meacham v. Knolls Atomic Power Lab.*,
  554 U.S. 84 (2008) ................................................................................................. 12

*Mondero v. Salt River Project*,
  400 F.3d 1207 (9th Cir. 2005) .................................................................................. 8

*Moskowitz v. Trs. of Purdue Univ.*,
  5 F.3d 279 (7th Cir. 1993) ...................................................................................... 23

*Nat'l R.R. Passenger Corp. v. Morgan*,
  536 U.S. 101 (2002) ............................................................................................... 21

*Novella v. Winchester Cnty.*,
  661 F.3d 128 (2d Cir. 2011) ................................................................................... 19

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

iv

*O'Loghlin v. Cnty. of Orange*,
    229 F.3d 871 (9th Cir. 2000) ........................................................................... 19, 21

*Oti Kaga Inc. v. South Dakota Hous. Dev. Auth.*,
    188 F. Supp. 2d 1148 (D. S.D. 2002) ....................................................................... 8

*Paige v. California*,
    291 F.3d 1141 (9th Cir. 2002) ................................................................................ 12

*Palmer v. United States*,
    794 F.2d 534 (9th Cir. 1986) ........................................................................... 11, 14

*S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*,
    690 F.2d 1235 (9th Cir. 1982) .................................................................................. 9

*Shaikh v. City of Chi.*,
    No. 00-4235, 2001 WL 123784 (N.D. Ill. Feb. 13, 2001) ...................................... 7

*Shea v. Rice*,
    409 F.3d 448 (D.C. Cir. 2005) ............................................................................... 21

*Smith v. City of Jackson*,
    544 U.S. 228 (2005) ................................................................................................ 17

*Sons v. McManis*,
    No. 08-0840, 2010 WL 3491514 (E.D. Cal. Sept. 3, 2010) ................................... 25

*Spaulding v. Univ. of Wash.*,
    740 F.2d 686 (9th Cir. 1984) .................................................................................. 12

*Stockwell v. City & Cnty. of S.F.*,
    749 F.3d 1107 (9th Cir. 2014) ................................................................................ 13

*Telesca v. Village of Kings Creek Condominium Ass'n*,
    390 F. App'x. 878 (11th Cir. 2010) ....................................................................... 23

*United States v. Balistrieri*,
    981 F.2d 916 (7th Cir. 1992) .................................................................................. 22

*Vitug v. Multistate Tax Comm'n*,
    88 F.3d 506 (7th Cir. 1996) .................................................................................... 17

*Wagner v. Taylor*,
    836 F.2d 578 (D.C. Cir. 1987) ............................................................................... 22

**Goodwin Procter LLP**
**601 S Figueroa Street, 41st Floor**
**Los Angeles, California 90017**

v

*Wards Cove Packing Co. v. Atonio*,
  490 U.S. 642 (1989)............................................................................. 14, 17

*Woodworth v. Bank of Am., N.A*,
  No. 09-3058, 2011 WL 1540358 (D. Or. Mar. 23, 2011) ...................................... 21


**California Cases**

*Perelman v. Deul*,
  No. B154293, 2002 WL 1797228 (Cal. Ct. App. Aug. 6, 2002) ........................... 24


**Federal Statutes and Regulations**

42 U.S.C. § 3601 .................................................................................................. 3

42 U.S.C. § 3613 .............................................................................................. 1, 6

42 U.S.C. § 3614 ................................................................................................ 22

12 C.F.R. Pt. 327 ................................................................................................. 7

12 C.F.R. § 203.4 ............................................................................................ 5, 16

24 C.F.R. § 203.17 ............................................................................................. 10

24 C.F.R. § 203.21 ............................................................................................. 10

24 C.F.R. § 203.24 ............................................................................................. 10

38 C.F.R. § 36.4310 ........................................................................................... 10

38 C.F.R. § 36.4311 ........................................................................................... 10


**California Statutes and Regulations**

Cal. Code Civ. Proc. § 339 ................................................................................ 24

**Goodwin Procter LLP**
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

vi

1   Bank of America is committed to fair lending, to serving the many diverse

2   communities that are part of the fabric of Los Angeles, and to helping make

3   homeownership possible for all, regardless of race or ethnicity.  In its Complaint

4   ("Compl.," ECF No. 1, ¶ 4), the City of Los Angeles nevertheless brazenly asserts that

5   Bank of America engaged in a decades-long "pattern and practice of lending

6   discrimination" alleged to consist first of making it too hard, and then too easy, and

7   then too hard again, for African-Americans and Latinos to obtain loans, and for being

8   given "predatory loans" at every turn.  The City brings this suit not to vindicate the

9   rights of those citizens, but to recover damages for itself.  The City's allegations are

10  not only inflammatory, they are categorically false.  But the Court does not need a

11  record going back decades to enter summary judgment here.  Defendants Bank of

12  America, N.A. (for itself and as successor-by-merger to Countrywide Bank, FSB) and

13  Bank of America Corp. ("Bank of America") are entitled to summary judgment

14  because the statutory claim is barred by the statute of limitations, and the common-law

15  claim is time-barred, too (or not even ripe).[1]

16  The Fair Housing Act ("FHA")—the basis for Count I—has a two-year statute

17  of limitations.  42 U.S.C. § 3613(a)(1)(A).  But the Complaint (filed December 6,

18  2013) focuses on events before 2008.  The City avoided a Rule 12(b)(6) dismissal by

19  arguing that Defendants committed a "continuing violation" (Compl. ¶ 196) and that

20  the City would muster "statistical data" and "confidential witnesses" to support its

21  allegations of lending discrimination within two years of the filing of the Complaint

22  (the "limitations period").  But discovery is now complete as to the limitations period,

23  and the City has no evidence of any discrimination whatsoever.  The confidential

24  witnesses have now executed sworn declarations affirming that they know *nothing*

25  about Bank of America's lending conduct in the limitations period.  And the data the

26  City promised would prove its theory now shows the exact opposite—that Bank of

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

---

[1] The other two Defendants, Countrywide Home Loans, Inc. and Countrywide Financial Corp., are separately moving for summary judgment because neither made any loans in the subject time period.  They join in this motion as alternative grounds for summary judgment.

America was a responsible and non-discriminatory mortgage lender throughout the period in question.

Because the City cannot show that there was any discrimination of any kind within the limitations period, there is nothing "continuing" and no "violation" to support the City's "continuing violation" theory.  Thus, the City's entire claim is time-barred and there is no issue for trial.

First, there is no "continuing" conduct.  The City brought suit alleging a decades-long "pattern or practice" by Defendants of making thousands of "predatory loans" that fell into eight categories: "[1] high-cost loans (*i.e.*, loans with an interest rate that was at least three percentage points above a federally-established benchmark), [2] subprime loans, [3] interest-only loans, [4] balloon payment loans, [5] loans with prepayment penalties, [6] negative amortization loans, [7] no documentation loans, and/or [8] ARM loans with teaser rates." Compl. ¶ 143.  But the record now shows six of these types of loans have not been made in the limitations period—they essentially vanished with the financial crisis—and there are almost no examples of the remaining two types.  Only nine (9) interest-only loans were made to African-Americans and Latinos during the limitations period, all nine to wealthy borrowers with incomes averaging over half a million dollars per year.  And only fifty-nine loans to minority borrowers meet the current, stricter federal definition of "high-cost," but forty-seven of those were for *investment properties* and thus not even covered by the Fair Housing Act, leaving only twelve (12) "high-cost" loans even arguably at issue.  Further, there is no evidence these loans were anything but properly priced, freely chosen loans.  Twenty-one loans, out of more than 15,000 loans originated by Defendants during this period—a total of about one-eighth of one per cent—are hardly evidence that Defendants continued a "pattern and practice" of making predatory loans into December 2011.

Second, the City also has no evidence that Defendants violated the FHA in the limitations period at all.  Knowing that the financial crisis and Defendants' own

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

2

policies ended the loan types on which the City based its Complaint, the City has been forced to dredge up new practices to complain about, and supplements its list of pre-2011 loan products by now criticizing federally insured loans (*i.e.*, FHA and VA loans) and home-equity lines of credit (HELOCs).  With that change, the City claims that since December 6, 2011, Bank of America made a grand total of 406 loans to minorities that were "discriminatory." But this change does the City no good.  There is no evidence that these 406 loans were more costly to African-American and Latino borrowers, or that minority borrowers were steered into taking them in lieu of cheaper products.  Statement of Undisputed Facts ("SUF") ¶¶ 55-57, 59.  Rather, most of the loans were refinances that benefited borrowers through interest-rate reductions, lower monthly payments, or both.  *Id*. ¶¶ 58, 65; *see also id.* ¶¶ 104-07.  On this record, there is no disputed issue of material fact that could support any finding of discrimination.

Further, the City cannot take advantage of any exception to the limitations bar due to its own conduct.  It is undisputed that the City was fully aware by 2007 (at the latest) of the facts on which it would base its Complaint, but it waited until December 2013 to sue, well past the time bar.

The City's claim in Count II, for unjust enrichment, fails as well.  The limitations period for this claim is also two years.  Moreover, as the City has now limited its cause of action only to seek recovery of future expenditures, any claim for unjust enrichment is not even ripe, as there has been no harm.

## **BACKGROUND**

The City's December 6, 2013 Complaint asserts a claim for violation of the FHA, 42 U.S.C. § 3601 *et seq.*, and a common-law claim for unjust enrichment. Compl. ¶¶ 197-208.  The City bases both claims on two different and mutually exclusive theories.  First, the City accuses Bank of America of "intentional discrimination on the basis of race" and "targeting" minority borrowers with certain types of "predatory loans." Compl. ¶¶ 143, 198.  Second (and contrarily), the City

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

ACTIVE/81588673.1

challenges a series of facially neutral policies that it claims had a "disproportionate impact on African Americans and Latinos" by giving them "less favorable" loan terms than "similarly situated whites." *Id.* ¶ 199. The City claims two types of damages. First, it contends it has been injured because the "predatory loans" led to residential foreclosures and vacancies, resulting in a drop in property values and a corresponding decrease in tax revenue. *Id.* ¶ 19. Second, the City believes it will suffer injury in the future because it "will" need to provide increased municipal services at affected properties. *Id.*; SUF ¶ 167.[2]

Bank of America moved for dismissal on February 19, 2014, arguing, *inter alia*, that the suit is barred by the statute of limitations. ECF No. 27-1 at 17-18. On June 12, 2014, this Court issued an opinion which reserved ruling on limitations issues until summary judgment. ECF No. 50.

The parties then reached an agreement to conduct discovery in stages. The first would be a "Limitations Phase" in which discovery would proceed exclusively as to "events occurring within the Fair Housing Act's two year statute of limitations or otherwise relevant to statute of limitations issues," to allow for an early summary judgment motion focused exclusively on this suit's timeliness. SUF ¶ 1.

Complying with the City's requests, Bank of America provided, among other things, (i) more than ten thousand pages of lending policies and procedures, encompassing policies on fair lending, regulatory compliance, loan pricing, underwriting, and employee compensation, as well as marketing materials and product guides for the loan types at issue; (ii) a deposition on FHA and VA lending practices; and (iii) detailed loan-level data to the City on all of the retail first-lien and HELOC mortgage loans it made to Los Angeles borrowers from the beginning of the limitations period to August 31, 2014—a total of 12,599 first-lien mortgage loans and 2,641 home-equity loans. *Id.* ¶¶ 2-3. As discussed below, and as set forth in the accompanying statement of undisputed facts, not a single policy, line of testimony, or

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

---

[2] The City originally sued to recover past municipal expenditures as well (*compare* Compl. ¶ 190), but it since has abandoned that aspect of its claim.

ACTIVE/81588673.1

data point reflected any evidence of discrimination.  To the contrary, all of it confirmed that Bank of America has substantial and stringent policies that prohibit many of the loan types the City complains about; that it requires full adherence to fair-lending principles, warning that it "will not tolerate discrimination on a prohibited basis in any aspect of the lending process"; and that its lending practices include formal, affirmative safeguards to insure that borrowers are offered alternative loan products from which to choose.  *Id.* ¶¶ 78-94.

Part of the parties' agreed procedure required the City to identify which of these 15,240 loans it believes were discriminatory.  SUF ¶ 15.  The City produced a list of 406 loans.  *Id.*  The City's methodology for assembling this list was simple: the City claims that every single loan made to an African-American or Latino borrower was discriminatory if it was called "interest only" (there were only 9), if it was defined as "high cost" for statistical purposes under the federal Home Mortgage Disclosure Act (there were 57),[3] if it was an FHA- and VA-insured loan (there were 264 of those), or if it was a HELOC (of which 76 were identified).  SUF ¶¶ 18-19, 21-28.  Bank of America's expert, Dr. Marsha Courchane, compared the terms of these loans to loans given to the City's non-Hispanic white borrowers during the same period and found no statistically significant difference in their cost, nor any evidence of their being offered in a discriminatory fashion.  *See* SUF ¶ 59.

The loan data also proved highly probative of the City's damages theories, which are based on allegations that borrowers go into foreclosure because the terms of their loans are unfair and that these foreclosures affect the City's tax base and anticipated (future) municipal-services spending.  Of the 12,599 first-lien loans given to Los Angeles borrowers in the discovery data set, 4,032 were made to African-

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

---

[3] Two loans were both FHA and "high-cost" and are reflected in the FHA total provided.  HMDA's implementing regulations require lenders to report data to the government on "the spread between [a] loan's annual percentage rate (APR) and a survey-based estimate of APRs currently offered on prime mortgage loans of a comparable type if the spread is equal to or greater than 1.5 percentage points for a first-lien loan. . . ." OCC Bulletin 2009-2 (SUF ¶ 52); *see also* 12 C.F.R. § 203.4(a)(12).  Before 2009, the threshold was 3%; that is the definition of high-cost loans used in the Complaint.  SUF ¶¶ 51-53; Compl. ¶ 143.

ACTIVE/81588673.1

American and Latino borrowers.  SUF ¶ 168.  As of August 31, 2014, only *two* of those borrowers' loans had been foreclosed.  *Id.* ¶ 14.  *Neither of these two borrowers had one of the four types of loans, and so were not among the 406 loans identified as discriminatory by the City.  Id.* ¶ 29.

## ARGUMENT

The Fair Housing Act provides that "[a]n aggrieved person may commence a civil action . . . not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A).  In a case like this, the claim accrues at the time of the making of a loan.  ECF No. 50 at 10.  As set forth below, Bank of America is entitled to summary judgment because there is no disputed issue of fact that would bear on whether Defendants engaged in discriminatory lending in the two years prior to suit.

The City maintains that its claims are timely on a "continuing violation" theory, which they express as an "unbroken eight year pattern and practice of issuing a variety of predatory mortgage loans to African-American and Latino borrowers residing within the City of Los Angeles" and a "pattern and practice of . . . imposing different terms and conditions" on minority borrowers.  ECF No. 36 at 12; Compl. ¶ 196.  What is at issue here is the very opposite of an "unbroken" practice: the loan types the City complains about terminated years ago, and, when it comes to the altogether-different types of loans made within the limitations period that the City challenges, there is no evidence of discrimination.

## I.   THERE WERE NO "PREDATORY" MORTGAGE LOANS MADE IN THE LIMITATIONS PERIOD.

The City's suit was untimely because the types of loans and loan products that it claims were predatory, and allegedly made to African-Americans and Latinos in a discriminatory manner prior to 2011, were not made within the limitations period. The Complaint defines the "predatory" loans as "high-cost loans (*i.e.*, loans with an interest rate that was at least three percentage points above a federally-established

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

6

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

benchmark), subprime loans, interest only loans, balloon payment loans, loans with prepayment penalties, negative amortization loans, no documentation loans, and/or ARM loans with teaser rates (*i.e.*, lifetime maximum rate > initial rate + 6%)." Compl. ¶143.  But there is no evidence that, on or after December 6, 2011, Bank of America made "predatory loans" to *anyone* in Los Angeles.  SUF ¶¶ 5-12.

In the wake of the country's financial crisis—well before 2011—Bank of America made a commitment not to make the type of loans that the City focuses on in its Complaint.  *Id.* ¶¶ 88-89.  It is undisputed that with but two exceptions, no loans in the challenged categories were offered or made by Bank of America in Los Angeles in the limitations period.  *Id.* ¶¶ 5-12.  The only two possible exceptions, from the 4,032 loans Bank of America made to African-Americans or Latinos in the City since December 6, 2011, were a grand total of nine (9) interest-only first lien loans and ten (10) first lien loans the Complaint defines as "high cost." *Id.* ¶¶ 18, 54.  Even the current, stricter definition for "high-cost" loans (*see* supra n. 3) yields only fifty-nine (59) loans, of which forty-seven (47) were for investment properties, not covered by the Fair Housing Act,[4] and fifty-one (51) were refinances that improved the terms of an existing loan.  *Id.* ¶¶ 48-49.  These exceptions do not constitute examples of discriminatory conduct, for there is no evidence that the few interest-only loans (all of which were made to wealthy borrowers; SUF ¶¶ 40-43) and the few "high cost" loans (no matter how they are counted) are discriminatory, or that they were anything like the "predatory loans" that the City contends were made before 2011.  *See id.* ¶¶ 5-12.[5] Simply making a loan to an African-American or Latino borrower does not violate the FHA, but that is what the City's theory boils down to—an absurd, and offensive, proposition.

---

[4] Because the FHA is concerned with the civil right to fair housing, not with "commercial venture[s]," it does not apply to investment properties.  *See, e.g., Home Quest Mortg. LLC v. Am. Family Mut. Ins. Co.*, 340 F. Supp. 2d 1177, 1186 (D. Kan. 2004); *Shaikh v. City of Chi.*, No. 00-4235, 2001 WL 123784, at *4 (N.D. Ill. Feb. 13, 2001).

[5] The City appears to object to HELOCs because they contain an interest-only repayment period (SUF ¶ 28), but HELOCs have that feature by definition (*see id.* ¶¶ 44-47; 12 C.F.R. Pt. 327, Subpt. A, App'x C (classifying a HELOC as an interest-only product)), and the City never challenged HELOCs on this basis in its pleading.

7

As there is no reason to infer that these few loans are discriminatory, there is likewise no basis for the City's contention that the alleged conduct of "predatory lending" continued into the limitations period.  And without evidence that the challenged conduct continued, there is no "continuing violation." *See infra* Part IV.

## II. THE CITY HAS NO OTHER EVIDENCE OF DISCRIMINATION WITHIN THE LIMITATIONS PERIOD.

In the absence of any evidence that Defendants continued to make "predatory" loans in the limitations period, the City contended in discovery that a total of 406 loans made in or after December 2011 were discriminatory.  Under either a disparate-treatment or a disparate-impact theory, however, there is no evidence to support this contention.  As a result, the two-year time bar requires the entry of summary judgment in Bank of America's favor.

### A. The City Has No Evidence of Disparate Treatment.

It is undisputed that the City has no direct evidence of discrimination.  The City cannot identify even a single case in which anyone at Bank of America refused to do business with a minority borrower on the same terms as any other borrower, sought to disadvantage a minority borrower, or made any derogatory statements about minority borrowers—the types of behavior that courts have previously recognized as direct evidence of discrimination.  *E.g.*, *Inland Mediation Bd. v. City of Pomona*, 158 F. Supp. 2d 1120, 1132 (C.D. Cal. 2001).

Without direct evidence that the defendant "expressly discriminated," a plaintiff can only defeat summary judgment through indirect evidence under one of the judicially recognized burden-shifting frameworks.  *Mondero v. Salt River Project*, 400 F.3d 1207, 1211 (9th Cir. 2005).  The framework of *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977), is the one applicable where, as here, the plaintiff alleges a pattern or practice of discrimination.[6] Under this framework, the City has the

---

[6] The familiar test of *McDonnell Douglas Corp. v. Green*, 411 U.S.  792, 802 (1973), does not apply in this case because the City does not satisfy the very first element of the test: as a municipality, the City does not "belong[] to a racial minority." *See also Oti Kaga Inc. v.*

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

ACTIVE/81588673.1

burden of showing (i) a "discriminatory motive," (ii) "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts," and (iii) "that racial discrimination was the [defendant]'s standard operating procedure—the regular rather than the unusual practice." 431 U.S. at 336. The evidence here does not even come close to creating a triable issue of disputed fact under *Teamsters*.

### 1. There Is No Evidence of a Discriminatory Motive.

"Proof of discriminatory motive is crucial to a disparate treatment claim." *Gamble v. City of Escondido*, 104 F.3d 300, 305 (9th Cir. 1997). The City has tried to evoke the requisite discriminatory motive from three sources: bank policies, confidential witness testimony, and loan data. As the discovery record now confirms, none of these offers even a scintilla of evidence of the requisite "intent . . . to discriminate." *Id.* at 306.

The Complaint contained plenty of allegations that Defendants purposely disadvantaged African Americans and Hispanics, including alleged "targeting of minority neighborhoods and customers for discriminatory practices and predatory pricing and products" and "engag[ing] in … traditional redlining." *See, e.g.,* Compl. ¶¶ 4, 11; SUF ¶ 76. None of this, of course, is actual *evidence* of discriminatory motive. Conclusory allegations of "targeting . . . minority loan applicants" and "refusing" to lend to minorities are bare "assertions" that cannot "manufacture a genuine issue of material fact." *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982).

Recognizing this, the City later singled out sixty-two (62) written policy documents that it claims are discriminatory or result in discriminatory loans. SUF ¶ 77. None of the 62 suggest that Bank of America intentionally treats borrowers differently on the basis of race or ethnicity. They say the opposite, expressly "prohibit[ing] discrimination in all aspects of the lending process." SUF ¶ 78. Nor can the City get by on the theory that policies giving "discretion" to individual bank

---

*South Dakota Hous. Dev. Auth.*, 188 F. Supp. 2d 1148 (D. S.D. 2002) (non-profit corporation could not use *prima facie* framework because it has no "race").

ACTIVE/81588673.1

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

employees somehow encouraged intentional discrimination by employees.  To proceed on this theory, the City must, at the very least, present evidence that the individual employees themselves acted with discriminatory intent—and it has none. *See McDonald v. Coldwell Banker*, 543 F.3d 498, 504-05 (9th Cir. 2008) (summary judgment appropriate where plaintiff "failed to produce any evidence establishing that" individual listing agents had a "discriminatory motive").

Next, the "confidential witnesses" the City alleged could support its claims now confirm they cannot.  Though the City touted nine witnesses in its Complaint, only two were alleged to have had any knowledge dating to within the limitations period, and both now admit they have nothing to say.  SUF ¶¶ 68-75.

That leaves only the loan data, which not only fails to support, but affirmatively rebuts, any claim of discriminatory motive.  Nearly two thirds of the 406 purportedly discriminatory loans are government-insured loans, which the City admits "are not inherently predatory." Compl. ¶ 86 & n.22.  As a matter of federal law, these types of loans lack the indicia that make a loan predatory under the City's theories—they are all fully amortizing loans processed and underwritten in accordance with guidelines promulgated by the federal government and do not impose balloon payments, pre-payment penalties, or teaser rates.  *See* 24 C.F.R. §§ 203.17(c)(2), 203.21, 203.24(a); 38 C.F.R. §§ 36.4310(a)-(b), 36.4311; HUD 4155.1 1.B.1, 4155.1 6.B.2.a, 4155.1 6.B.3.j, 4155.2 3.A.2.c.  Indeed, the government actively promotes these loans as affordable products for first-time homebuyers.  SUF ¶¶ 34-35.  The whole purpose of these programs is to reach "underserved borrowers and communities" and permit lenders to offer less costly loans and less restrictive credit requirements.  *See id.* ¶ 36. Making FHA or VA loans to underserved communities does not reflect predatory lending; it fulfills the very purposes of these programs.

The City has admitted as much by publicly touting the *benefits* of FHA and VA loans—repeatedly.  SUF ¶ 37.  In 2007, the City even adopted a resolution supporting federal legislation to expand lending on FHA loans, as a better option for "seniors and

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

10

minorities [who were] targeted by predatory lenders and given costlier loans even when they have qualified for loans with better terms." *Id*. The City cannot now claim in court that by making these loans Bank of America was discriminating against those very borrowers.

## 2. The Loan Data Evidences No Practice of Discrimination.

While statistical data can occasionally be used to "establish a general discriminatory pattern," *Diaz v. AT&T*, 752 F.2d 1356, 1363 (9th Cir. 1985), it is extremely rare that statistics alone will suffice to create a triable issue on a disparate-treatment claim. The Ninth Circuit has permitted plaintiffs to rely on statistical evidence to build a *prima facie* case only "[w]here gross statistical disparities can be shown." *Coral Constr. Co. v. King Cnty.*, 941 F.2d 910, 918 (9th Cir. 1991). Far from evidencing "gross statistical disparities," the loan data reflects no discriminatory patterns at all.

In the first place, 406 allegedly discriminatory loans out of more than 15,000 citywide, of which over 4,000 were to minorities, does not amount to the type of "gross statistical disparities" that could create a triable disparate-treatment case. The data set, on its face, does not support any conclusion that discrimination was Bank of America's "standard operating procedure—the regular rather than the unusual practice" since December 2011. *Teamsters*, 431 U.S. at 336.

Even if one looks only at the 406 loans in isolation—which is not the proper analysis—the data does not show any statistically significant disparity between the pricing received by African-American and Latino borrowers and the pricing received by similarly situated non-Hispanic whites. SUF ¶ 59. African Americans and Latinos also were no more likely to receive FHA or VA loans than similarly situated non-Hispanic whites. *Id*. ¶ 57. The City cannot make out a *prima facie* case absent "a stark pattern of discrimination unexplainable on grounds other than [a protected status]." *Palmer v. United States*, 794 F.2d 534, 539 (9th Cir. 1986). There is no such pattern here—not even close.

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

**B. The City Has No Evidence of Disparate Impact.**

The City's disparate-impact theory is equally unavailing.  To establish a *prima facie* case of disparate impact, the City must present evidence of (i) a facially neutral act or practice; (ii) significant adverse or disproportionate impact on persons of a particular type; and (iii) a causal connection between the act and the impact.  *Paige v. California*, 291 F.3d 1141, 1144-45 (9th Cir. 2002).  The City fails on each front.

**1.  The City Fails to Identify Specific Facially-Neutral Practices.**

Most of the purported practices the City challenges are not facially neutral at all.  "Targeting . . . minority loan applicants," "offering higher compensation for steering minority loan applicants into costlier loans," "refusing" to transact with "minority applicants," and "violating [a] fair lending policy" plainly entail various forms of intentional discrimination, not facial neutrality.  SUF ¶ 76.  Alleged policies of "providing unmonitored discretion to loan officers" and "abandoning a meaningful loan underwriting" review (*id.*) are also "claim[s] better presented under the disparate treatment model" because, at bottom, the theory is that a "lack of well-defined criteria" facilitated intentional discrimination.  *Spaulding v. Univ. of Wash.*, 740 F.2d 686, 709 (9th Cir. 1984); *see also Heagney v. Univ. of Wash.*, 642 F.2d 1157, 1163 (9th Cir. 1981) ("'impact' analysis is inappropriate," and plaintiff must "prove disparate treatment," where plaintiff alleges "subjective criteria . . . allowed a pattern or practice of discrimination to exist"); *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1436 (9th Cir. 1984) ("disparate treatment analysis" appropriate where "absence of objective . . . criteria" led to "intentional" discrimination).

To the extent the City tries to characterize the policies as facially neutral, the City still has no *prima facie* case.  For one thing, the supposed policies are defined too vaguely.  Allegations of "redlining" or "reverse redlining," or violating the bank's "own fair lending policy," fail to "isolate and identify the *specific* . . . practices that are allegedly responsible for any observed statistical disparities." *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 100 (2008) (quoting *Wards Cove Packing Co. v.*

12

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

1    *Atonio*, 490 U.S. 642, 656 (1989)); *see also Stockwell v. City & Cnty. of S.F.*, 749

2    F.3d 1107, 1114 (9th Cir. 2014) (requirement to challenge specific practices "has bite"

3    and is "not a trivial burden").

4         The only specific practices that emerged in discovery are the written Bank of

5    America policy documents singled out by the City, but their designation of a handful

6    of those as discriminatory does not add any flesh to its allegations.  For example, the

7    Complaint vaguely alluded to a "compensation policy" alleged to have "incentivized

8    loan officers to steer borrowers into predatory loans." Compl. ¶¶ 72, 98.  Bank of

9    America's policies in fact state firmly that "it does not have employee incentive

10   programs that could incent employees to inappropriately steer consumers to

11   nontraditional mortgages," and that loan officers are compensated based on the

12   *performance* of the loans they originate—which incentivizes them to make affordable

13   loans, not predatory ones.  SUF ¶¶ 95-99.  Other policies the City points to simply

14   state broad requirements or prohibitions, such as those outlining underwriting

15   standards.  *Id.* ¶¶ 77, 100-03.

16        Curiously, the City cites Bank of America's anti-discrimination and

17   underwriting policies *themselves* as discriminatory policies.  SUF ¶ 77.  What the City

18   probably intends to insinuate is that the policies were appropriate but individual

19   employees failed to follow them.  *Id.* ¶ 76.  That is not a disparate-impact claim.  *See*,

20   *e.g.*, *Hunt v. Tektronix, Inc.*, 952 F. Supp. 998, 1009 (W.D.N.Y. 1997) ("[P]laintiffs

21   do not allege that the policy itself, applied as written, causes a disparate impact.  They

22   allege that it is [defendant's] failure to follow the policy that causes a disparate

23   impact.  This too is nonsensical.  To the extent the plaintiffs assert that [defendant] has

24   diverged from the policy and used unauthorized criteria . . . , then their claim merges

25   with their disparate treatment theory. . . .").

26        The policies the City cites do not support a *prima facie* disparate impact case

27   for even more fundamental reasons: As shown below, there is no actual evidence of a

28

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

13

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

1  disparate impact during the limitations period, much less an impact linked to any

2  challenged policies.

3  **2. The Loan Data Show No Evidence of an Adverse, Disparate Impact.**

4  "Summary judgment is appropriate when statistics do not support a disparate

5  impact analysis," and thus the City cannot survive summary judgment without

6  affirmatively producing evidence that "outwardly neutral … practices" within the

7  limitations period had a "significantly adverse or disproportionate impact on persons

8  of a particular [type]." *Budnick v. Town of Carefree*, 518 F.3d 1109, 1118 (9th Cir.

9  2008). The evidence here shows no disproportionate impact—and even if there were,

10 there is no evidence that the particular policies challenged by the City are "responsible

11 for any observed statistical disparities." *Wards Cove*, 490 U.S. at 656. Merely

12 pointing to a laundry list of policies—without making any effort at all to link those

13 policies to actual loans—is not enough to state a *prima facie* case. *Palmer*, 794 F.2d

14 at 539 (summary judgment proper where statistics showed no "relationship" between

15 challenged practice and purported impact); *Escandon v. L.A. Cnty.*, 584 F. App'x 517,

16 519 (9th Cir. 2014) (summary judgment proper where plaintiff "provides no evidence

17 of a significant disparate impact that is the systematic result of a specific employment

18 practice") (internal quotation marks omitted).

19 The City cannot make any showing that there is a triable issue as to disparate

20 impact or causation. "The basis for a successful disparate impact claim involves a

21 comparison between two groups—those affected and those unaffected by the facially

22 neutral policy." *Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511, 519-20 (9th

23 Cir. 2011); *Lawrence v. Norton*, No. 04-0203, 2006 WL 850878, at *8 (E.D. Wash.

24 Mar. 28, 2006) ("With no comparison, there is no showing [minorities] . . . have been

25 more harshly affected by the complained of . . . practice than any other racial class. . .

26 ."). The record evidence of that comparison, Dr. Courchane's analysis, shows that

27 "[t]he pricing on the loans claimed discriminatory that were originated to African

28 American and Hispanic borrowers was not different and statistically significant when

14

compared to the pricing received by the non-Hispanic white borrowers with the same type of product." SUF ¶ 59.  Among the FHA/VA loans—the lion's share of the 406 at issue—African-American and Latino borrowers paid slightly *lower* rates than non-Hispanic whites.  *Id*.  ¶ 61.  After controlling for credit characteristics, African Americans and Latinos also paid less for HELOCs than non-Hispanic whites.  *Id.* ¶ 56.  In categories where African Americans and Latinos paid higher rates than non-Hispanic whites (on average), the difference was attributable to significant differences in credit scores.  *Id.* ¶¶ 60, 62.  Controlling for this, "African American and Hispanic borrowers pay no more for their loans than do similarly situated non-Hispanic whites." *Id.* ¶ 59.  Further, Bank of America did not charge origination fees on most of these loans, making them cheaper up-front than conventional loans.  *Id.* ¶ 38.

The City apparently intends to argue that despite receiving these loans on the same terms as other borrowers, African-Americans and Latinos were nevertheless disadvantaged by being "steer[ed]" into these four loan types "disproportionately." Compl. ¶ 166; SUF ¶ 76.  If this is the City's theory, there is no need for a trial.  As an initial matter, steering and product discrimination is a disparate *treatment* claim, not a claim of disparate *impact*.  And even if the City could somehow identify a neutral policy that resulted in steering, the evidence does not give any credence to a theory that minorities received worse loans than they would have received if they had been white.

Any contention that the 264 government-insured loans the City singles out were given disproportionately to minority borrowers is strange, as the entire point of the FHA program is to promote access to credit for "underserved borrowers and communities," and the City itself cited the interests of "seniors and minorities" in urging a significant expansion of FHA lending in the City.  SUF ¶¶ 36-37, 128.  It would therefore not be a great surprise if minorities did benefit from FHA loans in greater numbers than groups that have not been historically underserved.  But there is no evidence of it in any event; the data show that minorities "were not more likely to

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

receive government-insured loans than similarly situated non-Hispanic whites." SUF ¶ 57.  Nor can the City show that borrowers who received these loans would have received better pricing if they had obtained conventional loans instead.  Nearly all (95%) of Bank of America's government-insured loans were made to borrowers making a small down payment, who therefore became liable to pay government-mandated default insurance, the premiums for which are not retained by Bank of America.  *Id*. ¶ 39.  Mortgage insurance is also required for borrowers making small down payments on conventional loans, and so those same borrowers would have the same obligation had they not received an FHA or VA loan.  *See id*.  Taking the cost of mortgage insurance into account, these FHA and VA loans made by Bank of America were no more costly to borrowers than conventional mortgage loans would have been. *See id*.

The City likewise has no evidence that HELOCs were made disproportionately to African Americans or Latinos.  As an initial matter, the comparison necessary to support a disparate-impact claim is impossible because lenders are not required to collect or report race or ethnicity data for HELOCs, *see* 12 C.F.R. § 203.4(b)(2), and Bank of America did not collect it.  *See* SUF ¶ 169.  Further, the idea that HELOCs are predatory products that minority borrowers were "steered" into cannot withstand any scrutiny.  HELOCs are unique products, distinct from purchase loans as virtually all of them were made to borrowers who already owned their homes, had equity in them, and sought the HELOC in cash-out refinance transactions.  *Id*. ¶ 170.  The City cannot identify any other loan products that would have served this same function under better terms.

Finally, there is no evidence of a "significant *adverse* impact" on minorities who received interest-only or "high cost" loans, rather than other loans.  *Llamas v. Butte Cmty. Coll. Dist.*, 238 F.3d 1123, 1127 (9th Cir. 2001).  The nine interest-only loans at issue were *not* made disproportionately to African-American or Hispanic borrowers—172 of these loans were given to non-Hispanic whites—or in lieu of

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

16

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

'better' loans.  SUF ¶ 20.  The evidence is undisputed that these products were available only to well-qualified borrowers with high credit scores and significant asset reserves, and that the borrowers who obtained them were wealthy.  SUF ¶¶ 40-43.  The "high cost" loans were predominantly loans on investment properties, and there is nothing about the few others to suggest the loan was not freely chosen.  Indeed, Bank of America's practice is to present every borrower with several loan product choices (and for loan officers to attest that they had done so).  SUF ¶¶ 79-87.

Evidence of record that Bank of America makes fewer of the challenged loans than other lenders further negates any assertion of inappropriate product selection.  *See Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 513 (7th Cir. 1996) (comparison of defendant to "industry as a whole" a "proper basis for the initial inquiry in a disparate-impact case").  The proportion of African-American and Latino borrowers in Los Angeles who received FHA and VA loans from Bank of America is *lower* in comparison to other lenders.  SUF ¶ 63.  The same is true of the loans above the HMDA rate-spread threshold—only 1.6% of the loans made in the City from 2012 to 2013 to African-American or Latino borrowers were in this category, compared to 3.7% by other lenders.  *Id.* ¶ 64.  No reasonable factfinder could conclude that Bank of America's policies "steered" minority borrowers into government-insured and high-cost loans when the evidence shows that Bank of America's customers are *under*-represented among borrowers who received them.

Finally, whatever the claimed disparate impact, the City will not be able to establish that any particular policy caused the alleged disparity, a necessary element of the City's prima facie case.  "[T]he plaintiff is responsible for *isolating* and *identifying* the specific . . . practices that are allegedly responsible for any observed statistical disparities." *Wards Cove*, 490 U.S. at 656 (emphasis added); *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005); *accord Garcia v. Brockway*, 526 F.3d 456, 462 (9th Cir. 2008) ("[T]he Supreme Court has 'stressed the need to identify with care the specific [discriminatory] practice that is at issue.'").  An FHA plaintiff like the City needs to

17

1  isolate a neutral policy and show how it—rather than other things, or even chance—

2  caused the disparity.  The City has not done so.

3  **III. THE CITY CANNOT SHOW TIMELY INJURY.**

4       Separate from the question whether any of the 406 loans were discriminatory,

5  the City also has no evidence that any of these loans caused any injury to it.  The City

6  bases its entire case on the proposition that it was injured when discriminatory loans

7  went into foreclosure.  ECF No. 50 at 2; Compl. ¶¶ 166-67.  But the City has no

8  evidence that this occurred with any of the 406 loans at issue here.  As of August 31,

9  2014, the close of the data period that was the subject of discovery in the case, Bank

10  of America only foreclosed on *two* (2) loans made to African-American or Latino

11  borrowers during the limitations period, neither of which is among the 406 loans the

12  City challenges.  SUF ¶¶ 14, 29.  Consequently, it is undisputed that the City has not

13  been "aggrieved" by anything that happened within the statutory limitations period—

14  and it therefore cannot recover under the FHA.  42 U.S.C. § 3613(a)(1)(A).

15

16  **IV. THE CITY'S "CONTINUING VIOLATION" AND "PATTERN AND PRACTICE" THEORIES DO NOT NEGATE THE TIME BAR.**

17       The City cannot evade the limitations bar with the contention that the 406 loans

18  it identified within the limitations period, together with completely different varieties

19  of loans allegedly originated well before the limitations period (and long-since

20  terminated), are part of the same "pattern and practice" of discrimination and a

21  "continuing violation." *See*, *e.g.*, ECF No. 36 at 12.

22

23      **A. There Is No Continuing Violation Because the Conduct Challenged After 2011 Is Different from the Conduct Alleged Before That.**

24       The law does not recognize a continuing violation consisting of one set of

25  practices before the time-bar threshold and a different set of practices afterwards, tied

26  together only by a general assertion of discrimination.  The continuing violation

27  doctrine allows an FHA claim to include prior periods only if the identified

28  "discriminatory housing practice" in that prior period has not "terminated." The

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

18

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

doctrine is meant "to prevent a defendant from using its earlier illegal conduct to avoid liability for later illegal conduct of the same sort." *O'Loghlin v. Cnty. of Orange*, 229 F.3d 871, 875 (9th Cir. 2000).  But it still requires the later conduct to *be* "of the same sort" (*id.*) and "involve the same type of discrimination." *Berry v. Bd. of Supervisors*, 715 F.2d 971, 981 (5th Cir. 1983).[7]  So, for example, in the FHA context, the Supreme Court in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), applied the continuing-violation doctrine when the *same* unlawful "racial steering" practice was "manifested in a number of incidents." *Id.* at 367 n.1, 381; *see also Novella v. Winchester Cnty.*, 661 F.3d 128, 146 (2d Cir. 2011) (doctrine applies as to "separate violations of the same type").

As discussed above, the "predatory lending" practices that the City contends in its Complaint occurred a decade ago terminated more than two years before the City brought suit.  The alleged "predatory" loans then, and the more recent loans the City now attacks, are different types of loans and different types of conduct.  Indeed, it concedes government-backed loans are not inherently predatory, and it raised no concern in its Complaint about interest-only periods in HELOCs, interest-only loans made to wealthy borrowers, or "high cost" loans made to property investors.  Further, while the Complaint characterizes the earlier loans as ones where the fees and costs were inflated deliberately over loans that borrowers otherwise qualified for (Compl. ¶ 166), there is no evidence that the loans made in the limitations period are inflated in cost or that these borrowers qualified for better loans.[8]

---

[7] *Accord Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001); *Conn. Light & Power Co. v. Sec'y of U.S. Dep't of Labor*, 85 F.3d 89, 96 (2d Cir. 1996); *Khan v. Jenkins*, No. 85-2252, 1987 WL 36862, at *3 (4th Cir. Mar. 19, 1987).  The Ninth Circuit has declined to apply this principle only in the limited context of hostile-work-environment claims.  *See Fielder v. UAL Corp.*, 218 F.3d 973, 987 (9th Cir.  2000), *rev'd* 536 U.S. 919 (2002).

[8] The FHA/VA loans were no more expensive for minorities than for non-Hispanic whites, and no more expensive than conventional loans to either minorities or to non-Hispanic whites once insurance costs are accounted for.  SUF ¶ 39.  HELOC pricing was no different as between minorities and non-Hispanic whites.  *Id.* ¶ 56.  The same is true for the interest-only loans, all of which were made to wealthy borrowers—both minority and non-Hispanic white.  *Id.* ¶¶ 40-43.  Of the HMDA-reportable loans, only ten are "high cost" as the Complaint defines it—an interest rate 3% higher than a benchmark.  *Id.* ¶ 54.  The pricing on these loans is the same between minorities and non-Hispanic whites.  *Id.* ¶ 62.

19

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Absent a showing that the recent loans were discriminatory, and discriminatory in the same way and for the same reasons, the City cannot defeat summary judgment regardless of what it claims about earlier loans.  As the Ninth Circuit reasoned in finding FHA claims time-barred in analogous circumstances:

> We . . . reject [plaintiff]'s attempt to resuscitate its untimely allegations by recasting them as a "continuing violation" or as a "pattern-or-practice" of discrimination.  The Supreme Court's decision in *Havens Realty Corp. v. Coleman* establishes the contours of such claims under the FHA.  Under *Havens*, a party can meld untimely and timely acts into a single timely claim only if, at a minimum, the timely acts injure the same FHA-protected right as the untimely acts.  In this case, the untimely acts were . . . acts of discrimination against the putative residents of Fox Hollow . . . that injured [plaintiff] because it was deprived of revenue from Fox Hollow. . . . We . . . find no act of discrimination during the limitations period that injured [plaintiff].  We therefore conclude that [plaintiff] did not plead a timely "continuing violation" of the FHA or a timely "pattern-or-practice" claim.

*Alpha III, Inc. v. City of San Diego*, 187 F. App'x 709, 710-11 (9th Cir. 2006) (citations and footnotes omitted).

This Court should be mindful of the nature of the City's suit.  It contends that Defendants have positively ruined neighborhoods by making thousands of predatory loans leading to plunging property values.  Compl. ¶ 18.  Now that the evidence is in, the City is reduced to caviling over the terms and circumstances of a subset of loans that can be counted out on one's fingers—in a municipality with a million and a half residential housing units.  SUF ¶ 67.  There is no issue of fact for trial.

## B. The City Cannot Bring a "Pattern or Practice" Claim Based on Loans Outside the Limitations Period—Or Otherwise.

Even if it were appropriate to characterize every loan as part of a unitary "pattern or practice," the City's claims are still untimely. Every discriminatory loan is, by definition, a "discrete act" of discrimination which, this Court already concluded, gives rise to a claim (if any) on the day the loan closes. ECF No 50 at 10. Thus, each such loan constitutes a "separate actionable unlawful . . . practice" that must be challenged within the limitations period. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002); *see also, e.g.*, *Woodworth v. Bank of Am., N.A*, No. 09-3058, 2011 WL 1540358, at *15 (D. Or. Mar. 23, 2011) (FHA claim). In *Morgan*, the Supreme Court rejected the argument that "so long as one act falls within the [limitations] period, discriminatory . . . acts that are plausibly or sufficiently related to that act may also be considered for the purposes of liability." 536 U.S. at 114; *see also id.* at 112 ("discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period.").

While "pattern-or-practice" claims were not "at issue" in *Morgan*, courts since have repeatedly applied its reasoning to such claims.[9] Thus, regardless whether the City regards the 406 loans as 406 discrete acts of discrimination or as 406 examples of an underlying pattern or practice, the City still must build its case on acts and practices within the two-year period prior to its bringing suit.[10] As the Ninth Circuit has recognized, "[a] discriminatory practice, though it may extend over time and involve a series of related acts, remains divisible into a set of discrete acts, legal action on the basis of each of which must be brought within the statutory limitations period." *Lyons v. England*, 307 F.3d 1092, 1108 (9th Cir. 2002). A plaintiff's "assertion that this

---

[9] *E.g.*, *Shea v. Rice*, 409 F.3d 448, 456 (D.C. Cir. 2005); *Davidson v. AOL, Inc.*, 337 F.3d 1179, 1185-86 (10th Cir. 2003); *EEOC v. Freeman*, No. 09-2573, 2010 WL 1728847, at *4 (D. Md. Apr. 27, 2010).

[10] In *City of Los Angeles v. Citigroup Inc.*, 24 F. Supp. 3d 940, 952 (C.D. Cal. 2014), Judge Wright erroneously relied on *O'Loghlin* to conclude that all occurrences within a pattern were actionable so long as some occurrences happened within the limitations period. But *O'Loghlin* is inapposite to pattern cases—it dealt with serial acts, and *Morgan* thereafter narrowed the serial-acts doctrine to hostile-work-environment claims.

ACTIVE/81588673.1

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

series of discrete acts flows from a company-wide, or systematic, discriminatory practice will not succeed in establishing . . . liability for acts occurring outside the limitations period." *Id.* at 1107.

The City's pattern-or-practice theory is also foreclosed for an even more fundamental reason. The City has no right to sue under the FHA using a pattern-or-practice theory; only the Attorney General or a class-action plaintiff may do so. 42 U.S.C. § 3614(a) (Attorney General); *Havens*, 455 U.S. at 366 (class action). The Supreme Court and other courts addressing the analogous issue under Title VII—which is intended to be "interpreted consistently" with the FHA[11]—have explained that the reason for this is that the pattern-or-practice theory is intended to facilitate "an award of prospective relief to the class." *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 875-876 & n.9 (1984). Such a mechanism has no application here, where the City only seeks relief for itself, not the borrowers.

## V. THE CITY'S ACTUAL NOTICE OF ITS CLAIMS MORE THAN TWO YEARS BEFORE FILING SUIT BARS ITS CLAIMS.

The City's suit is also time-barred because it was aware of the asserted basis for its claims for years and did nothing to pursue them. At the Rule 12(b)(6) stage, this Court "reserve[d] ruling" on this issue to give the City "an opportunity to make an evidentiary submission as to the date of its discovery of the basis of its claim." ECF No. 50 at 11 n.9. The evidence now confirms prior notice bars the City's claim.

The continuing-violation doctrine is an equitable doctrine that can toll a statute of limitations to "permit the inclusion of acts whose character as discriminatory acts was not apparent at the time they occurred." *Knox v. Davis*, 260 F.3d 1009, 1014 (9th Cir. 2001). For this reason, actual notice is a relevant factor in deciding whether to grant the plaintiff the benefit of the doctrine, and courts have declined to do so where

---

[11] *United States v. Balistrieri*, 981 F.2d 916, 929 n.2 (7th Cir. 1992); *see, e.g.*, *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 150 (2d Cir. 2012); *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 965 (11th Cir. 2008); *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 761 (4th Cir. 1998), *vacated on other grounds*, 527 U.S. 1031 (1999); *Gilty v. Vill. of Oak Park*, 919 F.2d 1247, 1252 (7th Cir. 1990); *Wagner v. Taylor*, 836 F.2d 578, 592 n.94 (D.C. Cir. 1987).

"it would be reasonable to expect the plaintiff to sue before the statute expired."
*Douglas v. Cal. Dep't of Youth Auth.*, 271 F.3d 812, 824 n.13 (9th Cir. 2001); *accord Knox*, 260 F.3d at 1013-14 (doctrine inapplicable where plaintiff "had notice [outside limitations period] of all the wrongful acts she wished to challenge").[12]  "The FHA's statute of limitations begins to run as soon as 'facts supportive of the cause of action are or should be apparent to a reasonably prudent person,'" *Telesca v. Village of Kings Creek Condominium Ass'n*, 390 F. App'x. 878, 882 (11th Cir. 2010) (citation omitted), and the City admits it was fully aware of the facts on which it based this action long before it sued.

The City was fully aware that both Bank of America and Countrywide were making mortgage loans in the City since 2004.  SUF ¶¶ 120-21.  The City has been making public pronouncements that mortgage lenders were discriminating against minorities as far back as 2002.  *Id*. ¶¶ 113, 124.  In 2007, the City adopted a report discussing "efforts [to] protect[] potential home buyers from predatory lending practices, foreclosure activities, and the impact of sub-prime lending practices and foreclosures." *Id*. ¶ 126.  That report was based on the same allegations as this lawsuit—allegedly "abusive and unscrupulous practices" such as high-cost, negative amortization, balloon payment, and interest-only loans.  *Id*. ¶¶ 111, 127.  Further, the City expressly opined that these practices "targeted" minority borrowers, whom it alleged received "costlier loans even when they have qualified for loans with better terms." *Id*. ¶¶ 115, 128.

The City also has been blaming such discriminatory and predatory lending for "[t]he increase in foreclosures" since at least 2007.  *Id*. ¶¶ 130, 138.  And it has believed since at least that time that these foreclosures would "affect City property tax revenues." *Id*. ¶ 144.  In 2008, the City passed a resolution blaming "predatory lending" for a quadrupling of the number of foreclosures in California (*id*. ¶ 146), and

---

[12] *See also Hipp v. Liberty Nat.  Life Ins.  Co.*, 252 F.3d 1208, 1222-23 (11th Cir.  2001); *Cowell*, 263 F.3d at 295; *Keohane v. United States*, 669 F.3d 325, 329-30 (D.C.  Cir.  2012); *Moskowitz v. Trs.  of Purdue Univ.*, 5 F.3d 279, 282 (7th Cir.  1993).

ACTIVE/81588673.1

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

blamed mortgage delinquencies and foreclosures for lower tax revenue. *Id.* ¶¶ 133, 143-44.  In 2010, the City again opined that costly loans were responsible for a "foreclosure crisis in neighborhoods where a predominance [of] Latinos and African Americans lived." *Id*. ¶¶ 141, 149.  Again, this is the same theory asserted years later in this suit.  Compl. ¶ 175.

In 2011, a law firm solicited the City with a proposal to bring the instant FHA claim.  SUF ¶¶ 155-58.  In response, City Council members conceded that the City "has been dealing with those kinds of loans for years now." *Id*. ¶ 164.  Days after meeting with the Council, the law firm updated the City on a "settlement between Bank of America / Countrywide on the same issue" and advised: "[G]et going on this. The timing is now." *Id*. ¶¶ 165-66.  But still the City did not file this suit.

"The timing" has now passed.  All of the assertions the City makes in accusing Bank of America of discrimination now were apparent to it years ago.  The City should not be permitted to avail itself of an equitable exception to the statute of limitations where it could easily have sued before the statute expired.

## VI. THE CITY'S UNJUST ENRICHMENT CLAIM IS ALSO BARRED.

The City's unjust enrichment claim in Count II is time-barred as well.  As a quasi-contract claim, it is also subject to a two-year limitations period. *See* Cal. Code Civ. Proc. § 339; *Perelman v. Deul*, No. B154293, 2002 WL 1797228, at *3 (Cal. Ct. App. Aug. 6, 2002).Thus, the claim fails for the same reason as the FHA claim, as there is no evidence of discrimination within the two years prior to the City's suit.

But regardless of the limitations rule, or accrual principles, Bank of America is entitled to summary judgment on Count II for another reason of timing—as the City has recast its unjust-enrichment cause of action, the claim is not yet ripe.  As noted above, in discovery during this phase of the case, the City conceded that it "does not seek to recover damages for municipal services previously provided at any property at issue" and merely seeks "to recover damages for municipal service costs *to be incurred in the future* to remedy conditions which existed at properties that were

ACTIVE/81588673.1

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

foreclosed as a result of Defendants' discriminatory lending practices."  SUF ¶ 167 (emphasis added).  Courts have repeatedly held that such "anticipated" damages are not recoverable on an unjust-enrichment theory.  *See, e.g.*, *Honeywell, Inc. v. S.F. Hous. Auth.*, 164 F. Supp. 2d 1130, 1137 n.4 (N.D. Cal. 2001); *see also Sons v. McManis*, No. 08-0840, 2010 WL 3491514, at *8 (E.D. Cal. Sept. 3, 2010) (no claim for "intent to unjustly retain a benefit in the future").  Bank of America is therefore entitled to summary judgment on this cause of action, too.

## CONCLUSION

For the above-stated reasons, Bank of America respectfully requests that the Court enter summary judgment in its favor.

Respectfully submitted,

Dated: March 30, 2015            By:   /s/ Steven A. Ellis
                                       STEVEN A. ELLIS
                                       *sellis@goodwinprocter.com*
                                       LAURA A. STOLL
                                       *lstoll@goodwinprocter.com*
                                       **GOODWIN PROCTER** LLP

                                       THOMAS M. HEFFERON (pro hac vice)
                                       *thefferon@goodwinprocter.com*
                                       MATTHEW S. SHELDON (pro hac vice)
                                       *msheldon@goodwinprocter.com*
                                       **GOODWIN PROCTER** LLP
                                       901 New York Avenue NW
                                       Washington, DC 20001
                                       Tel.: 202.346.4000
                                       Fax.: 202.346.4444

                                       JAMES W. MCGARRY (pro hac vice)
                                       *jmcgarry@goodwinprocter.com*
                                       **GOODWIN PROCTER** LLP
                                       53 State Street
                                       Boston, MA 02109
                                       Tel.: 617.570.1000
                                       Fax.: 617.523.1231

                                       Attorneys for Defendants:
                                       BANK OF AMERICA CORPORATION
                                       and BANK OF AMERICA, N.A., for
                                       itself and as successor by merger to
                                       Countrywide Bank, FSB

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

25

**PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is: 601 South Figueroa Street, 41st Floor, Los Angeles, California 90017.

On **April 6, 2015**, I served the following documents by placing a true copy thereof in a sealed envelope(s) on the persons below as follows:

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE MOTION OF DEFENDANTS BANK OF AMERICA CORP. AND BANK OF AMERICA, N.A. (FOR ITSELF AND AS SUCCESSOR BY MERGER TO COUNTRYWIDE BANK, FSB) FOR SUMMARY JUDGMENT ON STATUTE OF LIMITATIONS**

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. I further certify that some of the participants in the case are not registered CM/ECF users. I have served the foregoing document(s) to the following non-CM/ECF participants:

| | |
|---|---|
| Michael N. Feuer | Counsel for Plaintiff: *City of Los Angeles* |
| City Attorney | |
| LOS ANGELES CITY ATTORNEY'S OFFICE | Tel. 213.978.8100 |
| City Hall East | Fax: 213.978.8785 |
| 200 North Main Street,  6th Floor | Mike.feuer@lacity.org |
| Los Angeles, CA  90012 | |

☐ By (MAIL).  I placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this firm's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at Los Angeles, California.

☑ By (OVERNIGHT DELIVERY) I deposited in a box or other facility regularly maintained by FedEx, an express service carrier, or delivered to a courier or driver authorized by said express service carrier to receive documents,  a true copy  of the foregoing document in sealed envelopes or packages designated by the express service carrier, addressed as stated above, with fees for overnight delivery paid or provided for.

I declare under penalty of perjury that I am employed in the office of a member of the bar of this Court at whose direction this service was made and that the foregoing is true and correct.

Executed on **April 6, 2015**, at Los Angeles, California.

| | |
|---|---|
| Jennifer Vosler | |
| (Type or print name) | (Signature) |

*Goodwin Procter LLP*
*601 S Figueroa Street, 41st Floor*
*Los Angeles, California 90017*

26

ACTIVE/81588673.1