STEVEN A. ELLIS (SBN 171742)
*sellis@goodwinprocter.com*
LAURA A. STOLL (SBN 255023)
*lstoll@goodwinprocter.com*
LEE I. SHERMAN (SBN 272271)
*leesherman@goodwinprocter.com*
**GOODWIN PROCTER LLP**
601 S. Figueroa Street, 41st Floor
Los Angeles, CA  90017
Tel.:  213.426.2500
Fax.:  213.623.1673

Attorneys for Defendants:
BANK OF AMERICA CORPORATION;
BANK OF AMERICA, N.A., for itself and as successor by merger to Countrywide Bank, FSB; COUNTRYWIDE FINANCIAL CORPORATION; and COUNTRYWIDE HOME LOANS, INC.

[ADDITIONAL COUNSEL LISTED IN SIGNATURE BLOCK]

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| CITY OF LOS ANGELES, a municipal corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS; and COUNTRYWIDE BANK, FSB,<br><br>        Defendants. | Case No. 2:13-cv-09046-PA-AGR<br><br>**REPLY IN SUPPORT OF MOTION OF DEFENDANTS BANK OF AMERICA CORPORATION AND BANK OF AMERICA, N.A. (FOR ITSELF AND AS SUCCESSOR BY MERGER TO COUNTRYWIDE FSB) FOR SUMMARY JUDGMENT ON STATUTE OF LIMITATIONS [DKT. 88]**<br><br>Date:      May 11, 2015<br>Time:     1:30pm<br>Courtroom: 15<br>Judge:    Hon. Percy Anderson<br><br>Complaint filed:  December 6, 2013<br><br>Filed concurrently with the following:<br>  1. Reply Separate Statement of Facts and Conclusions of Law;<br>  2. Response to Plaintiff's Evidentiary Objections;<br>  3. Evidentiary Objections; and<br>  4. Declaration of Matthew Sheldon |

ACTIVE/82295260.1

**Table of Contents**

Page

I. The City's Revision of its Theory Forecloses Any Issue of Fact. .................. 1

II. There Is No Triable Issue on the City's "Steering" Claims. ........................... 3

    A. There Is No Issue as to HELOCs. ......................................................... 3

    B. There Is No Issue as to the 6 Interest-Only Loans. ............................... 3

    C. There Is No Issue as to the 46 High-Cost Loans. ................................. 4

    D. There Is No Issue as to the 55 FHA/VA Loans. ................................... 6

    E. The Record Does Not Show a Material Issue for Trial. ....................... 9

III. The City's Claims Are Untimely ..................................................................... 9

IV. The City Has No Evidence of Damages .......................................................... 11

Conclusion ................................................................................................................. 12

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*AFSCME v. Washington*,
  770 F.2d 1401 (9th Cir. 1985) ............................................................................... 1

*Arevalo v. Hyatt Corp.*,
  No. 12-7054, 2013 WL 2042555 (C.D. Cal. May 13, 2013) ................................. 2

*Bjustrom v. Trust One Mortg.*,
  178 F. Supp. 2d 1183 (W.D. Wash. 2001) ............................................................ 7

*Caldwell v. Porch*,
  No. CV 12-3129, 2014 WL 1921013 (C.D. Cal. May 13, 2014) .......................... 2

*Capitol Mortg. Bankers, Inc. v. Cuomo*,
  222 F.3d 151 (4th Cir. 2000) ................................................................................. 7

*Chin v. Port Auth. of N.Y. & N.J.*,
  685 F.3d 135 (2d Cir. 2012) ................................................................................ 11

*City of Sausalito v. O'Neill*,
  386 F.3d 1186 (9th Cir. 2004) ............................................................................. 12

*Clearing House Ass'n v. Spitzer*,
  394 F. Supp. 2d 620 (S.D.N.Y. 2005) ................................................................. 12

*Coleman v. Quaker Oats Co.*,
  232 F.3d 1271 (9th Cir. 2000) ............................................................................. 12

*Colo. River Indian Tribes v. Town of Parker*,
  776 F.2d 846 (9th Cir. 1985) ............................................................................... 12

*Comm. Concerning Cmty. Improvement v. City of Modesto*,
  583 F.3d 690 (9th Cir. 2009) ............................................................................... 10

*Coral Constr. Co. v. King Cnty.*,
  941 F.2d 910 (9th Cir. 1991) ................................................................................. 1

*Davis v. D.C.*,
  949 F. Supp. 2d 1 (D.D.C. 2013) ...................................................................... 2, 3

**Goodwin Procter LLP**
**601 S Figueroa Street, 41st Floor**
**Los Angeles, California 90017**

*Douglas v. Cal. Dep't of Youth Auth.*,
  271 F.3d 812 (9th Cir. 2001) .................................................................................. 11

*Gamble v. City of Escondido*,
  104 F.3d 300 (9th Cir. 1997) .................................................................................. 11

*Garcia v. Countrywide Fin. Corp.*,
  No. 07-1161, 2008 WL 7842104 (C.D. Cal. Jan. 17, 2008) ................................... 1

*Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n*,
  508 F.3d 366 (6th Cir. 2007) ................................................................................... 2

*Hollis v. Chestnut Bend Homeowners Ass'n*,
  760 F.3d 531 (6th Cir. 2014) ................................................................................. 11

*Llamas v. Butte Cmty. Coll. Dist.*,
  238 F.3d 1123, 1127 (9th Cir. 2001) ....................................................................... 4

*Lyons v. England*,
  307 F.3d 1092 (9th Cir. 2002) ............................................................................... 11

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973) ................................................................................................ 8

*Miller v. Bank of Am., N.A.*,
  No. 01-1651, 2005 WL 1902945 (D.D.C. July 13, 2005) ...................................... 4

*Mitchell v. Citizens Bank*,
  No. 10-0569, 2011 WL 101688 (M.D. Tenn. Jan. 11, 2011) ................................. 4

*Nat'l R.R. Passenger Corp. v. Morgan*,
  536 U.S. 101 (2002) ......................................................................................... 10, 11

*O'Loghlin v. Cnty. of Orange*,
  229 F.3d 871 (9th Cir. 2000) ................................................................................. 10

*O'Regan v. Arbitration Forums, Inc.*,
  246 F.3d 975 (7th Cir. 2001) .................................................................................. 8

*Pac. Gas & Elec. Co. v. State Energy Res. Cons. & Dev. Comm'n*,
  461 U.S. 190 (1983) ............................................................................................... 12

*Telesca v. Village of Kings Creek Condo. Ass'n, Inc.*,
  390 F. App'x 877 (11th Cir. 2010) ......................................................................... 4

**Goodwin Procter LLP**
601 S Figueroa Street, 41st Floor
Los Angeles, California  90017

*United Air Lines v. Evans*,
    431 U.S. 553 (1977) .................................................................................... 9, 10

*Village of Bellwood v. Dwivedi*,
    895 F.2d 1521 (7th Cir. 1990) ............................................................................ 2

*Wards Cove Packing Co. v. Atonio*,
    490 U.S. 642 (1989) ............................................................................... *passim*

*Watson v. Ft. Worth Bank & Trust*,
    487 U.S. 977 (1988) ................................................................................. 3, 5, 7

*In re Wells Fargo Residential Mortg. Lending Discrimination Litig.*,
    No. 08-1930, 2010 WL 4791687 (N.D. Cal. Nov. 18, 2010) ............................... 4

*Woodworth v. Bank of Am., N.A.*,
    No. 09-3058, 2011 WL 1540358 (D. Or. Mar. 23, 2011) .................................. 11

**Federal Statutes**

42 U.S.C. § 3602(b) ..................................................................................................... 4

**Other Authorities**

12 C.F.R. § 1026.36(d)(1)(i)-(ii) ................................................................................. 9

CFPB, SMALL ENTITY COMPLIANCE GUIDE, 2013 LOAN ORIGINATOR
    RULE 30 (Jan. 13, 2014), *available at*
    http://files.consumerfinance.gov/f/201401_cfpb_complaince-
    guide_loan-originator.pdf ................................................................................... 9

Fed. R. Civ. P. 56(d) ................................................................................................... 2

U.S. Dep't of Housing & Urban Dev., SHOPPING FOR YOUR HOME LOAN:
    HUD'S SETTLEMENT COST BOOKLET 13 (2009) .................................................... 5

**Goodwin Procter LLP**
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

## I.  THE CITY'S REVISION OF ITS THEORY FORECLOSES ANY ISSUE OF FACT.

Bank of America's opening brief ("Mem.") established that this lawsuit is barred by the FHA's two-year statute of limitations because there is no evidence of discrimination within the limitations period. In its opposition ("Opp."), the City backs down from the bold accusations it made in its Complaint and now limits its theory to an assertion that a "small fraction" of minority borrowers received FHA/VA loans and two so-called "predatory" loan types instead of cheaper products. RSUF ¶¶ 218, 237.[1] The City's theory and supposed evidence do not raise either a factual or legal issue preventing the entry of summary judgment.

First, the City concedes it has no evidence of disparate-treatment discrimination within the limitations period. Opp. at 3. Defendants thus are entitled, at the very least, to summary judgment on any aspect of this suit that concerns alleged disparate treatment. *See*, *e.g.*, *Garcia v. Countrywide Fin. Corp.*, No. 07-1161, 2008 WL 7842104, at *11 (C.D. Cal. Jan. 17, 2008) (dismissing disparate-treatment theory while claim proceeds on disparate impact).

Despite the concession, the City tries to hold the door open for later by citing *AFSCME v. Washington*, 770 F.2d 1401 (9th Cir. 1985), for the asserted proposition that "statistical evidence may be probative of the discriminatory motive required to prove disparate treatment." Opp. at 3. *AFSCME* does not help the City. Statistical evidence only supports a disparate-treatment claim "[w]here gross statistical disparities can be shown," *Coral Constr. Co. v. King Cnty.*, 941 F.2d 910, 918 (9th Cir. 1991), and if there is "independent corroborative evidence of discrimination." *AFSCME,* 770 F.2d at 1407. Here, the City fails to show a triable issue on either front. First, the City's challenge to only 107 loans (RSUF ¶¶ 218, 237) out of over 4,032 made to minority borrowers and 12,599 citywide during the relevant period (SUF ¶ 168) is light years away from a "gross" disparity. Even the City's own expert, Ian Ayres, musters no more than the opinion that the conduct the City challenges

---

[1] "RSUF" refers to Defendants' responses to Plaintiff's Separate Statement of Facts.

"caused a small fraction of minority borrowers to be placed in different types of loans."  RSUF ¶¶ 218, 237.  A "small fraction" cannot be a "gross disparity," and the City provides no "independent corroborative evidence" of intentional misconduct in any event.[2]

The City asserts that it has evidence of a disparate *impact* within the limitations period, supported solely by Dr. Ayres' opinion that African Americans are statistically more likely to be sold FHA/VA loans and that Hispanics are statistically more likely to be sold "predatory" loans.  Opp. 13, 16.  But Prof. Ayres' statistics do not create a triable issue of fact, even if accepted at face value (which they should not be).  The City's claim that Defendants discriminated within the limitations period because loan officers were more likely to sell allegedly disadvantageous loan types to minorities is an allegation that Defendants steered minorities in their selection of loan products.  And "racial steering necessarily involves disparate treatment."  *Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n*, 508 F.3d 366 (6th Cir. 2007).[3]  Because the City has foreclosed itself from asserting a disparate-treatment claim, it has foreclosed itself from pursuing its case based on its "steering" theory.  Likewise, it has also foreclosed itself from pursuing its "pattern or practice" theory, because "the theory of a 'pattern-or-practice' case is that the observed disparities were caused by intentional discrimination."  *Davis v. D.C.*, 949 F. Supp. 2d 1, 9 (D.D.C. 2013).

---

[2] The City mentions in a footnote that it thought it could obtain evidence of disparate treatment from two "confidential witnesses," but the discussion is immaterial.  The City does not make any showing under FED. R. CIV. P. 56(d) as to these people.  The City's speculation as to what they may say in the future matters not at all, since it cannot carry its burden of opposing summary judgment "simply by raising a question, without any evidence," or through "mere speculation and conjecture."  *Caldwell v. Porch*, No. CV 12-3129, 2014 WL 1921013, at *8 (C.D. Cal. May 13, 2014); *Arevalo v. Hyatt Corp.*, No. 12-7054, 2013 WL 2042555, at *10 (C.D. Cal. May 13, 2013).

[3] As the Seventh Circuit reasoned in *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1533 (7th Cir. 1990), "either the defendants deliberately tried to alter their customers' preferences," or they didn't.  The former is a disparate-treatment claim, and the latter is no claim at all, because "honestly tr[ying] to serve those preferences," no matter how imbalanced the resulting "pattern," "d[oes] not violate the statute."  *Id*.

## II. THERE IS NO TRIABLE ISSUE ON THE CITY'S "STEERING" CLAIMS.

The Court need go no further than the above to enter summary judgment for Defendants. But even if one treats the City's steering allegations as cognizable under a disparate-impact theory, there is still no material fact dispute for trial.

### A. THERE IS NO ISSUE AS TO HELOCs.

The City originally challenged 76 home-equity lines of credit. SUF ¶ 27. The City has now abandoned this claim, as it does not even mention HELOCs in its brief, and its expert draws no conclusions about them. *See* SUF ¶ 56.

### B. THERE IS NO ISSUE AS TO THE 6 INTEREST-ONLY LOANS.

The City originally claimed that 9 interest-only ("I/O") loans were discriminatory. That number is now down to 6, as 3 of these loans were made to African-Americans and the City's own expert concedes that there is no evidence of a disparate impact on African-Americans for loans in this category—he says only Latinos were affected. RSUF ¶ 237. But the City offers no evidence that any of those 6 were discriminatory, because Dr. Ayres does not separately analyze them. Instead, he lumps them together with 46 "high cost" loans, labels the apples and oranges "Predatory Loans," and offers an opinion that Latinos obtain "Predatory Loans" at higher rates than "similar" non-Hispanic whites. *Id.*; Opp. at 14-15. But when the 6 I/O loans are analyzed *independently*, the City's disparate-impact theory is exposed as unsupported and absurd, since the undisputed evidence shows 172 I/O loans made to non-Hispanic whites. SUF ¶ 20; RSUF ¶ 237. In addition, the Latino borrowers obtaining these loans were well-off financially. SUF ¶¶ 41-43. Yet the policy the City points to as causing a "disproportionate issuance" of "predatory" loans to Latinos is a policy designed "to assist low-income borrowers." Opp. at 14. That policy plainly could not have impacted *these* 6 borrowers. A disparate-impact claim fails when the plaintiff cannot show that the asserted disparity was caused by the policy challenged. *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 657-58 (1989); *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 994 (1988).

### C. THERE IS NO ISSUE AS TO THE 46 HIGH-COST LOANS.

The other loans the City (conclusorily) calls "predatory" are those with interest rates above a threshold that makes them reportable under the Home Mortgage Disclosure Act ("HMDA"), a/k/a "high-cost" loans. *See* Mem. at 5. The City originally claimed 59 as discriminatory, SUF ¶ 23, but it has now cut that number down to 46 based on its expert's opinion that there is no evidence of a disparate impact on African-Americans, only on Latinos. RSUF ¶ 237.

The assertion that Defendants made high-cost loans disproportionately to Latinos does not present a triable issue. First, a substantial majority of the 46 loans are not subject to the FHA as a matter of law, and so irrelevant: 35 of these loans were for investment properties. RSUF ¶ 237. Courts have repeatedly held that the FHA does not apply to investment properties because the law's scope is limited to dwellings, 42 U.S.C. § 3602(b), not commercial assets. *See* Mem. at 7 n.4 (collecting cases); *see also*, *e.g.*, *In re Wells Fargo Residential Mortg. Lending Discrimination Litig.*, No. 08-1930, 2010 WL 4791687, at *2 (N.D. Cal. Nov. 18, 2010).[4] Dr. Ayres did not look at the set of *non*-investment, high-cost loans, but when they are excluded, there is no evidence of a disparate impact. RSUF ¶ 237. As a result, his analysis is not relevant to the issue of whether high-cost loans were extended in a discriminatory manner.

Second, even if the City's claims about "disproportionate issuance" (Opp. at 14) were taken at face value, that is not by itself sufficient to show an issue for trial about these loans. To defeat the motion, the City also carries the burden of (i) producing at least some evidence that Latinos were *disadvantaged* by these loans, *see Llamas v.*

---

[4] *Accord Mitchell v. Citizens Bank*, No. 10-0569, 2011 WL 101688, at *2 (M.D. Tenn. Jan. 11, 2011) ("Plaintiff has failed to state a claim under the FHA because he owned the property as a commercial venture."); *Miller v. Bank of Am., N.A.*, No. 01-1651, 2005 WL 1902945, at *6 (D.D.C. July 13, 2005) ("The FHA is inapplicable to this case because [plaintiff] used the properties for commercial purposes."); *compare Miller*, 2005 WL 1902945, at *6, *with Telesca v. Village of Kings Creek Condo. Ass'n, Inc.*, 390 F. App'x 877, 881 (11th Cir. 2010) (plaintiff had FHA claim because property was for "personal use," not a "mere investment property").

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

*Butte Cmty. Coll. Dist.*, 238 F.3d 1123, 1127 (9th Cir. 2001), and (ii) showing an actual, causal connection between the specific practices challenged and the alleged disparate impact. *Wards Cove*, 490 U.S. at 657-58; *Watson*, 487 U.S. at 994. The City fails to carry either burden.

The City makes only the barest effort to show that borrowers who received high-cost loans were disadvantaged by them. The sum total of its argument is: "These greater spreads strain borrowers' resources compared to non-predatory loans because their associated costs exceed the costs of more conventional mortgage products. Thus, I/O and High-Cost loans are disadvantageous to borrowers for a variety of reasons." Opp. at 14. The City has *no idea* whether this statement is true (and tellingly cites no evidence for it). The mere fact that a loan has a higher interest rate does not mean that it "exceed[s] the costs" of an alternative product, because the interest rate is just one of many factors in a loan's cost and may be higher as part of a trade-off that delivers closing credits or other benefits to the borrower up-front. *See*, *e.g.*, U.S. Dep't of Housing & Urban Dev., SHOPPING FOR YOUR HOME LOAN: HUD'S SETTLEMENT COST BOOKLET 13 (2009) ("Often, you can pay lower total settlement costs in exchange for a higher interest rate and vice versa."). Further, the City points to no evidence that any of these borrowers qualified for a different loan—or wanted one.[5] A tautological statement that higher-cost loans are more costly than lower-cost loans does not create a triable issue that Bank of America "[s]teer[ed] borrowers into loans that are less advantageous than loans for which they qualify." Compl. ¶ 166.

The City also fails to carry its burden of showing a triable issue on the requisite causal connection between the policies it challenges and the purported statistical disparity. *See Watson*, 487 U.S. at 994. The City attributes the alleged "disproportionate issuance" of high-cost loans to the asserted fact that "[d]uring the

---

[5] The undisputed evidence shows that Bank of America had policies requiring loan officers to present borrowers with a "range of products for which they are qualified," to "review the complete range" with the borrower, and to "attest" that they had done so before moving forward with any specific option. SUF ¶¶ 79-87. The City offers no evidence—none—that officers failed to follow these policies in any specific instance.

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

statutory period, BoA originated High-Cost loans in conjunction with the Neighborhood Assistance Corporation of America," whose "purpose is to assist low-income borrowers and those with poor credit to obtain loans." Opp. at 14 (citation omitted). But *none* of the loans the City challenges were originated in conjunction with NACA. RSUF ¶ 225. Plainly, then, there can be no "causal link" between NACA and the claimed "imbalances." *Wards Cove*, 490 U.S. at 658.

The remainder of the City's causation argument is even weaker: it attempts to draw the requisite causal connection by asserting that the Bank's "risk management policies failed to appropriately monitor relevant data to identify and correct the disproportionate issuance of . . . High-Cost loans to [Latino] borrowers." Opp. at 15. This turns the very concept of causation on its head—and is also circular. A statistical disparity cannot be *caused* by a failure to identify a statistical disparity. Further, there is no reason whatsoever why a "disproportionate issuance" of loans should need to be "corrected" unless that disproportion was caused by discrimination—and thus the City cannot *establish* it was caused by discrimination simply by claiming that it was not "corrected."

### D. THERE IS NO ISSUE AS TO THE 55 FHA/VA LOANS.

The lion's share of the loans the City originally put at issue in discovery were the 264 loans to minority borrowers insured by the FHA or VA. SUF ¶ 21. That number is now down to 55, as the City's expert concedes that the Latinos were no more likely to receive FHA/VA loans than similarly situated non-Hispanic whites. RSUF ¶ 218. This makes for a remarkable juxtaposition in the City's litigating position—that Defendants discriminate against one group, but not the other, for certain loans and discriminate in the reverse manner for a different type of loan.

Regardless, there is no triable issue of fact because there is no evidence that even a single borrower who obtained an FHA or VA loan was disadvantaged. While the City *argues* that "FHA/VA loans have higher costs to borrowers than conventional loans" (Opp. at 8), this general statement, even if it were true, does not help the City,

because one can only be disadvantaged if he or she had a choice and would have taken an alternative—yet the City fails to produce any evidence that even a single one of these 55 borrowers would have qualified for a conventional loan or would have preferred one. This is fatal. Given that the FHA/VA programs are designed, in part, to provide options to those not served by conventional loans, it was important for the City to show that the 55 borrowers qualified for something different. Further, the majority of the 55 were refinances of existing FHA/VA loans under special streamline refinance programs. Those borrowers could not have obtained a streamlined refinance *without* going through the government program, so the trier of fact could never assume that any one of them would have preferred a conventional loan. RSUF ¶ 218. And it is undisputed that the refinances delivered net economic benefits to the borrowers. SUF ¶¶ 58, 104-07.

But it is in the required causal connection between bank policies and the claimed disparate impact that the City's argument crumbles most spectacularly. The City claims a "disproportionate issuance of FHA/VA loans" to African-Americans as a result of three things—loan officer compensation policies, a loan "target market" policy, and allegedly inadequate monitoring of statistics. Opp. at 8-10. There is no evidence of causation, based on these policies or otherwise.

As an initial matter, there actually *is* no evidence on causation. While a plaintiff can sometimes show causation by pointing to a policy and then controlling for all other factors that could explain a disparity, the City here cites multiple, unrelated policies with no causal analysis. Thus, it fails to "isolate" the policy alleged to cause a disparity. *Watson*, 487 U.S. at 994; *Wards Cove*, 490 U.S. at 656.

And none of the policies help the City's case. "[P]olicies . . . targeting low to moderate income borrowers desiring a low down payment" for FHA loans (Opp. at 9) are not actionable, as *the whole point* of FHA loans is "to promote the availability of low and moderate income housing." *Capitol Mortg. Bankers, Inc. v. Cuomo*, 222 F.3d 151, 152 (4th Cir. 2000); *see also*, *e.g.*, *Bjustrom v. Trust One Mortg.*, 178 F. Supp. 2d

1  1183, 1188 (W.D. Wash. 2001).  It is hard to imagine a more "legitimate,
2  nondiscriminatory reason" than fulfilling an express Congressional mandate.
3  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

4        The City then attempts to show the requisite causal connection by claiming that
5  FHA/VA loans are "profitable" and "generate substantial revenues" for Bank of
6  America because of costs and fees required by HUD and the VA (Opp. at 2, 5-8)—an
7  argument that fails on its own terms because those costs and fees go to HUD and the
8  VA, not Bank of America.  *See* SUF ¶ 39.  Next, the City claims that Bank of
9  America's compensation policies "provide incentives to issue these higher cost
10 FHA/VA loans" because they allow a 97% loan-to-value ratio, compared to 95% for
11 conventional loans, and thus would allow a slightly higher loan amount.  Opp. at 8.
12 There are many reasons this theory falls apart, but two easily suffice to eliminate any
13 issue of causation for trial.  First, if the policy indeed incentivized officers "to
14 encourage borrowers into more expensive FHA/VA loans" (Opp. at 9), the incentive
15 would apply just the same if the borrower were white or Latino, and thus is legally
16 insufficient as a "causal link" to the purported impact on African-Americans.[6]  *Wards*
17 *Cove*, 490 U.S. at 658; *see also*, *e.g.*, *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d
18 975, 986 (7th Cir. 2001) (no disparate impact on women where policy applied the
19 same way to men).  Second, the theory breaks down just by doing the math.  The City
20 figures that the difference in amount lent for an FHA loan vs. a conventional loan is
21 $1,500 on a $100,000 home (Opp. at 9 n.5), which translates to between $4.50 and
22 $10.50 in extra commission income for the officer who allegedly pushed the FHA/VA
23 loan on the borrower.  *See* RSUF ¶ 192.  In its Complaint, the City confidently
24 asserted that Bank of America's "compensation structure imposed substantial pressure

---

[6] Likewise, the assertion that "BoA does not incur principal loss if a borrower defaults on an FHA loan" (Opp. at 6) is color-blind, and cannot serve as a "causal link" to the issuance of FHA loans more frequently to African-Americans than to similarly situated whites.

to close loans and maximize loan points." Compl. ¶ 118. That "substantial pressure" is now confirmed to be not even lunch money.[7]

The third alleged policy, failing to "correct" disparities, does not support the requisite causation showing for the same reasons discussed in Part II.C above.

### E. THE RECORD DOES NOT SHOW A MATERIAL ISSUE FOR TRIAL.

Bank of America is entitled to summary judgment for the independent reason that the City's showing, even setting its defects aside, simply does not contain material evidence of discrimination within the limitations period. As noted, during this time Bank of America made 12,599 loans in total, 4,032 to minority borrowers. The City is now claiming that no more than 107 evidence discrimination—a number which even their own expert volunteers is "a small fraction" of the population. The issue for this motion is whether there is a triable issue as to a "pattern or practice" of discrimination within the limitations period. Compl. ¶ 8. Bank of America submits that such a "small fraction" of loans does not a practice make.

## III. THE CITY'S CLAIMS ARE UNTIMELY.

The City concedes that if it cannot make out a prima facie case of discrimination within the limitations period, then its whole suit must be thrown out as untimely. Opp. at 19 n.8.[8] The City is wrong, however, to argue that a number as tiny as "one predatory loan . . . during the limitations period" is enough to open the floodgates on a limitless variety of loan types and alleged practices *before* the limitations period. *Id*. That is not how the continuing-violations doctrine works.

---

[7] Compensating loan officers based on loan amount has been blessed by the Consumer Financial Protection Bureau as a legitimate form of incentive compensation. *See* 12 C.F.R. § 1026.36(d)(1)(i)-(ii). In contrast, it would be *illegal* under the CFPB's regulations to do what the City would apparently prefer and incentivize loan officers to originate conventional loans in lieu of FHA/VA loans, or to vary the compensation as between the two to account for differences in loan volume. *See* CFPB, SMALL ENTITY COMPLIANCE GUIDE, 2013 LOAN ORIGINATOR RULE 30 (Jan. 13, 2014), *available at* http://files.consumerfinance.gov/f/201401_cfpb_complaince-guide_loan-originator.pdf (prohibition on "[v]arying compensation to a loan originator based on the 'product type'").

[8] *See also*, *e.g.*, *United Air Lines v. Evans*, 431 U.S. 553, 558 (1977) ("[T]he emphasis should not be placed on mere continuity; the critical question is whether any present *violation* exists.").

ACTIVE/82295260.1      9

For one thing, it is well-established that the doctrine only covers "conduct of the same sort." *O'Loghlin v. Cnty. of Orange*, 229 F.3d 871, 875 (9th Cir. 2000). This forecloses the City's position that it can resurrect stale "redlining" claims by making a case based on "reverse redlining," or that it can challenge any of the other loan types no longer at issue (like subprime, teaser-rate, and balloon-payment loans) based on totally different practices post-2011. Discrimination claims must be based on "specific . . . practices." *Wards Cove*, 490 U.S. at 656. If the practices at issue within the limitations period are limited to FHA/VA loans, I/O loans, and high-cost loans, then the only loans before the limitations period that can amount to a continuing violation are other FHA/VA, I/O, and high-cost loans. The City is wrong to insinuate that this Court previously held that a generic allegation that minorities were "disadvantage[d]" both before and after the limitations period is enough to make out a continuing violation as to a wide variety of practices. Opp. at 18. To the contrary, this Court found that the City had sufficiently pleaded a continuing violation because "[t]he Complaint specifies . . . the types of predatory loans" allegedly made during an "unbroken eight year pattern and practice." ECF No. 50 at 11. Now that the City admits that most of those loan types did *not* continue into the limitations period, that ruling furnishes no basis for finding claims challenging those loan types timely. The Court can grant summary judgment on this basis alone.

Loans outside the limitations period are not even actionable if they *are* the same type of loans as those subject to a timely challenge. The continuing-violation doctrine only permits recovery "for all discriminatory acts that occurred during the limitations period." *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 701 (9th Cir. 2009). "A discriminatory act" prior to that "may constitute relevant background evidence," but it has no other "present legal consequences" and cannot give rise to damages. *Evans*, 431 U.S. at 558.

The City attempts to evade this result by asking this Court to embrace the unprecedented proposition that *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101

Goodwin Procter LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017

(2002), and other Title VII cases, have zero pertinence to FHA claims. Opp. at 20. In fact, the Ninth Circuit has repeatedly held that "[w]e apply Title VII discrimination analysis in examining Fair Housing Act (FHA) discrimination claims," *Gamble v. City of Escondido*, 104 F.3d 300, 304 (9th Cir. 1997), and courts in this Circuit "look[] to *Morgan*" in analyzing FHA continuing violations claims. *E.g.*, *Woodworth v. Bank of Am., N.A.*, No. 09-3058, 2011 WL 1540358, at *13 (D. Or. Mar. 23, 2011). It makes perfect sense that "much of our FHA jurisprudence is drawn from cases interpreting Title VII," because both "employ similar language and are part of a coordinated scheme." *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 537 (6th Cir. 2014). And *Morgan* mandates the result that each loan is a discrete act, "legal action on the basis of each of which must be brought within the statutory limitations period." *Lyons v. England*, 307 F.3d 1092, 1108 (9th Cir. 2002); *see also*, *e.g.*, *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 157-58 (2d Cir. 2012).[9] Again, the Court can grant summary judgment on this basis alone.

## IV. THE CITY HAS NO EVIDENCE OF DAMAGES.

Finally, the City attempts to defeat summary judgment through a gut-overhaul of its damages theory. The City originally alleged it was an "aggrieved person" based on a "disproportionately high rate of foreclosure . . . in minority neighborhoods," costing the City tax revenue and "municipal services" expenses. Compl. ¶¶ 172-74. Then, the record evidence showed *zero* foreclosures on the challenged loans. In response, the City abandons its tax-and-services theories and claims that it was

---

[9] Separately, the City's claims are also time-barred based on its undisputed notice of the alleged facts years before it filed suit. The City's position that notice is "irrelevant" (Opp. at 22) does not accord with Ninth Circuit law, which acknowledges there is no "litmus test" but still considers notice relevant in deciding whether to apply the equitable continuing-violations doctrine. *Douglas v. Cal. Dep't of Youth Auth.*, 271 F.3d 812, 824 n.13 (9th Cir. 2001). Thus, the City finds itself feigning ignorance and insisting that its undisputed notice of its claims only amounts to notice against lenders in "general[]," not Bank of America in particular. Opp. at 23. This can hardly be taken seriously, inasmuch as notice encompasses both actual knowledge and whether a plaintiff "should have been aware," *Douglas*, 271 F.3d at 824 n.13, and even the least diligent investigation would have managed to confirm that the country's biggest mortgage lender, with branches, ATMs, and billboards all over Los Angeles, was making loans there.

aggrieved by suffering "injury to its interest in 'ensuring that [its] residents are free from housing discrimination.'" Opp. at 17. That is not an injury for which the City can sue, because municipalities "may not simply assert the particularized injuries to the 'concrete interests' of its citizens on their behalf." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1196 (9th Cir. 2004); *see also Colo. River Indian Tribes v. Town of Parker*, 776 F.2d 846, 848 (9th Cir. 1985) (cities "cannot sue as *parens patriae* because their power is derivative and not sovereign"); *Clearing House Ass'n v. Spitzer*, 394 F. Supp. 2d 620, 630-31(S.D.N.Y. 2005) (no FHA authorization for *parens patriae* actions), *aff'd in part and rev'd in part on other grounds*, 510 F.3d 105 (2d Cir. 2007), 557 U.S. 519 (2009).[10] And it is too late, in any event, for the City to rely on a new damages theory not pled in its Complaint. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1295 (9th Cir. 2000).

## CONCLUSION

Bank of America is entitled to summary judgment on limitations grounds. In the alternative, Bank of America respectfully submits that it is entitled to summary judgment at the very least on (i) the City's disparate-treatment theory, and/or (ii) any claims *not* based on either alleged steering of African Americans into FHA/VA loans or alleged steering of Latinos into I/O and "high-cost" loans.

Respectfully submitted,

Dated: April 27, 2015    By:    /s/ Steven A. Ellis
                                       STEVEN A. ELLIS
                                       *sellis@goodwinprocter.com*
                                       LAURA A. STOLL
                                       *lstoll@goodwinprocter.com*
                                       LEE I. SHERMAN
                                       *leesherman@goodwinprocter.com*

---

[10] On its unjust-enrichment claim, the City concedes the claim is based on harm that has not "occurred yet." Op. at 25. In response to case law *specific to unjust enrichment* holding that the claim does not cognize future harms (Mem. at 24-25), the City claims otherwise in reliance on inapposite dicta in *Pac. Gas & Elec. Co. v. State Energy Res. Cons. & Dev. Comm'n*, 461 U.S. 190 (1983), which addressed whether an energy resources law was preempted by the Atomic Energy Act, and which merely remarked that "impending" harm can justify "*preventive*" relief." *Id.* at 193, 201 (emphasis added).

**GOODWIN PROCTER LLP**

THOMAS M. HEFFERON (pro hac vice)
*thefferon@goodwinprocter.com*
MATTHEW S. SHELDON (pro hac vice)
*msheldon@goodwinprocter.com*
**GOODWIN PROCTER LLP**
901 New York Avenue NW
Washington, DC  20001
Tel.:  202.346.4000
Fax.:  202.346.4444

JAMES W. MCGARRY (pro hac vice)
*jmcgarry@goodwinprocter.com*
**GOODWIN PROCTER LLP**
53 State Street
Boston, MA  02109
Tel.:  617.570.1000
Fax.:  617.523.1231

Attorneys for Defendants:
BANK OF AMERICA CORPORATION and BANK OF AMERICA, N.A., (for itself and as successor by merger to Countrywide Bank, FSB)

**Goodwin Procter LLP**
**601 S Figueroa Street, 41st Floor**
**Los Angeles, California  90017**

# PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is: 601 South Figueroa Street, 41st Floor, Los Angeles, California 90017.

On **April 27, 2015**, I served the following documents by placing a true copy thereof in a sealed envelope(s) on the persons below as follows:

**REPLY IN SUPPORT OF MOTION OF DEFENDANTS BANK OF AMERICA CORPORATION AND BANK OF AMERICA, N.A. (FOR ITSELF AND AS SUCCESSOR BY MERGER TO COUNTRYWIDE FSB) FOR SUMMARY JUDGMENT ON STATUTE OF LIMITATIONS [DKT. 88]**

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. I further certify that some of the participants in the case are not registered CM/ECF users. I have served the foregoing document(s) to the following non-CM/ECF participants:

Michael N. Feuer
City Attorney
LOS ANGELES CITY ATTORNEY'S OFFICE
City Hall East
200 North Main Street, 6th Floor
Los Angeles, CA 90012

Counsel for Plaintiff: *City of Los Angeles*
Tel. 213.978.8100
Fax: 213.978.8785
Mike.feuer@lacity.org

☑ By (MAIL). I placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this firm's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at Los Angeles, California.

☐ By (OVERNIGHT DELIVERY) I deposited in a box or other facility regularly maintained by FedEx, an express service carrier, or delivered to a courier or driver authorized by said express service carrier to receive documents, a true copy of the foregoing document in sealed envelopes or packages designated by the express service carrier, addressed as stated above, with fees for overnight delivery paid or provided for.

I declare under penalty of perjury that I am employed in the office of a member of the bar of this Court at whose direction this service was made and that the foregoing is true and correct.

Executed on **April 27, 2015**, at Los Angeles, California.

Jen Vosher
[Type name]
(Type or print name)

_____
(Signature)

ACTIVE/82295260.1

1